## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN ACADEMY OF PEDIATRICS
345 Park Boulevard
Itasca, IL 60143,

   *Plaintiff,*

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue, S.W.
Washington, DC 20201,

HEALTH RESOURCES AND SERVICE
ADMINISTRATION
5600 Fishers Lane
Rockville, MD 20857,

CENTERS FOR DISEASE CONTROL AND
PREVENTION
1600 Clifton Rd.
Atlanta, GA 30329,

ROBERT F. KENNEDY JR., in his official
capacity as Secretary of Department of Health and
Human Services,
200 Independence Avenue, S.W.
Washington, DC 20201,

THOMAS J. ENGELS, in his official capacity as
Administrator of Health Resources and Service
Administration,
5600 Fishers Lane
Rockville, MD 20857,

JIM O'NEILL, in his official capacity as Acting
Director of Centers for Disease Control and
Prevention,
1600 Clifton Rd.
Atlanta, GA 30329

   *Defendants.*

Case No. 1:25-cv-4505

## COMPLAINT

## INTRODUCTION

1.  The American Academy of Pediatrics (AAP), the nation's preeminent professional organization for child health, is committed to improving the health of children, including through furnishing pediatricians and families with accurate, scientifically supported information.  In recent months, AAP's unwillingness to retreat from this commitment has brought it into conflict with the political leadership of the Department of Health and Human Services (HHS), which has advanced policies that AAP believes are detrimental to public health.  AAP has spoken out against these changes, even though AAP's advocacy has been met with targeted smears from HHS Secretary Robert F. Kennedy Jr. and other senior officials looking to discredit one of the agency's most prominent critics. HHS and its political leadership have retaliated against AAP for its evidence-based positions and unyielding advocacy in violation of the First Amendment.  In this suit, AAP challenges HHS's retaliatory actions, which not only irreparably harm AAP, but undermine the health and safety of all Americans by senselessly slashing programs that help pediatricians detect, prevent, and mange fatal and debilitating illnesses and conditions.

2.  On December 16, 2025, HHS's efforts to undermine and harm AAP escalated substantially when two distinct HHS subcomponents abruptly terminated nearly $12 million in federal awards to AAP.  These funds had been used for initiatives such as providing training and technical assistance to pediatricians in rural communities, the reduction of sudden unexpected infant death, the prevention of fetal alcohol spectrum disorders, and universal newborn hearing screenings.

3.  This coordinated attack to strip critical funds from AAP was not the result of a routine reappraisal of whether the terminated awards furthered agency priorities, conducted independently by Centers for Disease Control and Prevention (CDC) and Health Resources and Service Administration (HRSA) personnel, but was a decision from HHS leadership to punish AAP for its speech that

contradicted and criticized HHS's views on high-profile health policy issues.  HHS's action to punish AAP for its past speech and to chill future advocacy is a quintessential First Amendment violation.

4.    AAP has long been a prominent public voice on matters of child health policy and has been a particularly vocal advocate regarding pediatric vaccinations.  AAP is also a particularly sharp critic of recent radical changes to CDC's vaccination recommendations that were implemented at the behest of Secretary Kennedy—including by serving as lead plaintiff in litigation challenging recent changes to CDC's vaccine schedules.  As a result, AAP has recently drawn the ire of Secretary Kennedy and his allies.

5.    HHS officials have responded to AAP's public statements on high-profile health policy issues with vitriol.  Secretary Kennedy accused AAP of "malpractice" and "betray[ing] their oath to first do no harm" because of AAP's position on access to gender-affirming medical care.  And with respect to AAP's position on vaccines, Secretary Kennedy claimed that AAP is "gravely conflicted" and engaged in "a pay-to-play scheme to promote commercial ambitions of AAP's Big Pharma benefactors."  A top HHS advisor called AAP a "demonic force[]," exclaimed that it is "practicing evil," and accused it of "committing war on kids."  And several of Secretary Kennedy's handpicked vaccine advisors have repeatedly publicly criticized AAP and its positions on vaccines and gender-affirming medical care, calling AAP "morally wrong," "vaccine-fanatics" motivated by "[f]inancial interests," "[p]ersonal vendetta," or "[f]anaticism," and deserving to be "shamed and shunned."

6.    While these politicized attacks are inaccurate on their own terms, the terminated awards at issue here largely have nothing to do with these high-profile health policy issues.  Instead, the terminated awards supported more than a dozen AAP programs that furnish resources to medical providers and facilitate early detection and interventions for various pediatric diseases and conditions.  The affected AAP programs are collateral damage, cancelled not because they are associated with or

promote policies that the current administration opposes on their own terms, but merely because HHS wants to harm AAP for its advocacy.

7.      The award terminations are only explicable as retaliation for AAP's advocacy. HRSA and CDC tersely asserted that the programs no longer align with the agency's priorities. But there are numerous incongruities in both HHS subcomponents' respective justifications for the award terminations: the current administration had approved continued funding for the same programs mere months earlier; there was no advanced warning from program staff at any time that either agency had any concerns with the projects' alignment with their priorities; and, in many instances, AAP was just one of many awardees under a given program, sometimes working in partnership on the funded program with other awardees, yet it alone had its funding terminated.

8.      HHS's actions are unconstitutional. The First Amendment does not permit HHS to retaliate against AAP for its viewpoints or for having filed a lawsuit against the federal government. HHS's actions constitute *de facto* unconstitutional conditions on federal funding, in violation of the First Amendment and the Spending Clause of the U.S. Constitution. And they violate the Fifth Amendment's equal protection guarantee and the Administrative Procedure Act.

9.      Absent this Court's intervention, Defendants' unlawful actions will cause AAP real and immediate harm. AAP does not have other sources of grant funding to replace the federal awards, and without the necessary funds it must immediately terminate its work on its dozens of programs that save children's lives every day. Within a few weeks, AAP will have to begin laying off employees dedicated to this critically important work.

## JURISDICTION AND VENUE

10.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

11.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

12.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because at least one Defendant resides in this district.

## THE PARTIES

13.     Plaintiff American Academy of Pediatrics is the nation's premier professional organization for child health and serves as an independent forum for improving the health of all children.  The AAP's membership includes 67,000 pediatricians, with members in every state in the country who currently provide direct care to infants, children, adolescents, and young adults in both hospital and outpatient settings.

14.     Defendant U.S. Department of Health and Human Services is a federal agency headquartered in Washington, DC.

15.     Defendant Health Resources and Service Administration is a federal agency subcomponent of the U.S. Department of Health and Human Services.  HRSA is headquartered in Rockville, Maryland.

16.     Defendant Centers for Disease Control and Prevention is a federal agency subcomponent of the U.S. Department of Health and Human Services.  CDC is headquartered in Atlanta, Georgia.

17.     Defendant Robert F. Kennedy Jr. is the Secretary of the U.S. Department of Health and Human Services.  He is sued in his official capacity.

