**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AMERICAN ACADEMY OF PEDIATRICS,

       *Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

       *Defendants*.

Case No. 1:25-cv-4505

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER OR,
IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

    A.    AAP and the award-funded programs at issue ...............................................3

    B.    AAP's public advocacy and resulting HHS officials' attack on AAP ....................5

    C.    HRSA and CDC abruptly terminate seven AAP awards ...........................8

    D.    Impact of the terminations .......................................................................10

LEGAL STANDARD ..........................................................................................................11

ARGUMENT ......................................................................................................................12

    I. AAP Is Likely to Succeed on the Merits ......................................................12

        A. The award terminations are unconstitutional retaliation ...................12

        B. The terminations are also unconstitutional viewpoint discrimination .................19

        C. This Court has jurisdiction to award relief ...........................................20

    II. AAP Will Suffer Irreparable Harm Absent Immediate Relief ...................21

    III. The Equitable Factors Strongly Favor Emergency Relief ...........................23

CONCLUSION ...................................................................................................................24

## INTRODUCTION

The American Academy of Pediatrics (AAP), the nation's preeminent professional organization for child health, has an abiding commitment to promoting the health and well-being of infants, children, adolescents, and young adults. In furtherance of that mission, AAP engages in a range of activities to provide pediatricians, other pediatric clinicians, and families with evidence-based child health information. For many decades, and across presidential administrations, subagencies within the Department of Health and Human Services (HHS), such as the Centers for Disease Control and Prevention (CDC) and the Health Resources and Services Administration (HRSA), have supported AAP work through various grant awards that have enabled AAP to pursue initiatives to support and educate clinicians and to promote child health. For example, AAP has received funding to provide training and technical assistance to pediatricians in rural communities, to reduce sudden unexpected infant death syndrome, to support early identification of autism, to support adolescent health, and to develop standards for newborn nurseries in hospitals to improve the quality and consistency of newborn care. However, these programs—and over a dozen more—were abruptly ended on December 16, 2025, when HRSA and CDC executed letters terminating seven awards to AAP, with nearly $12 million in outstanding committed funding.

These award terminations escalate an ongoing campaign by Secretary of Health and Human Services Robert F. Kennedy, Jr. and other high-ranking officials in HHS to discredit and harm AAP based on its advocacy for an evidence-based approach to child health. AAP has been a prominent voice on high-profile health policy issues, provoking the ire of senior HHS officials. AAP is a particularly sharp critic of recent radical changes to the CDC's vaccination recommendations that were implemented at the behest of Secretary Kennedy. AAP is also the lead plaintiff in litigation challenging recent changes to CDC's vaccine schedules. In public statements, Secretary Kennedy has repeatedly disparaged AAP by name. In April 2025, a senior HHS advisor went further, describing

AAP as a "demonic force[]." Calley Means (@CalleyMeans), X (Apr. 20, 2025, at 3:01pm ET), https://perma.cc/3E8W-UVRH.

Against that backdrop, the Secretary's ideological supporters unsurprisingly had no trouble recognizing the recent award terminations for what they are: a targeted effort to harm AAP. The CEO of Children's Health Defense—an organization founded and long led by Secretary Kennedy—"applaud[ed]" this "defunding" of AAP. Children's Health Defense (@ChildrensHD), X (Dec. 17, 2025, at 8:53pm ET), https://perma.cc/2CEY-XEAT. The vice chair of the CDC's Advisory Committee on Immunization Practices (ACIP)—who was installed by Secretary Kennedy after he fired the entire committee—likewise thanked Secretary Kennedy for the award terminations, citing positions that AAP has taken on a range of public health issues that are largely unrelated to the subject matter of the seven terminated awards. Robert W. Malone, MD (@RWMaloneMD), X (Dec. 17, 2025, at 9:10pm ET), https://perma.cc/UQ3R-ZNVB.

The agencies have nonetheless claimed that these coordinated terminations, which appear to have targeted only AAP and not any other awardees, were the result of routine reappraisals of whether the terminated awards furthered agency priorities. Yet, funding for the terminated awards had been approved by the current administration mere months earlier and the agencies' stated rationales contain blatant inconsistencies. In some cases, Defendants have even continued to fund other entities that were recipients of awards under the same grants as AAP and that are performing analogous work. Even cursory scrutiny confirms that the agencies' explanations were pretextual and that AAP was singled out for retaliation based on its constitutionally protected speech.

This action to punish AAP for its past speech and to chill future advocacy is a quintessential First Amendment violation. These award terminations are not only unlawful, but also threaten to inflict irreparable harm on both AAP and the public. AAP lacks the financial capacity to maintain the defunded programs during the pendency of the litigation. Within just a few weeks, AAP will

have no choice but to shutter programs that provide literally lifesaving services to children and to terminate several dozen employees.

The Court should enter a temporary restraining order, or alternatively a preliminary injunction, to block the unlawful termination of AAP's awards and require HRSA and CDC to immediately resume disbursing the funding awarded to AAP. As described further below, in light of the imminent harm to AAP, we respectfully request a ruling from the Court by January 9, 2026.