18.     Defendant Thomas J. Engels is the Administrator of the Health Resources and Service Administration.  He is sued in his official capacity.

19.     Defendant Jim O'Neill is the Acting Director of the Centers for Disease Control and Prevention. He is sued in his official capacity.

## BACKGROUND

### I. Congressional Appropriations for Helping Fund Essential Public Health Initiatives

### A. HHS's grant authority and process

20.     Congress saw fit to provide HHS with broad authority to supply federal grants that protect and advance the national health. The terminated awards at issue here were authorized by the Public Health Service Act, 42 U.S.C. §§ 201 *et seq.*, which authorizes various federal grants for public health initiatives, funding programs for preventive care, health center operations, health workforce training, substance abuse/mental health research, and more; the Social Security Act, 42 U.S.C. § 701(a)(2), which authorizes funds to improve the health of all mothers and children, including by reducing infant mortality and the incidence of preventable diseases and handicapping conditions among children; and the Early Hearing Detection and Intervention Act, 42 U.S.C. § 280g-1, which authorizes funds to develop statewide newborn, infant, and young child hearing screening, evaluation, diagnosis, and intervention programs and systems, and to assist in the recruitment, retention, education, and training of qualified personnel and health care providers (including, as appropriate, education and training of family members).

21.     Pursuant to these and other authorities, HHS has funded numerous essential projects intended to improve public health over past decades. For example, in 2025, CDC awarded $2.7 billion in grant funds.[1] The same year, HRSA awarded $10.7 billion in grant funds.[2]

---

[1] Tracking Accountability in Gov't Grants Sys., *Grants by OPDIV*, Dep't of Hum. and Health Servs. (Dec. 24, 2025), https://perma.cc/F2JH-4K29.

[2] *Id.*

22.     HHS grants are awarded through a highly competitive application process.  As relevant here, initially, the agency will issue a notice of funding opportunity (NOFO) that lays out the requirements for applicants to meet, the agency's goals and objectives for the award, and specific criteria for scoring applications.  The NOFO goes through several layers of review on the agency side before it is published.  The agency then conducts an extensive review of the applications submitted. An agency may rely on external reviewers who are experts in the subject area, in addition to their own internal reviewers.  Relying on the rubric set out in the NOFO, the agency then decides who has the top scores to be awarded funding.  If an applicant is successful, the agency issues an award letter, which includes relevant information such as the terms and conditions of the award.

23.     Grant awards generally have multi-year terms.  However, awards are generally funded on an annual basis and an award of a grant is not a guarantee that the agency will continue to fund the grant for the entirety of the multiyear period contemplated in the initial award.  Rather, an awardee must submit an annual continuation application to continue receiving funds.  While continuation of funding applications are not competitive insofar as other entities are not vying directly for the same grant funds, the awardee must still persuade the agency to continue funding the grant.  Particularly after a change in presidential administration, grantees may be expected in their continuation applications to propose programmatic shifts in response to changed agency priorities.  These changes are often made in consultation with, or at the direction of, the agency's liaison responsible for the grant.

### B.  AAP current projects and HHS funding

24.     AAP has received a number of HHS grants over the past several decades, including from HRSA and CDC, to fund essential child health initiatives.  Until now, never in its history had an AAP award of federal funding for which AAP was prime ever been terminated.  Nor had AAP ever been found to be in noncompliance with the conditions of any award.

25.    At issue here are seven federal awards that fund more than a dozen of projects across a range of issue areas such as to reduce sudden unexpected infant death, improve rural access to pediatric care, address youth and adolescent mental health, support children with birth defects, identify autism earlier, identify newborns and infants who are deaf and hard of hearing, and prevent fetal alcohol spectrum disorders.  AAP has six other active HHS awards that have not been terminated as of the date this complaint was filed.  However, the terminated awards make up nearly two-thirds of AAP's total federal award funding.

26.    To receive the HRSA and CDC awards, AAP spent weeks or even months to develop application packages responsive to the NOFO published by the agency for each award.  AAP submits information about its background and expertise in the area; the goals, objectives, and activities proposed to achieve the outcomes outlined by the federal agencies; logistical details about how the project will be staffed, and which partners will be part of the project.  In addition, budgetary information is submitted that is consistent with the resources needed to complete the project. Applications usually also include letters of support from other organizations to highlight the benefits of AAP's proposal.  At the end of the process outlined above, HRSA and CDC selected AAP to receive the awards at issue.

27.    The AAP has dozens of employees directly funded in whole or in part by recently terminated CDC or HRSA awards, and has additional employees indirectly funded by these awards. Those staff members administer and operationalize the projects, provide fiscal management, and focus their day-to-day activities on managing the projects.

28.    AAP remains in close communication with agency liaisons throughout the lifespan of a federal award.  Agency liaisons may ask AAP to adjust an area of focus or to revise the budget to align with changing agency priorities.  During the COVID-19 pandemic, for example, agency priorities

shifted rapidly, and AAP was routinely in communication with agency liaisons to modify work plans and activities as needed.

29.     Following the change of presidential administration in January 2025, AAP worked closely with agency program staff to ensure its projects and continuation applications conformed to the priorities and preferred terminologies of the new administration.

30.     AAP also took many steps to ensure that its work and its sub-awardees' work was fully compliant with all of the new administration's executive orders until the terminations.  AAP even paused work on some projects in this period to align with directives provided by the agency's program officers.

31.     AAP's continuation of funding applications for each of the seven recently terminated grants were approved during the current Trump administration.  The earliest was issued in April 2025. Four of the continued funding approvals were issued as recently as three months ago, in September 2025.

32.     AAP's seven terminated awards include the following:

    a.  **CDC Award 1:** *Enhancing Partnerships to Address Birth Defects, Infant Disorders, and Related Conditions, and the Health of Pregnant and Postpartum People.*  CDC awarded AAP a grant to fund multiple projects under this proposal from September 30, 2023, to September 29, 2026.  CDC awarded AAP $8,785,000 in September 2025 to: protect infants and children from emerging threats; improve immunization support and communication; develop standards to improve the quality and consistency of newborn care delivered across the United States; strengthen national capacity to improve early identification and intervention for developmental delays and disabilities among young children; strengthen pediatricians' knowledge and skills in supporting children with Tourette Syndrome

and ADHD; build capacity for substance use prevention in pediatric and perinatal care; build capacity for relational health and trauma-informed care; improve outcomes related to perinatal health and substance use; improve clinical and public health outcomes for infants and children with birth defects, infant disorders, and related conditions; improve early diagnosis and management of chronic disabling conditions; strengthen awareness of congenital heart defects among healthcare clinicians; and support the Congenital Heart Public Health Consortium.  At the time of the termination, approximately $7,876,408 remained of the award.