## BACKGROUND

### A. AAP and the award-funded programs at issue

Founded in 1930, AAP is the nation's premier professional organization for pediatric medicine and serves as an independent forum for addressing children's health. Declaration of Debra B. Waldron ¶ 4 (Waldron Decl.). AAP membership includes 67,000 pediatricians, with members in every state in the country who provide direct care to infants, children, adolescents, and young adults in both hospital and outpatient settings. *Id.* To help further its child health mission, AAP provides training, technical assistance, education, and other support to pediatricians on critical child health topics. *Id.* ¶ 6. For decades, some of this work has received federal support through competitively awarded grants, including awards issued by CDC and HRSA. *Id.* ¶ 8.

CDC and HRSA are separate subagencies within HHS and their grantmaking functions generally operate independently from one another. *Id.* ¶ 9. Nonetheless, they use generally similar procedures for grantmaking. *Id.* As relevant here, the process begins when a grantmaking entity announces a notice of funding opportunity that articulates the type of programs the agency wishes to fund and the criteria awardees must satisfy. *Id.* After a lengthy competitive application process, awardees are selected by the agency. *Id.* ¶¶ 9–12. In many instances, multiple awardees will be selected under the same award. *Id.* ¶ 13. Thus, when AAP is selected for an award,

other similarly situated entities will sometimes be funded as well, including to work in partnership with AAP. *Id.*

Awardees are assigned a point of contact—a technical monitor or a project officer—at the relevant agency. *Id.* ¶ 14. Awardees remain in close communication with those agency liaisons throughout the lifespan of the award. *Id.* The scope or focus of a program may evolve during the life of the award. *Id.* Agency program staff can ask for modifications, including to align with changing agency priorities. *Id.* During the COVID-19 pandemic, for example, agency priorities shifted rapidly, and AAP staff routinely were in communication with agency liaisons to modify work plans as needed. *Id.*

Awards generally have multiyear terms. *Id.* ¶ 15. However, notice of continued funding usually occurs on an annual basis and there is no guarantee that the agency will continue to fund the program for the entirety of the multiyear period contemplated in the initial award. *Id.* Rather, an awardee must submit an annual continuation of funding application and progress report to continue receiving funds. *Id.* Continuation of funding applications are not competitive insofar as other entities are not vying directly for the same award funds. *Id.* However, the awardee must still demonstrate that continued funding is warranted. *Id.* Particularly after a change in presidential administration, awardees may be expected in their continuation applications to propose programmatic shifts in response to changed agency priorities. *Id.* These changes are often made in consultation with, or at the direction of, the agency technical monitor or program officer responsible for the award. *Id.*

AAP had a number of multiyear awards with CDC and HRSA that were first awarded prior to January 2025. After the beginning of the Trump administration, AAP worked closely with agency program staff to ensure its continuation applications conformed to the priorities and preferred terminologies of the new administration. *Id.* ¶ 16. Early in 2025, after the issuance of multiple executive orders related to diversity, equity, and inclusion, AAP modified its work plans and

4

continuation applications to align with new agency priorities. *Id.* ¶ 27. AAP regularly communicated with its agency liaisons to tell them what steps it was taking and to seek their guidance on how to proceed. *Id.*

Agency staff never suggested that the modifications AAP implemented were inadequate nor did agency staff ever ask AAP to make changes to conform to changed agency priorities that AAP failed to implement. *Id.* ¶ 28. Accordingly, since the start of the Trump administration, AAP's continuation of funding applications have been approved consistently. *Id.* ¶ 17. That is true for each of the seven HRSA and CDC awards at issue here. *Id.* Continuation applications were approved for all seven, and four of these approvals issued as recently as September 2025. *Id.*

### B.  AAP's public advocacy and resulting HHS officials' attack on AAP

As part of its mission, AAP advocates on "a wide range of issues that impact children, families and pediatricians." Advocacy, Am. Acad. of Pediatrics, https://perma.cc/A9RK-6HU2. These include important child health issues, including subjects such as optimal vaccine policy. AAP has been consistently vocal about its support for pediatric vaccinations for COVID-19, influenza, MMRV, RSV, hepatitis B, and others, and has publicly opposed HHS's newly adopted contradictory positions. AAP's advocacy has recently brought it into public clashes with senior leadership at HHS, including Secretary Kennedy, who has supported significant changes to vaccination policies.

In June 2025, Secretary Kennedy fired the 17 sitting members of the CDC's Advisory Committee on Immunization Practices, an advisory committee that helps set vaccine policy, and installed his own picks as their replacements. *See* Maria Godoy, *RFK Jr. replaced everyone on the CDC's vaccine panel. Here's why that matters*, NPR (June 13, 2025), https://perma.cc/XM6G-MP24. In August, AAP was notified that it was no longer permitted to serve on ACIP's subcommittees. *See* CBS/AP, *Top medical organizations kicked out of CDC vaccine recommendations process call decision "dangerous,"* CBS News (Aug. 4, 2025), https://perma.cc/FSW9-YP7W. Since then, ACIP released plans to evaluate the

timing and order of vaccines for children and the safety of vaccine ingredients, even though these issues have been studied extensively and monitored continuously; voted to no longer routinely recommend COVID-19 vaccinations; and voted to recommend ending universal vaccination at birth for hepatitis B. Melissa Jenco, *ACIP work group to look at timing of childhood vaccines, ingredients*, Am. Acad. of Pediatrics (Oct. 15, 2025), https://perma.cc/5RLZ-HABQ; Will Stone et al., *CDC vaccine panel adds new rules for getting the COVID vaccine in a tense meeting*, NPR (Sep. 19, 2025), https://perma.cc/4TQV-B4ME; Tim Röhn, *This vaccine adviser to RFK Jr. has some choice words for his critics*, Politico (Dec. 14, 2025), https://perma.cc/4GHA-27AU.