b.  **CDC Award 2:** *Category C: Pediatric Healthcare Clinicians.*  CDC awarded AAP a grant to fund multiple projects under this proposal from August 1, 2024, to September 29, 2029.  CDC awarded AAP $1,100,001 in July 2025 to: strengthen pediatricians' capacity to support national and state public health infrastructure; strengthen food allergy resources in schools and out-of-school time; reduce stigma around mental health topics; and build awareness about pediatric sepsis.  At the time of the termination, approximately $1,042,610 remained of the award.

c.  **CDC Award 3:** *National Partnerships to Address Prenatal Alcohol and Other Substance Use and Fetal Alcohol Spectrum Disorders.*  CDC awarded AAP a grant to fund this project from April 1, 2023, to September 29, 2026.  CDC awarded AAP $308,750 in August 2025 to fund a program to address the knowledge, self-efficacy, and capacity of pediatricians to work with public health organizations that make up the systems of services for families living with substance use and children with fetal alcohol spectrum disorders.  At the time of the termination, approximately $409,153 (including carryover from a prior year) remained of the award.

d. **HRSA Award 1:** *Telehealth Technology-Enabled Learning Program.* HRSA awarded AAP a grant to fund this project from September 30, 2021, to September 29, 2026. HRSA awarded AAP $475,000 in July 2025 to support the National Rural Adolescent and Child Health ECHO Training Center, which provides training, technical assistance, and community building to pediatricians and other healthcare providers in rural communities, where children face unique and unmet health needs. At the time of the termination, approximately $408,498 remained of the award.

e. **HRSA Award 2:** *Comprehensive Systems Integration for Adolescent and Young Adult Health.* HRSA awarded AAP a grant to fund this project from September 1, 2023, to August 31, 2028. HRSA awarded AAP $1,500,561 in July 2025 to support a program that increases the capacity of states, territories, and tribal organizations to promote adolescent health and young adult health and well-being. At the time of the termination, approximately $1,698,360 (including carryover from a prior year) remained of the award.

f. **HRSA Award 3:** *Universal Newborn Hearing Screening.* HRSA awarded AAP a grant to fund this project from April 1, 2024, to March 31, 2029. HRSA awarded AAP a total of $302,224 in March 2025 and July 2025 to support a project that aims to enhance the confidence and training of healthcare professionals involved in screening, diagnosing, and providing services to infants, children, and families within the Early Hearing Detection and Intervention System. At the time of the termination, approximately $146,354 remained of the award.

g. **HRSA Award 4:** *Safe Infant Sleep Systems Integration Program.* HRSA awarded AAP a grant to fund this project from July 1, 2022, to June 30, 2025, and in August

2025, extended the award with funds until 2026. HRSA awarded AAP a total of $1,000,000 in June 2024 and August 2025 to support a project that aims to reduce rates of sudden unexpected infant death (SUID) by connecting families with educational and awareness resources and building families' capacity to practice safe infant sleep. At the time of the termination, approximately $348,714 remained of the award.

## II. HHS's Targeted Retaliatory Actions against AAP

### A. AAP advocates for public health positions that contradict HHS's views

#### 1. *Pediatric vaccinations*

33.     AAP has been consistently vocal about its evidence-based support for pediatric immunizations for COVID-19, influenza, measles, mumps, rubella, varicella, respiratory syncytial virus, hepatitis B, and others, and has publicly opposed HHS's contradictory positions.

34.     Secretary Kennedy is widely known for his decades-long history of promoting anti-vaccine views that depart from the generally accepted scientific consensus.[3] He frequently questions the efficacy and safety of vaccines, in particular mRNA technology, which helped develop coronavirus vaccines during the pandemic.[4] In June 2025, Secretary Kennedy fired the 17 sitting members of the CDC's Advisory Committee on Immunization Practices (ACIP), an advisory committee that helps set vaccine policy and recommendations, and installed his own picks as their replacements.[5] HHS's spokesperson defended the decision, stating without evidence that: "[t]he old ACIP members were

---

[3] Jamie Ducharme, *RFK Jr. Denied He Is Anti-Vaccine During His Confirmation Hearing. Here's His Record*, TIME (Jan. 29, 2025), https://perma.cc/E4QV-UPJG.

[4] Kamin Gock, *Measles outbreak in US prompts questions over Robert F Kennedy Junior's mixed messages on vaccination*, ABC (Aug. 11, 2025), https://perma.cc/699X-C4UP.

[5] Maria Godoy, *RFK Jr. replaced everyone on the CDC's vaccine panel. Here's why that matters*, NPR (June 13, 2025), https://perma.cc/XM6G-MP24.

plagued by conflicts of interest, influence, and bias."[6]  In August, AAP was notified that it was no longer permitted to serve on ACIP's subcommittees.[7]

35.     Since then, ACIP has demonstrated its distrust of vaccines and voted to no longer recommend certain vaccinations for certain populations.  ACIP released plans to look at the timing and order of vaccines for children and the safety of vaccine ingredients, even though these issues have been studied extensively and monitored continuously.[8]  In September, ACIP voted to no longer routinely recommend COVID-19 vaccinations.[9]  This month, ACIP voted to recommend ending universal vaccination at birth for hepatitis B with subsequent sign off from CDC leadership.[10]

36.     AAP nevertheless continued to recommend COVID-19, hepatitis B, and other vaccines that ACIP no longer routinely recommends.[11]  For the first time in 30 years, AAP published vaccine recommendations that significantly depart from the federal government's guidance.  And AAP consistently speaks out against the administration's anti-vaccine stance.  For example, Sean O'Leary, a physician who heads the AAP's infectious-diseases committee, said in response to HHS's COVID-19 vaccine policy: "The majority of what we've seen from the secretary has been a pretty clearly

---

[6] Brenda Goodman, *HHS further constrains certain vaccine advisers to the CDC, limiting their input in evidence reviews*, CNN, (Aug. 1, 2025), https://perma.cc/2HCR-C22W.

[7] *Top medical organizations kicked out of CDC vaccine recommendations process call decision "dangerous,"* CBS News, (Aug. 4, 2025), https://perma.cc/FSW9-YP7W.

[8] Melissa Jenco, *ACIP work group to look at timing of childhood vaccines, ingredients*, Am. Acad. of Pediatrics, (Oct. 15, 2025), https://perma.cc/5RLZ-HABQ.

[9] Will Stone et al., *CDC vaccine panel adds new rules for getting the COVID vaccine in a tense meeting*, NPR, (Sep. 19, 2025), https://perma.cc/4TQV-B4ME.

[10] Tim Röhn, *This vaccine adviser to RFK Jr. has some choice words for his critics*, Politico, (Dec. 14, 2025), https://perma.cc/4GHA-27AU.