Based on its commitment to scientifically supported health policy and its concern for the safety and well-being of children, AAP has continued to recommend COVID-19, hepatitis B, and other vaccines in contradiction to ACIP's advice. *See* Press Release, *The American Academy of Pediatrics Releases Its Own Evidence-Based Immunization Schedule*, AAP (Aug. 19, 2025), https://perma.cc/YMS9-7XYL. Therefore, as a result of the government's changes in position, AAP is for the first time in 30 years sharing vaccine recommendations that significantly differ from the federal government's guidance. AAP has also publicly criticized the government's recently changed positions. For example, Sean O'Leary, a physician who heads AAP's infectious-diseases committee, said in response to HHS's COVID-19 vaccine policy: "The majority of what we've seen from [Secretary Kennedy] has been a pretty clearly orchestrated strategy to sow distrust in vaccines. We make our recommendations based on what's in the best interest of the health of children." *See* Lena H. Sun, *RFK Jr., pediatrician association clash over covid shots for kids*, Wash. Post (Aug. 19, 2025), https://perma.cc/5PK4-8EY8. AAP is also the lead plaintiff in litigation challenging recent changes to CDC's vaccine schedules and Secretary Kennedy's subversion of ACIP's independence. *See Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass.).

AAP has also consistently supported access to appropriate medical care for transgender youth, asserting that prohibitions on care interfere with the ability of an adolescent, their parents, and their physician to determine the best medical options for them. As such, AAP has opposed HHS's contradictory positions. The Trump administration and HHS have repeatedly attacked gender-affirming care in hyperbolic terms, including through President Trump's executive order on gender-affirming care, *see* Exec. Order 14187, 90 Fed. Reg. 8,771 (Jan. 28, 2025), and HHS's report seeking to discredit medical care for transgender youth, *see* Press Release, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, Dep't of Health and Hum. Servs. (Nov. 19, 2025), https://perma.cc/YP58-J4G3. On December 18, 2025, two days after HHS terminated AAP's awards, Secretary Kennedy and Dr. Mehmet Oz, who leads the Centers for Medicare and Medicaid Services, announced new proposed rules to restrict access to gender-affirming care. *See* Selena Simmons-Duffin, *RFK Jr. and Dr. Oz announce moves to ban gender-affirming care for young people*, NPR (Dec. 18, 2025), https://perma.cc/762Y-NULF.

AAP, in turn, supports access to gender-affirming medical care when it is in the best interest of children's health. *See* Alyson Sulaski Wyckoff, *AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update*, Am. Acad. of Pediatrics (Aug. 4, 2023), https://perma.cc/V39Q-72B4. AAP has also publicly criticized HHS's positions on gender-affirming medical care, explaining that AAP "oppos[es] [HHS's] infringements on the patient-physician relationship." Melissa Jenco, *AAP speaks out against HHS report on gender dysphoria, infringement on physician-patient relationship*, Am. Acad. of Pediatrics (May 1, 2025), https://perma.cc/4W3E-2WN5.

Secretary Kennedy and other HHS officials have repeatedly criticized AAP for its advocacy concerning vaccines, gender-affirming medical care, and other public health topics. Secretary Kennedy has accused AAP of "malpractice" and "betray[ing] their oath to first do no harm" because

of AAP's position in support of access to gender-affirming medical care. *See* Press Release, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, HHS (Nov. 19, 2025), https://perma.cc/3NM5-UNJ8. Secretary Kennedy repeated these same accusations against AAP just last week. *See* PBS NewsHour, *WATCH: Trump administration seeks to cut off access to transgender health care for U.S. children* (YouTube, Dec. 18, 2025), at 2:04-2:51, https://www.youtube.com/watch?v=_TQeKC87geU. And with respect to AAP's position on vaccines, Secretary Kennedy has claimed that AAP is "gravely conflicted" and engaged in "a pay-to-play scheme to promote commercial ambitions of AAP's Big Pharma benefactors." Robert F. Kennedy, Jr. (@SecKennedy), X (Aug. 19, 2025, at 5:17pm), https://perma.cc/C7H4-AGGZ. A top HHS advisor called AAP a "demonic force[]," exclaimed that it is "practicing evil," and accused it of "committing war on kids." Calley Means (@CalleyMeans), X (Apr. 20, 2025, at 3:01pm ET), https://perma.cc/3E8W-UVRH; Joe Kinsey, *White House MAHA Official Destroys Youth Transgender Treatments as Nike Continues to Dodge Study Questions*, OutKick (Apr. 25, 2025), https://perma.cc/ZWY4-MQBW. Several of Secretary Kennedy's handpicked ACIP members have repeatedly publicly criticized AAP and its positions on vaccines and gender-affirming medical care, calling AAP "morally wrong," "vaccine-fanatics" motivated by "[f]inancial interests," "[p]ersonal vendetta," or "[f]anaticism," and deserving to be "shamed and shunned." Dr. Robert W. Malone, *"Woke" Bioethics Tyranny, Malone News*, Substack (Aug. 4, 2025), https://perma.cc/W95R-AQYW; Retsef Levi @RetsefL, X (Aug. 19, 2025, at 4:28pm ET), https://perma.cc/V38D-89JZ, Retsef Levi @RetsefL, X (Aug. 19, 2025, at 4:28pm ET), https://perma.cc/298Z-H5T6.