[11] Press Release, *The American Academy of Pediatrics Releases Its Own Evidence-Based Immunization Schedule*, Am. Acad. of Pediatrics (Aug. 19, 2025), https://perma.cc/YMS9-7XYL.

orchestrated strategy to sow distrust in vaccines. We make our recommendations based on what's in the best interest of the health of children."[12]

37.    In July, AAP filed a lawsuit challenging HHS's changes to the COVID-19 vaccine policy—made without any citation to scientific evidence—and decision to fire ACIP's members. *See Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass.). On December 17, the day after HHS terminated AAP's grants, there was a hearing on the government's motion to dismiss AAP's lawsuit.

2.    *Gender-affirming care*

38.    AAP supports access to gender-affirming care and has opposed HHS's contradictory positions, asserting that prohibitions on care interfere with the ability of an adolescent, their parents, and their physician to determine the best medical options for them.[13] The Trump administration and HHS have repeatedly attacked gender-affirming care, including through President Trump's January 28, 2025 executive order on gender-affirming care[14] and HHS's report seeking to discredit medical care for transgender youth.[15] On April 28, 2025, the White House announced that, since its executive order, HHS terminated research grant funding related to transgender populations and is exploring ways to increase access to detransition care.[16] On December 18, 2025, two days after HHS terminated

---

[12] Lena H. Sun, *RFK Jr., pediatrician association clash over covid shots for kids*, Wash. Post (Aug. 19, 2025), https://perma.cc/5PK4-8EY8.

[13] Alyson Sulaski Wyckoff, *AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update*, Am. Acad. of Pediatrics (Aug. 4, 2023), https://perma.cc/V39Q-72B4.

[14] Exec. Order 14187, 90 Fed. Reg. 8,771 (Jan. 28, 2025).

[15] Press Release, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, Dep't of Health and Hum. Servs., (Nov. 19, 2025), https://perma.cc/YP58-J4G3.

[16] Press Release, *Report to the President on Protecting Children from Surgical and Chemical Mutilation Executive Summary*, The White House (Apr. 28, 2025), https://perma.cc/Z59L-UF9X.

AAP's grants, Secretary Kennedy and Dr. Mehmet Oz, who leads the Centers for Medicare and Medicaid Services, announced new proposed rules to restrict access to gender-affirming care.[17]

39.     AAP has publicly criticized HHS's positions on gender-affirming medical care, explaining that AAP "oppos[es] [HHS's] infringements on the patient-physician relationship."[18]

### B.  The Administration's animus towards AAP

40.     Since taking office, Secretary Kennedy has repeatedly cast AAP as an enemy that HHS is battling.  When HHS released its report on gender-affirming medical care, Secretary Kennedy claimed that AAP had "peddled the lie" that this type of care "could be good for children."[19]  Secretary Kennedy charged that AAP "betrayed their oath to first do no harm" and accused them of "malpractice."[20]  Secretary Kennedy repeated these same accusations against AAP just last week when he announced the proposed rules to restrict access to gender-affirming care.[21]

41.     Secretary Kennedy and other HHS officials have also recently and repeatedly claimed that AAP is "gravely conflicted" when it comes to its position on pediatric vaccinations and said he "wouldn't put a big stake in what they say that benefits pharmaceutical interests."[22]  Secretary Kennedy

---

[17] Selena Simmons-Duffin, *RFK Jr. and Dr. Oz announce moves to ban gender-affirming care for young people*, NPR (Dec. 18, 2025), https://perma.cc/762Y-NULF.

[18] Melissa Jenco, *AAP speaks out against HHS report on gender dysphoria, infringement on physician-patient relationship*, Am. Acad. of Pediatrics (May 1, 2025), https://perma.cc/4W3E-2WN5.

[19] *Supra* n.15.

[20] *Id.*

[21] PBS NewsHour, *Trump administration seeks to cut off access to transgender health care for U.S. children*, at 2:04-2:50, YouTube (Dec. 18, 2025), https://perma.cc/JC82-DQPL.

[22] *Hearing on 2026 Health Care Agenda*, at 30:11-30:45, C-SPAN (Sep. 4, 2025), https://www.c-span.org/program/senate-committee/health-and-human-services-secretary-kennedy-testifies-on-health-care-agenda-part-1/664946.

accused AAP of being "a pay-to-play scheme to promote commercial ambitions of AAP's Big Pharma benefactors."[23]

42.     Calley Means, a top adviser at HHS, has called AAP a "demonic force[]" that HHS is "fighting,"[24] exclaimed that AAP is "practicing evil," and accused it of "committing war on kids."[25]

43.     Like Secretary Kennedy, Means has repeatedly argued that AAP is "completely captured" by corporate interests and criticized its positions on pediatric vaccinations and gender-affirming medical care.[26]  Means has explained that Secretary Kennedy's "Make America Healthy Again" movement is intended to be "a very harsh examination of what the American Academy of Pediatrics has been advising patients."[27]

44.     Robert Malone, Secretary Kennedy's handpicked CDC adviser who is the ACIP vice chair, has recently and repeatedly criticized AAP, calling the non-profit a "woke organization[]"[28] and accusing them of peddling "[m]isinformation."[29]  He has retweeted articles that accuse AAP of

---

[23]     *See* Robert F. Kennedy, Jr. (@SecKennedy), X (Aug. 19, 2025, at 5:17pm ET), https://perma.cc/C7H4-AGGZ.  However, less than 4% of AAP's charitable fund revenue comes from industry sources.  *See* Mary Kekatos et al., *Both Republicans and Democrats clash with RFK Jr. on vaccines, CDC turmoil*, ABC (Sep. 4, 2025), https://perma.cc/3GFH-534L.

[24] Calley Means (@CalleyMeans), X (Apr. 20, 2025, at 3:01pm ET), https://perma.cc/3E8W-UVRH.

[25] Joe Kinsey, *White House MAHA Official Destroys Youth Transgender Treatments as Nike Continues to Dodge Study Questions*, OutKick (Apr. 25, 2025), https://perma.cc/ZWY4-MQBW.

[26] *Id.*

[27] Susanna Vogel, *Top RFK aide lashes out against healthcare industry for profiting off of illness*, Healthcare Dive (Oct. 25, 2025), https://perma.cc/7NYB-KDN6.

[28]     Robert W Malone, MD (@RWMaloneMD), X (July 12, 2025, at 7:52am ET), https://perma.cc/DJ93-FJR9.

[29]     Robert W Malone, MD (@RWMaloneMD), X (Aug. 25, 2025, at 3:06pm ET), https://perma.cc/9UE9-7LLQ.