### C.  HRSA and CDC abruptly terminate seven AAP awards

On December 16, 2025, without any prior warning from program staff, the government terminated seven awards to AAP. Three CDC awards and four HRSA awards were terminated. Waldron Decl., Exs. 1–7.

For each of the CDC awards, AAP was sent a terse letter stating that the agency had determined that the "award no longer effectuates agency and Department of Health and Human Services (HHS) priorities" because they failed to align with the agency's desire to "deprioritize diversity, equity, and inclusion initiatives that prioritize group identity and to improve and protect the lives and health of all Americans." Waldron Decl., Exs. 1–3. Each letter then cited to a few statements in the relevant award materials purportedly showing a focus contrary to these priorities by, for example, referencing ways the program would promote "health equity." *E.g.*, Waldron Decl., Ex. 1, at 6; Ex. 2, at 6. Each CDC letter also stated that "CDC has determined that this award must be fully terminated because the premises of the award are incompatible with agency and departmental priorities, making modifications or partial continuation impossible." *See id.*

Similar letters were sent for each of the HRSA awards. Each contained a boilerplate statement that the agency's priorities had changed and that "current priorities include focusing agency resources toward activities that more directly support improved health outcomes for adolescents and young adults, including the addition of a focused emphasis on nutrition and the prevention and management of chronic disease." Waldron Decl., Exs. 4–7. The HRSA letters further stated that though "in its discretion HRSA may suspend (rather than immediately terminate) an award to allow the recipient an opportunity to take appropriate corrective action before HRSA makes a termination decision, after review and consideration, no corrective action is possible." *Id.*

The terminated awards funded an array of public health programs. Examples include:

- Reducing rates of sudden unexpected infant death (SUID) by connecting families with educational and awareness resources and building families' capacity to practice safe infant sleep

- Helping pediatric care teams better prevent, screen for, and connect patients to treatment for substance use disorders in children, young adults, and the perinatal population

- Improving clinical and public health outcomes for infants and children with birth defects, infant disorders, and related conditions

- Supporting physicians in caring for patients with congenital heart defects

- Developing national standards for certain newborn hospital nurseries

- Improving early identification and intervention for developmental delays and disabilities among young children

- Strengthening food allergy resources in schools and out-of-school time

- Advancing access to care, identification, and health of children living with prenatal alcohol and substance exposure

- Assisting pediatricians and other healthcare providers in rural communities, where children face unique and unmet health needs

*See* Waldron Decl. ¶¶ 19–25 (discussing these examples and others).

Based on AAP's communications with its partners and other organizations that receive HRSA and CDC awards, it understands that none of the other entities that received awards under the same awards as AAP have had their own awards terminated. *Id.* ¶ 34. For example, AAP is just one of three national organizations to receive awards to cooperatively operate an Early Hearing and Detection Intervention network. *Id.* ¶ 37. While the award supporting AAP's participation in this network was terminated, those of its partner organizations have not been. *Id.*

### D. Impact of the terminations

In total, the outstanding value of the terminated awards is roughly $12 million, which is nearly two-thirds of the HHS grant funding AAP had been due to receive. *Id.* ¶ 18. AAP is not in a

position to maintain these programs without the terminated funds. Declaration of Mark Del Monte ¶ 18 (Del Monte Decl.). AAP has abruptly stopped work on all of the programs. Waldron Decl. ¶¶ 41, 44. Maintenance of the staff and indirect costs funded by the terminated awards is costing AAP more than $100,000 per week. Del Monte Decl. ¶ 15. Without the terminated awards, AAP is being forced to lay off several dozen employees, sever relationships with many partner organizations and sub-awardees who have been assisting with the impacted programs, and disrupt critical and years-long work that saves children's lives. *Id.* ¶ 12; Waldron Decl. ¶¶ 40–46. AAP expects to be forced to send termination notices to employees by January 9, 2026. Del Monte Decl. ¶ 12.

## LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions."). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks omitted) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid"); *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment & Assumption of Leasehold Int.*

11

*Made as of Jan. 25, 2007*, No. 22-1043, 2024 WL 3443596, at *1–2 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent).

## ARGUMENT

### I.    AAP Is Likely to Succeed on the Merits

In an effort to penalize and silence one of their sharpest and most prominent critics, Defendants terminated $12 million in awards to AAP. Just recently, a court in this District preliminarily enjoined a similarly retaliatory award termination, concluding that it violated the First Amendment. *See Am. Bar Ass'n v. DOJ*, 783 F. Supp. 3d 236 (D.D.C. 2025). For much the same reason, AAP is likely to prevail here in showing that the award terminations were unlawful.