"medical fascism" that would have the public "comply as slaves" to their medical expert advice.[30]  He has also recently and repeatedly called out AAP's positions on pediatric vaccinations and gender-affirming healthcare, calling AAP's positions "morally wrong" and arguing that AAP should be "shamed and shunned."[31]

45.    Dr. Malone has also tied his criticism of AAP's positions on pediatric vaccinations and gender-affirming medical care to AAP's federal grant awards.  This past fall, Dr. Malone republished an article entitled: "How the American Academy of Pediatrics Betrayed Children Everywhere."  *See* Dr. Robert W. Malone, *How the American Academy of Pediatrics Betrayed Children Everywhere*, Substack, Sep. 1, 2025, https://perma.cc/75SN-W47R.  The article criticized AAP's stance on public health issues, and argued that the federal government has "handsomely rewarded" AAP with tens of millions of dollars in federal grant awards "to push vaccines and combat 'Misinformation.'"  *Id.*  Dr. Malone also tweeted another article from Children's Health Defense, the anti-vaccine activist group that Kennedy led until 2023, which criticized AAP's stance on child health issues and observed that AAP "received tens of millions of dollars in federal funding in a single year."[32]

46.    In addition to his call that AAP be "shamed and shunned," *supra* ¶ 44, Dr. Malone has publicly stated that "there have to be consequences" for AAP's "frivolous lawsuit" challenging HHS's new COVID vaccination policy.[33]  In the same tweet, he reminded everyone of AAP's stance on gender-affirming medical care:

---

[30]  Robert W Malone, MD (@RWMaloneMD), X (Aug. 4, 2025, at 8:43am ET), https://perma.cc/T89E-P7QQ.

[31]  Robert W. Malone, MD, *"Woke" Bioethics Tyranny*, Substack, Aug. 4, 2025, https://perma.cc/W95R-AQYW.

[32]  Robert W. Malone, MD (@RWMaloneMD), X (Aug. 25, 2025, at 3:06pm ET), https://perma.cc/AL8R-6U2T.

[33]  Robert Malone, MD (@RWMaloneMD), X (July 12, 2025, at 7:52am ET), https://perma.cc/FZS5-64WL.



47.    Another one of Secretary Kennedy's hand-picked vaccine advisers shares Dr. Malone's harsh criticism of AAP.  Retsef Levi, a current ACIP member, has repeatedly criticized AAP's position on pediatric vaccinations, calling AAP "vaccine-fanatics"[34] and their position "outrageous."[35]  Levi also charged that "[f]inancial interests," "[p]ersonal vendetta," or "[f]anaticism" must have motivated AAP to recommend COVID-19 vaccination for young children.[36]

---

[34] Retsef Levi (@RetsefL), X (Aug. 4, 2025, at 10:59am ET), https://perma.cc/V38D-89JZ.

[35] Tim Rohn, *This vaccine adviser to RFK Jr. has some choice words for his critics*, Politico (Dec. 14, 2025), https://perma.cc/4GHA-27AU.

[36] Retsef Levi (@RetsefL), X (Aug. 19, 2025, at 4:28pm ET), https://perma.cc/298Z-H5T6.

48.     Secretary Kennedy's chosen ACIP chair, Martin Kulldorff, has called AAP's position on vaccines "unscientific"[37] and has tweeted that it is "[a]stonishing that pro-mercury in kids is their battle cry!!"[38]

### C. HHS's abrupt termination of AAP grants

49.     Prior to receiving the termination notices, AAP was fully performing with respect to the CDC and HRSA awards.  As noted, AAP works with liaisons at CDC and HRSA who communicate with AAP if there is a desire to change course or shift the focus of the award.  AAP's points of contact at the agencies never suggested that AAP was not in compliance with the terms and conditions of any of its awards.  Nor did they provide any reason to believe that the termination of any AAP awards was imminent.

50.     In fact, leading up to and even after the termination notices were issued, AAP's liaisons at CDC and HRSA maintained lines of communication suggesting that it was business as usual for the awards in question.  Agency staff appeared to be unaware that the awards were about to be or had been terminated.  For example, AAP staffers exchanged emails with CDC team members on December 16 and 17, discussing ongoing and future anticipated work for one of the relevant programs.

51.     On December 17, AAP received letters from CDC, executed on December 16, terminating each of the three CDC awards discussed above, effective December 22.  The letters stated:

> CDC has determined that this award no longer effectuates agency and Department of Health and Human Services (HHS) priorities.  More specifically, your organization's award materials reflect design elements that are not aligned with current CDC and HHS priorities to, to the extent permitted by applicable federal law, deprioritize diversity, equity, and inclusion initiatives that prioritize group identity and to improve and protect the lives and health of all Americans.

---

[37] Martin Kulldorff, *Should vaccines contain mercury?*, The Hill (July 9, 2025), https://perma.cc/V82M-ZXYD.

[38] Martin Kulldorff (@MartinKulldorff), X (July 1, 2025, at 10:35am ET), https://perma.cc/AR85-VQDF.

. . .

After careful review, CDC has determined that this award must be fully terminated because the premises of the award are incompatible with agency and departmental priorities, making modifications or partial continuation impossible.

52.    CDC included terse explanations of the decision to terminate each grant.  One letter, for example, said that AAP's application submissions "expressly center on identity-based language" and that these "elements" were "woven through the title, narrative, and work plans" of the award project, meaning that AAP's activities were "no longer in alignment with the stated HHS and CDC priority areas."  Another letter asserted that the AAP's award materials "commit to providing health equity as a strategy in which Capacity Building Assistance (CBA) will be provided."

53.    On December 16, AAP also received letters from HRSA terminating each of the four HRSA awards discussed above, effective immediately.  Each letter stated that funding for the award "is hereby terminated pursuant to 2 C.F.R. § 200.340(a)(4)."  The letters stated:

HRSA's current priorities include focusing agency resources toward activities that more directly support improved health outcomes for adolescents and young adults, including the addition of a focused emphasis on nutrition and the prevention and management of chronic disease.  These enhancements will help ensure the program remains responsive and evidence based.

Although in its discretion HRSA may suspend (rather than immediately terminate) an award to allow the recipient an opportunity to take appropriate corrective action before HRSA makes a termination decision, after review and consideration, no corrective action is possible here since no corrective action could align the award with current agency priorities.

54.    The justifications proffered in the CDC and HRSA letters are implausible on their face and are in conflict with AAP's communications with agency staff related to each project.

55.    Upon information and belief, the decision to terminate AAP's grants came from HHS leadership, rather than normal channels at HRSA or CDC.  AAP staff were told by agency staff that they were unaware of these terminations, which AAP staff understood to mean that the terminations came at the direction of HHS leadership.

56.     James Miller, a top HHS official and a political appointee, emailed other department and CDC officials on December 16 with the subject line, "CDC Termination Memos for Review," and directed officials to "please proceed with canceling these today if not done already."  Jordan Faircloth, CDC's deputy chief of staff and a political appointee, responded about an hour later: "10-4. On it."  *See* Lena H. Sun & Paige Winfield Cunningham, *American Academy of Pediatrics loses HHS funding after criticizing RFK Jr.*, Wash. Post, Dec. 17, 2025, https://perma.cc/MC32-WRU7.