#### A.    The award terminations are unconstitutional retaliation

The First Amendment guarantees every American the right to "freedom of speech" and "to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment right to petition includes the right "to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). "Official reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotation marks omitted). The government therefore violates the First Amendment when it retaliates against someone for engaging in protected speech or petitioning conduct. *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see also, e.g.*, *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 150–51 (D.D.C. 2025) (collecting sources).

To establish a claim for retaliation under the First Amendment, a plaintiff must show "(1) that he engaged in protected conduct, (2) that the government took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) that there exists a causal link between the exercise of a constitutional right and the adverse action taken against him." *Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015) (internal quotation

marks omitted). To establish a causal link, "a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Id.* (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)); *see also Hartman*, 547 U.S. at 256 ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, . . . retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

Here, all three factors are readily satisfied.

### 1.    AAP has engaged in protected First Amendment conduct

AAP has engaged in protected conduct, both by speaking and by petitioning the government. AAP has long been a prominent public voice on matters of public health policy and has been a particularly vocal advocate regarding vaccinations. Del Monte Decl. ¶¶ 5–6. The significance of AAP's advocacy in this area is demonstrated by the fact that Secretary Kennedy has repeatedly felt compelled to respond to AAP by name and has attempted to discredit the organization. AAP has also engaged in protected First Amendment activity by serving as the lead plaintiff in *Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass.).

### 2.    The award terminations would deter a person of ordinary firmness from speaking again

The award terminations also would "deter a person of ordinary firmness in [AAP's] position from speaking again." *Doe*, 796 F.3d at 106 (internal quotation marks omitted). The retaliatory award terminations will force AAP to shutter projects, lay off staff, and break commitments to partner organizations and sub-awardees. *See infra* section II. The sudden ripping away of funding—thereby functionally extinguishing significant portions of AAP's work—is unquestionably "sufficiently adverse . . . to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022).

      **3.**    **AAP's First Amendment activity was the cause of the government's retaliatory actions**

The award terminations here are also only explicable as retaliation for AAP's advocacy. Because "direct evidence of an improper motive is usually difficult, if not impossible, to obtain," courts have recognized that "[c]ircumstantial evidence is equally as probative as direct evidence in proving illegitimate intent." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) (quoting *Bailey v. Ramos*, 125 F.4th 667, 685 (5th Cir. 2025)). Here, a mountain of evidence shows Defendants' intent to retaliate against AAP.

*First*, as described above, AAP has been treated as a bête noir by Secretary Kennedy, other senior HHS officials, and their ideological compatriots, including Children's Health Defense, an organization Secretary Kennedy founded and long chaired. Secretary Kennedy has repeatedly and recently smeared AAP by name in public statements and one of his top advisors has called the organization "demonic" and accused it of "committing war on kids." *See supra* at 8. These attacks were issued in reaction to AAP's speech and advocacy on matters of public concern. In August 2025, following AAP's release of vaccine recommendations that diverged from the radically revised CDC recommendations issued at Secretary Kennedy's behest, the Secretary attacked AAP's recommendations as a "pay-to-play scheme to promote commercial ambitions of AAP's Big Pharma benefactors." *See* Robert F Kennedy, Jr. (@SecKennedy), X (Aug. 19, 2025, at 5:17pm ET), https://perma.cc/C7H4-AGGZ. Likewise, less than a month before the terminations, Secretary Kennedy accused the AAP of "peddl[ing] . . . lie[s]" because of AAP's position that gender-affirming care can be medically appropriate. *See* Press Release, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, HHS (Nov. 19, 2025), https://perma.cc/3NM5-UNJ8.

In another First Amendment retaliation case, the D.C. Circuit recently deemed probative that "three individuals who had publicly criticized [the plaintiff's] reporting by name were involved with [FTC] Chairman Ferguson or the Commission at the time" of the challenged adverse action. *See*

*Media Matters*, 2025 WL 2988966, at *8. Here, the agency head himself has been the source of public criticism of AAP. And Secretary Kennedy's handpicked CDC advisor has called for AAP to be "shamed and shunned," said there have to be "consequences" for AAP's "frivolous" lawsuit, and repeatedly called attention to the fact that AAP is the recipient of millions of dollars in federal awards. *See* Dr. Robert W. Malone, *"Woke" Bioethics Tyranny*, Malone News, Substack (Aug. 4, 2025), https://perma.cc/W95R-AQYW; Robert Malone @RWMaloneMD, X (July 12, 2025, at 7:52am ET), https://perma.cc/FZS5-64WL; Robert Malone @RWMaloneMD, X (Aug. 25, 2025, at 3:06pm ET), https://perma.cc/M6A4-ZBAP.

*Second,* the "proximity in time between the protected speech and government's adverse actions" provides evidence of retaliatory intent. *Media Matters*, 2025 WL 2988966, at *8. Since Secretary Kennedy's confirmation, AAP has continually clashed with HHS over vaccine policy and other public health issues. For example, Secretary Kennedy's accusation that AAP is "peddl[ing] . . . lie[s]" about gender-affirming care was made less than a month before the award terminations. *See* Press Release, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, HHS (Nov. 19, 2025), https://perma.cc/3NM5-UNJ8. Secretary Kennedy also repeated these accusations against AAP two days after the award terminations.  *Supra* at 8.  AAP is also engaged in related ongoing litigation in the District of Massachusetts, and the terminations were executed one day before a hearing in that case was held.