57.     Upon information and belief, HRSA and CDC did not terminate any other grants as a part of their decision to terminate AAP's grants.  In fact, AAP applied for HRSA Award 3, which addresses universal newborn hearing screening, as one of *three* national technical assistance centers that make up the Early Hearing Detection and Intervention National Network.  HRSA terminated AAP's award for purportedly no longer effectuating program goals or agency priorities, but neither of the other two centers that received awards under the same grant for purposes of operating the same program as AAP were terminated.

58.     Secretary Kennedy's allies and ideological supporters had no trouble recognizing the recent grant terminations for what they are: a targeted effort to harm AAP.

59.     The day after the terminations, on December 17, 2025, CDC adviser Malone posted that "HHS has terminated multiple federal grants to the American Academy of Pediatrics (AAP) . . . for good reason."[39]  He blamed the terminations on AAP's speech related to gender-affirming care and vaccinations, among other public health issues largely completely unrelated to the programs funded by the seven terminated awards.

---

[39] Robert W. Malone, MD (@RWMaloneMD), X (Dec. 17, 2025, at 9:10pm ET), https://perma.cc/UQ3R-ZNVB.



**Robert W Malone, MD** ✔
@RWMaloneMD

Breaking NEWS: HHS has terminated multiple federal grants to the American Academy of Pediatrics (AAP), totaling around $18-20 million and for good reason.
The AAP has recommended pediatrians practice gender affirming care for children and from summer 2021 and thereafter, the AAP recommended that all students and school staff age 2 and older wear masks in schools - even though there is no evidence that mask use would stop transmission.
In 2025, the AAP issued its own COVID-19 vaccination guidance that diverged from federal policy, recommending COVID shots for all children 6–23 months old.  This puts children at risk for myocarditis and other severe adverse events from these dangerous injections - injections that are not safe for children, do not stop transmission or infection.
The AAP continues to use "identity-based language" and has lost touch with American families and children, advocating various fadish trends that that have caused real physical damage to our youth.

Thank you, Sec. Kennedy and HHS for taking this positive and important step to ensure the health of our children.

Last edited 9:10 PM · Dec 17, 2025 · 168.1K Views

60.    Secretary Kennedy's former colleagues at Children's Health Defense—which repeatedly criticized AAP as "in the business of propaganda,"[40] "pushing vaccines that cause harm,"[41] "medically reckless,"[42] an "assault on childhood itself,"[43] "poster child for corruption,"[44] and "pushing . . . [a] sinister agenda"[45]—"applaud[ed] the HHS decision to end seven multimillion dollar grants to the American Academy of Pediatrics," explaining that "[t]heir defunding is necessary and appropriate" because AAP "is a front organization for the pharmaceutical industry."[46]

---

[40] Children's Health Defense (@ChildrensHD), X (Sep. 18, 2025, at 11:34am ET), https://perma.cc/TYU4-E95A.

[41] Children's Health Defense (@ChildrensHD), X (Sep. 3, 2025, at 12:59pm ET), https://perma.cc/9BHP-LSCD.

[42] Children's Health Defense (@ChildrensHD), X (Sep. 3, 2025, at 9:00am ET), https://perma.cc/868X-5S9Y.

[43] *Id.*

[44] Children's Health Defense (@ChildrensHD), X (Aug. 26, 2025, at 8:00pm ET), https://perma.cc/8UNE-XDKC.

[45] Children's Health Defense (@ChildrensHD), X (Aug. 20, 2025, at 11:00pm ET), https://perma.cc/R6JU-TWJD.

[46] Children's Health Defense (@ChildrensHD), X (Dec. 17, 2025, at 8:53pm ET), https://perma.cc/2CEY-XEAT.



61.    The account dedicated to Secretary Kennedy's "Make America Healthy Again" movement posted: "Huge MAHA Win Big Pharma's puppet, the American Academy of Pediatrics, just lost federal funding thanks to HHS. Under RFK Jr., taxpayer dollars will no longer bankroll propaganda, only organizations committed to gold-standard, evidence-based science will receive support."[47]

### D.  The irreparable harm to AAP from HHS's unlawful retaliation

62.    The termination of AAP's grants has immediate and devastating effects on AAP, its partners, and children's lives.

---

[47] MAHA Action (@MAHA_Action), X (Dec. 17, 2025, at 9:17pm ET), https://perma.cc/DVM3-SXKE.

63.     AAP is currently losing roughly $116,500 per week in unfunded salaries and indirect costs because of the terminations.  AAP cannot sustain these losses in the immediate term, and will have to let staff members go by January 9, 2026 in order to not put the rest of AAP's operations at risk.  AAP will be forced to lay off dozens of staff members—approximately 10% of AAP total full-time employees are likely to be impacted.  AAP would also have to pay out severance, unused vacation days, and would have to reimburse the state for any AAP terminated employees claiming unemployment benefits, all of which would not be recoupable even if the awards are reinstated.

64.     Without these awards, all the critical projects discussed above will have to be discontinued.  These essential programs and services will no longer be provided by AAP.  In some cases, AAP is the only organization providing the resources in question, and it is unlikely that any individual replacement organization could step in to provide those services.

65.     In the wake of the terminations, AAP received outreach from many partners and beneficiaries of its work, expressing disappointment in the terminations and hopes that the awards would be reinstated.

66.     As a nonprofit corporation, AAP has no budgetary surplus to save the projects funded through federal grants and its critical work from this catastrophe.  AAP overall has lost nearly $12 million in outstanding federal funds.  It cannot reallocate funds for its research projects without further reducing resources for other programs and, in turn, putting those programs at risk.  And without HRSA and CDC grants to AAP, many important programs will be terminated.

67.     The following examples illustrate just some of the severe harms that will result from the award terminations.

   a.   The elimination of the project supporting immunization support and communication will result in a diminished ability to prevent community spread of harmful infectious diseases, including whooping cough, measles, and winter

respiratory viruses. This is particularly dangerous at the current moment, with measles and whooping cough cases on the rise and deaths having occurred in multiple states.

b.  Sudden unexpected infant death is the leading cause of death for infants under one year of age. Following the dissolution of the federal Safe to Sleep campaign earlier this year and the termination of the safe sleep cooperative agreement, there is no nationally coordinated approach to support new parents in understanding and practicing safe sleep, which has the potential to result in an increase in sleep-related deaths in healthy infants.

c.  The timely release of national standards of care for certain newborn nurseries is now in jeopardy. High-quality, safe newborn care is essential in the first hours of a baby's life. National standards would help to ensure that newborn care in all settings has the appropriate infrastructure, personnel, and policies to provide a healthy start to life for all newborns.

d.  The loss of funding for the Universal Newborn Hearing Screening Program will result in delays in identifying infants who are deaf and hard of hearing, and corresponding delays in access to critical therapies and services to improve language acquisition and communication. This will impact the acquisition of language and delay speech and language acquisition, which can impact neuro cognitive development, learning, and communication.