*Third*, the fact that AAP's awards with both HRSA and CDC were terminated on the same day is highly probative that AAP was targeted by HHS leadership. HRSA and CDC are entirely separate subagencies within HHS and their grantmaking functions operate independently from one another. They are not even geographically co-located—HRSA is based in Rockville, Maryland, and CDC is headquartered in Atlanta, Georgia. Yet, these independent entities each terminated multiple AAP awards on the same day. The logical inference is that both HRSA and CDC were responding

to an instruction from their parent agency, HHS, to scrutinize and terminate AAP awards, or were engaged in a coordinated effort.

There is also other evidence that the termination decisions were made outside of typical channels. AAP was in regular communications with HRSA and CDC staff about the projects funded by these awards. Waldron Decl. ¶¶ 14, 16. But there was no advanced warning from program staff at any time that either agency had any concerns with the projects' alignment with their priorities. *Id.* ¶ 28. Indeed, agency staff routinely made suggestions to AAP staff when they did have concerns or preferences about their projects in the past. *Id.* ¶¶ 14, 27. Moreover, regular program staff were apparently not aware of the terminations even after they occurred. On December 17—the day after the terminations—AAP received a routine communication from program staff at CDC inquiring about AAP's plans for implementing an aspect of one of the affected programs, apparently unaware that it had been defunded. *Id.* ¶ 31. AAP staff were told by agency staff that they were unaware of these terminations, which AAP staff understood to mean that the terminations came at the direction of HHS leadership, rather than through normal channels. *Id.* ¶ 34.[1]

*Fourth*, AAP was singled out for adverse treatment. *See Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (recognizing in the retaliatory arrest context that one particularly probative type of evidence of retaliation is "objective evidence that [the plaintiff] was [sanctioned] when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been") (internal quotation marks omitted). In many instances, AAP was just one of many awardees under a given program, yet it alone had its funding terminated. One particularly egregious example involves a

---

[1] The Washington Post reported that James Miller, a top HHS official and a political appointee, emailed other department and CDC officials on December 16 with the subject line, "CDC Termination Memos for Review," and directed officials to "please proceed with canceling these today if not done already." Jordan Faircloth, CDC's deputy chief of staff and a political appointee, responded about an hour later: "10-4. On it." *See* Lena H. Sun & Paige Winfield Cunningham, *American Academy of Pediatrics loses HHS funding after criticizing RFK Jr.*, Wash. Post (Dec. 17, 2025), https://perma.cc/MC32-WRU7.

HRSA award supporting an Early Hearing and Detection Intervention network. The network operates as a partnership between three national organizations (one operated by AAP and two others). Yet, though HRSA terminated the award to AAP purportedly on the ground that the program no longer effectuates agency priorities, the awards of AAP's two partner organizations have not been rescinded and the program is continuing to operate, just without the critical support AAP had been providing. Waldron Decl. ¶ 37.

Likewise, AAP is just one of several dozen awardees under a program denominated "Enhancing Partnerships to Address Birth Defects, Infant Disorders and Related Conditions, and the Health of Pregnant and Postpartum People." *Id.* ¶¶ 19, 35. The CDC's terse termination letter to AAP seems to fault AAP's award documents for focusing on "pregnant and postpartum people," which the agency views as indicative of an "identity-based" approach that the agency no longer wants to support. *Id.*, Ex. 3, at 7. Even setting aside that absurdity that AAP is being faulted for using the very nomenclature adopted by CDC itself in the very title of its own award program (which AAP had preemptively flagged for CDC to no avail), to the best of AAP's knowledge, none of the dozens of other awardees receiving awards under the same program to support "pregnant and postpartum people" has been terminated. *Id.* ¶ 35.

*Fifth*, retaliation can be inferred from the sheer implausibility of Defendants' proffered justifications for the terminations. *See Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022) (pointing to "evidence that the defendant proffered false or pretextual explanations for the adverse action."). Here, there are numerous incongruities in HRSA's and CDC's respective justifications for the award terminations. For example, as noted above, AAP received no advanced warning from HRSA or CDC technical staff about concerns with the focus of any of the terminated awards. On the contrary, continued funding of each award was approved during the Trump administration, and after numerous executive orders stating the administration's policy preferences as to federal funding.

17

Waldron Decl. ¶ 17. Almost all of the awards were approved for continued funding while those

agencies were under their respective current heads (Thomas J. Engels as HRSA Administrator and

Jim O'Neill as Acting CDC Director). *See id.* ¶¶ 19–25 (identifying the "recent budget period" for

each award and, in the case of the award identified as "HRSA Award 4," the date of extension of

funding).[2] Funding for four of the seven terminated awards was approved as recently as September

2025—just three months before the terminations. *Id.* ¶ 17.

      The sheer implausibility of the agencies' changed-priorities rationale is further confirmed by

the agencies' insistence that each of the awards would need to be terminated outright. The agencies'

unwillingness to afford AAP an opportunity to make modifications to better align its programs with

the agencies' new claimed priorities, as is typically done when an agency wishes to change the focus

of an award, suggests that the agency was more concerned with punishing AAP than conforming the

programs to updated priorities. *See supra* at 9 (quoting the termination letters).