e.  The loss of funding for "Learn the Signs. Act Early" diminishes the capacity to support screening and early identification for developmental delays and autism. AAP's portfolio of resources will no longer be promoted or updated, meaning

fewer clinicians and parents will know how to monitor developmental milestones effectively.

f. The loss of funding for partnerships to protect infants and children from emerging threats will prevent AAP from ensuring that families receive timely, trusted information and resources. This will result in not only worsened health outcomes, but also higher healthcare costs, widening disparities, and diminished national preparedness. Children and families are less likely to be identified for and to receive care for congenital cytomegalovirus, perinatal Hepatitis C, and congenital syphilis. Congenital syphilis cases are on the rise in the United States per CDC, increasing for the twelfth year in a row, with nearly 4,000 reported cases in 2024.

g. The loss of funding will eliminate planned educational courses on Tourette Syndrome and ADHD, leaving pediatricians without critical training to identify health risks such as suicidality, sleep disturbances, and co-occurring conditions. Without these resources, clinicians will lack evidence-based strategies for behavior guidance and parent support, reducing their ability to provide anticipatory guidance and effective care.

h. Pediatricians and other medical clinicians will not be trained in how to integrate child-centered, trauma-informed care practices into their clinical care. This means that children and families who have experienced trauma will not receive care that is tailored to their needs. The loss of this funding will worsen the current mental health crisis among U.S. children and teenagers.

i. The loss of funding for certain projects will hinder the ability to improve coordination of care and services for infants and children impacted by spina bifida, muscular dystrophy, and gastroschisis, among other chronic conditions. It will

also hinder the ability to prevent congenital heart defects and improve outcomes for affected children and adults.

j.  The loss of funding will have a direct negative impact on infants with perinatal substance exposure, including those born with neonatal opioid withdrawal syndrome and their birth mothers.  The loss of funding will eliminate critical training for multidisciplinary pediatric healthcare teams, as well as resources allowing clinicians to build capacity to support children born with neonatal opioid withdrawal syndrome—a critically important need given the national health emergency being fueled by the opioid epidemic.

k.  The loss of funding for educational efforts to build capacity of pediatricians to assess for prenatal alcohol exposure will result in more children being undiagnosed, misdiagnosed, and untreated.  Children without the appropriate diagnosis and early intervention services are more likely to experience school failure, misuse substances themselves, and become involved in the criminal justice system.

l.  The loss of funding to strengthen food allergy resources means that schools and out-of-school programs will lose access to critical resources and training needed to manage food allergies safely, increasing the risk of severe allergic reactions among students.  Additionally, the progress made through national collaborations and evidence-based guidelines could stall, limiting the ability to implement consistent, effective food allergy management practices across K–12 and out-of-school settings.

m.  The loss of funding for "Let's Talk About It" will halt a national communications campaign designed to support clinicians, parents, and families in having open,

26

destigmatizing conversations around mental health. Without this campaign, fewer youth and fewer parents will feel comfortable talking about their mental health needs, leading to worsening symptoms and increased feelings of isolation and despair.

n.  The loss of funding for the Telehealth Technology-Enabled Learning Program means that children and families in rural areas will not have access to health services that meet their unique needs. Pediatricians serving rural communities will lose targeted training on suicide prevention, autism, obesity, substance use, and other critical mental health issues. This will widen gaps in care and harm children and families in rural communities.

o.  A funding gap for "Information Sharing Among Pediatric Clinicians and Summer Camp for Health Care Providers" hinders efforts to promote early action to prevent severe life-threatening infection and multiple organ failure in children. Sepsis is a condition where minutes can make a difference in preventing the most serious health outcomes for an affected child. Providers of all types would benefit from education and guidance about early symptoms and the immediate lifesaving steps to take to improve outcomes in children.

68.    AAP's partners will also be harmed by the award terminations. Many AAP projects funded by these awards have subawardees in the public health space. Because of the terminations, AAP has been forced to notify these groups to stop their work on the awards. For some of those groups, the funds constitute a significant portion of their payroll, and there will be an immediate disruptive impact on their personnel. Other groups will simply not be able to continue the important public health work they were able to do because of these funds.

27

69.     This damage to AAP's partnerships will further harm AAP's reputation as a leader in the field and as a trusted partner on these issues.  If AAP's funding is not reinstated, its partners will be forced to discontinue longstanding, effective working relationships.

70.     In sum, these award terminations will have a catastrophic effect on public health.  It is no exaggeration to say that children's lives will be lost as a result of the terminations.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the First Amendment – Retaliation for Protected Activity

71.     The paragraphs above are incorporated and reasserted as if fully set forth here.

72.     The First Amendment guarantees a right to "freedom of speech" and "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The right to petition includes the right "to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).  The government violates the First Amendment when it retaliates against someone for exercising their First Amendment rights.  *See, e.g., Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."); *Smith v. Ark. State Highway Emp., Loc. 1315*, 441 U.S. 463, 465 (1979) (a person can "speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so").  "Reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation modified).  "[T]he law is settled" on this issue. *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2024) (Alito, J., concurring) (quoting *Hartman*, 547 U.S. at 256).

73.     The grant terminations by HHS violate the First Amendment's prohibition on retaliation for engaging in protected First Amendment activity.  Defendants carried out the award

terminations to retaliate against AAP for engaging in speech that the government disfavors and for petitioning for judicial relief adverse to the government.

74.    As demonstrated above, AAP has engaged in protected speech of its positions on vaccines and gender-affirming medical care, including vocal criticism of HHS's positions on these issues, as well as petitioned for judicial relief adverse to the government as the lead plaintiff in vaccine-policy-related litigation against HHS.  To punish AAP for its protected First Amendment activities, HHS terminated roughly $12 million in federal awards to AAP.

75.    The grant terminations are "sufficiently adverse . . . to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).  Indeed, these retaliatory actions by Defendants would "deter a person of ordinary firmness in [AAP's] position from speaking again." *Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015).

76.    Defendants' First Amendment violations have caused and will cause AAP ongoing and irreparable harm.  AAP's freedom of speech and right to petition the government, in court and otherwise, are being significantly impaired.  And the termination of AAP's grants will force AAP to terminate scores of employees and halt its life-saving work in a number of critical public health areas.

## COUNT II

### Violation of First Amendment – Viewpoint Discrimination

77.    The paragraphs above are incorporated and reasserted as if fully set forth here.

78.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).  "The government" therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Vistors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 706 (2010) (Alito,

J., dissenting) ("The proudest boast of our free speech jurisprudence is that we protect the freedom to express [even] the thought that we hate." (citation modified)).  Viewpoint-based punishments are particularly pernicious in the context of legal advocacy because they "threaten[] severe impairment of the judicial function," which depends on an "informed, independent bar."  *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 545–46 (2001).