      The termination letters also employ cursory boilerplate language that evinces no

consideration of the merits of the individual awards being terminated. Each of the CDC letters

describes the AAP program at issue as "not aligned" with CDC's desire to "deprioritize diversity,

equity, and inclusion (DEI) initiatives," followed by a few cherrypicked references in the respective

award materials to concepts such as "health equity." Waldron Decl., Ex's. 1–3. The HRSA letters are

even more rote, asserting without elaboration that the termination is based on a desire to "focus[]

agency resources toward activities that more directly support improved health outcomes for

adolescents and young adults, including the addition of a focused emphasis on nutrition and the

prevention and management of chronic disease." *Id.*, Exs. 4–7. Bizarrely, HRSA used that same

justification even when terminating an AAP award for "Comprehensive Systems Integration for

---

    [2] Mr. Engels began serving as HRSA Administrator in February 2025. *See*
https://perma.cc/P8ZQ-QLCB. Mr. O'Neill began serving as Acting CDC Director in August
2025. *See* https://perma.cc/3MFE-FEZQ.

Adolescent and Young Adult Health (HRSA-23-079)," a program that is, obviously, focused on improving health outcomes for adolescents, including through management of chronic disease. Waldron Decl. ¶¶ 23, 39. A second award terminated on this rationale supported AAP's National Rural Adolescent and Child Health ECHO Training Center, even though project activities specifically focus on the stated priorities of nutrition and chronic disease prevention. *Id.* ¶¶ 22, 38.

In light of the sheer implausibility of Defendants' explanations for the award terminations, Defendants' ideological compatriots had no trouble in seeing the terminations for what they are: an effort to "defund" AAP based on positions it has taken on vaccines and other public health issues. *See supra* at 2. There is simply no room for doubt that the but-for cause of the termination of AAP's awards was Defendants' desire to harm AAP for its advocacy, a direct violation of the First Amendment.

### B.  The terminations are also unconstitutional viewpoint discrimination

For much the same reasons, the award terminations constitute impermissible viewpoint discrimination. It is axiomatic that the government may not regulate speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 168–69 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *see also Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) ("To permit one side . . . to have a monopoly in expressing its views . . . is the antithesis of constitutional guarantees." (internal quotation marks omitted)). Such government targeting is a "'blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 158 (quoting *Rosenberger*, 515 U.S. at 829); *see also, e.g., Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 99 (D.D.C. 2025). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

The confluence of circumstances here establishes that AAP was targeted for its views. As one member of the ACIP has candidly acknowledged, "HHS has terminated multiple federal awards to the American Academy of Pediatrics (AAP)" for the purportedly "good reason" that AAP has recommended pediatricians practice gender-affirming care when it is in the best interest of the child, "issued its own COVID-19 vaccination guidance that diverged from [recently changed] federal policy," and "continues to use 'identity-based language.'" Robert W. Malone, MD (@RWMaloneMD), X (Dec. 17, 2025, at 9:10pm ET), https://perma.cc/UQ3R-ZNVB. Targeting an organization for adverse governmental action based on its views on matters of public policy and its language choices is paradigmatic viewpoint discrimination that is repugnant to the First Amendment.

### C. This Court has jurisdiction to award relief

Plaintiffs are also likely to prevail in showing that this Court has jurisdiction to award relief. In other recent cases where parties have challenged award terminations in district court, the government has argued that the suits are disguised contract actions that are within the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a). *See, e.g., Vera Institute of Justice v. DOJ*, No. 25-5248 (D.C. Cir.); *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir.) (en banc review granted on Dec. 17, 2025). But whatever rule may apply in the context of other types of challenges, such as under the Administrative Procedure Act, the law is clear that First Amendment claims like those at issue here can properly be brought in district court. *See American Bar Ass'n v. DOJ*, 783 F. Supp. 3d at 243–45 (rejecting the government's Tucker Act argument in the context of a First Amendment claim). The D.C. Circuit has recognized "that Tucker Act jurisdiction is not exclusive for claims founded upon the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).

This conclusion follows from the D.C. Circuit's two-part test for identifying "disguised" contract actions that properly belong within the exclusive jurisdiction of the Court of Claims. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Specifically, the analysis turns on "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought." *Id.* Here, the source of AAP's rights is the First Amendment to the Constitution, not any provision of its award agreements. The extent of AAP's rights under the agreements is immaterial. *See Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972) (recognizing that a plaintiff's "lack of a contractual" right is "immaterial to his free speech claim"). Likewise, the remedy sought is not monetary damages or an order requiring the government to specifically perform the terms of its award agreements. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). Rather, AAP seeks the traditional First Amendment remedy of an injunction against enforcement of unconstitutionally motivated governmental action.[3]

## II. AAP Will Suffer Irreparable Harm Absent Immediate Relief

AAP is suffering and will continue to suffer irreparable harm from Defendants' retaliatory and otherwise unlawful termination of their awards. In light of AAP's likelihood of success on the merits, its First Amendment injuries require emergency relief. *See Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022). And the threat to the very existence of several AAP programs requires as much speed as possible in obtaining that relief.