79.    HHS's grant terminations violate the First Amendment's prohibition on viewpoint discrimination.  As the above circumstances makes clear, AAP was targeted for its views on vaccines and gender-affirming medical care.  As CDC advisor Dr. Malone candidly acknowledged: "HHS has terminated multiple federal grants to the American Academy of Pediatrics (AAP)" for the purportedly "good reason" that AAP has recommended pediatricians practice gender affirming care, "issued its own COVID-19 vaccination guidance that diverged from [recently changed] federal policy," and "continues to use 'identity-based language.'"  *Supra* ¶ 59.

80.    Because Defendants' actions amount to viewpoint discrimination, strict scrutiny applies.  *See Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 168–71 (2015).  The grant terminations may be sustained "only if the government proves" that those actions are "narrowly tailored to serve compelling state interests."  *Id.* at 163.

81.    The termination of AAP's grants does not meet that demanding test.  There is no compelling interest in punishing an organization for, or chilling it from, advancing views with which the government disagrees.  On the contrary, there is a compelling interest in *permitting* organizations to present to courts views contrary to the government's.  *See Velazquez,* 531 U.S. at 545–48.  Nor is there a compelling interest in selectively withholding from an entity government resources based on that entity's viewpoint.  And Defendants have not articulated a compelling interest.

82.    Even if there were a compelling interest at stake, the grant terminations are not narrowly tailored to advancing that interest because they terminated AAP's grants without any

apparent connection to any government interest.  As explained above, the justifications proffered in the CDC and HRSA letters are implausible on their face and conflict with AAP's communications with agency staff related to each project.

83.    As explained above, Defendants' First Amendment violations have caused and will cause AAP ongoing and irreparable harm.

## COUNT III

### Violation of the First Amendment and Spending Power – Unconstitutional Conditions on Government Grants

84.    The paragraphs above are incorporated and reasserted as if fully set forth here.

85.    When the government funds an activity pursuant to the legislative branch's spending power, *see* U.S. Const. art. I, § 8, the government cannot "leverage funding to regulate speech outside the contours of the federal program itself," *USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 206 (2013).  The government also may not "deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

86.    The termination of AAP's grants effectively seeks to create a new condition of government grants—that the grantee may not engage in speech or petitioning activity that the government disfavors.  That is an unconstitutional condition that burdens the First Amendment rights to free speech and to petition the government and is wholly unrelated to the federal program itself.

87.    As explained above, Defendants' unconstitutional conditions on federal grants have caused and will cause AAP ongoing and irreparable harm.

## COUNT IV

### Violation of the Fifth Amendment – Equal Protection

88.    The paragraphs above are incorporated and reasserted as if fully set forth here.

89.    The termination of AAP's grants violates the Equal Protection Clause as incorporated by the Fifth Amendment, which prohibits the federal government, its agencies, its officials, and its

employees from denying persons the equal protection of the laws. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

90.     The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,'" including both where the affected class has a single member and where it consists of a group of disfavored parties. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations omitted). Such a claim requires the plaintiff to allege (a) that it "has been intentionally treated differently from others similarly situated" and (b) "that there is no rational basis for the difference in treatment." *Id.* Further, when the differential treatment burdens a plaintiff's First Amendment activity, a standard "appreciably more stringent than 'minimum rationality'" governs. *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988).

91.     To justify discriminatory conduct, the government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (citing, *e.g.*, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973)). "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *City of Cleburne*, 473 U.S. at 447.

92.     The termination of AAP's grants violates those equal-protection principles because its purpose is to discriminate against AAP. The targeted nature of the treatment is apparent by the above-described circumstances. A number of other similarly situated organizations have not been subject to the same, or even similar, sanctions. The different treatment alone demonstrates that the terminations here were motivated by a bare intent to punish AAP.

93.     No credible, rational justification exists for treating AAP differently than similarly situated organizations. The termination letters' stated reason—that the grants do not effectuate agency priorities—is belied by both HRSA's and CDC's disparate treatment of similarly situated

32

grantees. HRSA and CDC targeted only AAP's grants for termination and had singled out only AAP for its viewpoints and advocacy. Defendants' true motive was to punish AAP for engaging in activity that Defendants dislike.

94. As explained above, Defendants' violations of the Fifth Amendment have caused and will cause AAP ongoing and irreparable harm.

## COUNT V

### Violation of the Administrative Procedure Act

95. The paragraphs above are incorporated and reasserted as if fully set forth here.

96. The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

97. An agency action is reviewable under the APA if it is a final agency action—that is, one that "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

98. The termination of AAP's grants is final agency action reviewable under 5 U.S.C. § 704. The termination notices mark the consummation of HRSA's and CDC's decision-making and specifies that the grants are terminated "effective immediately." The termination notices eliminate AAP's right to continued funding under the grants, and it gives rise to legal consequences by, among other things, imposing closeout obligations on AAP.

99. The termination of AAP's grants is contrary to constitutional right because, as explained above, it violates AAP's First Amendment rights.

33

100.    As explained above, Defendants' termination of the grants in violation of the Administrative Procedure Act has caused and will cause AAP ongoing and irreparable harm.

## PRAYER FOR RELIEF

AAP requests that the Court enter the following relief:

A.  Declare that the terminations of AAP's grants are unlawful and null and void and set the terminations of the grants aside.

B.  Grant preliminary and permanent injunctive relief barring Defendants from enforcing or otherwise giving effect to the terminations of AAP's grants, including through the enforcement of closeout obligations.

C.  Grant preliminary and permanent injunctive relief barring Defendants from re-obligating funds used to support AAP's terminated grants.

D.  Enter an order in exercise of the Court's equitable powers that directs Defendants to take all steps necessary to ensure that HRSA and CDC disburse funds on AAP's grants in the customary manner and in customary timeframes.

E.  Award AAP its costs, reasonable attorney's fees, and other disbursements as appropriate.

F.  Grant such other relief as the Court deems just and proper.

December 24, 2025                              Respectfully submitted,

                                             */s/ Joshua M. Salzman*
                                             Joshua M. Salzman (D.C. Bar No. 982239)
                                             Allyson R. Scher (D.C. Bar No. 1616379)
                                             Michael J. Torcello (D.C. Bar No. 90014480)
                                             Joel McElvain (D.C. Bar. No. 448431)
                                             Robin F. Thurston (D.C. Bar No. 1531399)

                                             DEMOCRACY FORWARD FOUNDATION
                                             P.O. Box 34553
                                             Washington, D.C. 20043
                                             (202) 448-9090
                                             jsalzman@democracyforward.org
                                             ascher@democracyforward.org
                                             mtorcello@democracyforward.org
                                             jmcelvain@democracyforward.org
                                             rthurston@democracyforward.org

                                             *Counsel for Plaintiff*