It is settled law in this Circuit that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (internal quotation marks

---

[3] For the same reasons that the terminations violate the First Amendment, they also violate the Administrative Procedure Act because they constitute adverse final agency action in contravention of the prohibition in 5 U.S.C. § 706(2)(B) against agency action that is "contrary to constitutional right." In addition to the First Amendment and APA claims, the Complaint asserts an equal protection claim, but for purposes of this motion, AAP relies exclusively on its First Amendment and related APA claims.

omitted); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same, as to "the loss of constitutional freedoms" generally (quoting *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (plurality opinion)); *see also Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." (internal quotation marks omitted)). Thus, "[s]uits involving 'the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.'" *Talbott v. United States*, No. 25-cv-240, 2025 WL 842332, at *36 (D.D.C. Mar. 18, 2025) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)).

As described above, AAP's "First Amendment interests are . . . being impaired" by HHS's adverse actions, which are designed to chill AAP's protected speech and petition rights. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Nat'l Treasury Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991)). AAP has thus established that it is being irreparably injured by Defendants' adverse actions against it.

Further, accounting for its current funds and expenses, AAP will have no choice but to begin laying off dozens of staff (and approximately 10% of AAP's total full-time employees) beginning January 9. Del Monte Decl. ¶ 12. Without its award funding, and without its staff, AAP will not be able to carry out this vital work. Even if award funding is ultimately restored at the conclusion of the litigation, critical staff may have taken other jobs. *Id.* ¶ 14. AAP must also break off relationships with partner organizations, damaging AAP's reputation as a leader in the field and as a trusted partner.  Waldron Decl. ¶ 45. Given the magnitude of the impact on AAP's operations, allowing the terminations to persist for the duration of the litigation would inflict irreparable harm. *See American Bar Ass'n v. DOJ*, 783 F. Supp. 3d at 247 (finding irreparable harm where the loss of award funding would threaten the existence of the plaintiff's operations).

The terminations also threaten irreparable harm to AAP's core mission to advance children's health and the profession of pediatrics that cannot be reversed once AAP halts work on its life-saving projects funded by the federal awards. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (concluding that actions that "unquestionably make it more difficult" for an organization "to accomplish [its] primary mission" constitute irreparable harm warranting emergency relief). As a result of the terminations, all the critical projects discussed above will be discontinued. Waldron Decl. ¶ 41. These essential programs and services will no longer be provided by AAP. *Id.* To cite just a few examples, the award terminations will leave communities with diminished ability to prevent community spread of harmful infectious diseases that impact infants and children; will halt efforts to prevent infants from dying in their cribs; will end efforts to promote early action in response to life-threatening sepsis infections; and will remove resources for preventing congenital heart defects and improving outcomes for affected children and adults. *Id.* ¶ 43. Preventable illnesses—including life-threatening ones—will spread more freely; conditions such as fetal alcohol syndrome and hearing impairments will be detected later, depriving children of the benefits of early interventions; and adolescents will be denied resources and interventions to combat substance abuse and mental health crises. *Id.* Critical information about the prevention of sudden unexpected infant death syndrome will not be adequately publicized, raising the specter of avoidable infant deaths. The abrupt termination of these critical resources is antithetical to AAP's mission to protect children's health and unquestionably prevents AAP from carrying out its mission.

### III. The Equitable Factors Strongly Favor Emergency Relief

The final two temporary restraining order factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, AAP's strong likelihood of success on the merits, *see supra* section I, itself establishes that the equities and public interest favor preliminary relief. "It is well established that the

Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). There is therefore "generally no public interest in the perpetuation of unlawful agency action." *Id.* (internal quotation marks omitted).

That is particularly true where, as here, constitutional rights are at stake. The Constitution "is the ultimate expression of the public interest," so "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (internal quotation marks omitted); *see also, e.g.*, *Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal citation and quotation marks omitted)).

Even beyond the need to protect AAP's First Amendment rights, awarding preliminary relief to reinstate AAP's awards is in the public interest. As illustrated above, *supra* at 23, the eliminated programs provide critical public health services; because of AAP's inability to carry out these programs, children's lives are now at avoidable risk. The public interest overwhelmingly favors the maintenance of these programs during the pendency of the litigation.[4]

## CONCLUSION

For all these reasons, the Court should grant AAP's motion and enter a temporary restraining order, or preliminary injunction, as set forth in the attached proposed order.

---

[4] AAP respectfully submits that, if the Court awards preliminary relief, it should set any bond required under Federal Rule of Civil Procedure 65(c) at a de minimis level. An onerous bond is not warranted "where requiring one would have the effect of denying [a] plaintiff[] [its] right to judicial review of administrative action." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025). Imposing anything more than a minimal bond would have that effect here because, as explained above, AAP does not have the resources to function without the award money that Defendants unlawfully withdrew—and so does not have the resources for a bond either.

December 24, 2025

Respectfully submitted,

*/s/ Joshua M. Salzman*
Joshua M. Salzman (D.C. Bar No. 982239)
Allyson R. Scher (D.C. Bar No. 1616379)
Michael J. Torcello (D.C. Bar No. 90014480)
Joel McElvain (D.C. Bar. No. 448431)
Robin F. Thurston (D.C. Bar No. 1531399)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jsalzman@democracyforward.org
ascher@democracyforward.org
mtorcello@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiff*