**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN ACADEMY OF PEDIATRICS,

       *Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

       *Defendants*.

Case No. 1:25-cv-4505-BAH

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER OR,
IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

    I.    AAP Is Likely to Succeed on the Merits .................................................................. 2

        A. The award terminations are unconstitutional retaliation ................................................ 4

        B. The award terminations are also unconstitutional viewpoint discrimination ............... 12

        C. This Court has jurisdiction to provide relief ................................................................ 12

    II.    AAP Will Suffer Irreparable Harm Absent Immediate Relief ...................................... 17

    III.    Equitable Relief Is in the Public Interest ................................................................... 21

    IV.    No Stay Should Be Issued ........................................................................................ 22

    V.    Any Bond Should Be *De Minimis* .......................................................................... 23

CONCLUSION ...................................................................................................................... 23

## INTRODUCTION

Defendants' submissions only confirm that the American Academy of Pediatrics (AAP) was singled out for adverse treatment based on its protected speech. There is no dispute that AAP has been a vocal advocate on public health matters and a prominent critic of Defendants' several recent departures from evidence-backed public health policies. AAP has exercised its First Amendment rights both by speaking out and by bringing litigation to challenge the Department of Health and Human Services' (HHS) unprecedented and unscientific reversals. Defendants have responded by terminating awards supporting AAP programs that promote public health. The affected programs are generally unrelated to these high-profile health policy disputes. For example, Defendants punished AAP for its advocacy by pulling its funding under one program that provides training and technical assistance to rural healthcare providers and another program promoting early action to combat sepsis in children.

Defendants attribute the termination of seven AAP grant awards to large-scale programmatic reviews being conducted by the Centers for Disease Control and Prevention (CDC) and the Health Resources and Services Administration (HRSA), but they concede that HRSA has thus far only terminated AAP's grants and that CDC has terminated only a tiny handful of others. Baugh Decl. ¶ 15, ECF No. 16-2; Legier Decl. ¶ 10, ECF No. 16-1. Given that each agency administers several thousand grants, these numbers are striking.[1] And Defendants' declarations are even more telling in what they do not say. These carefully worded submissions never deny that the termination decisions here were directed by the senior HHS officials who have vitriolically expressed overt hostility to AAP based on its public health advocacy. Nor do they include any affirmative statement disclaiming that AAP's protected speech factored into the

---

[1] Tracking Accountability in Gov't Grants Sys., Grants by OPDIV, Dep't of Health & Hum. Servs. (Dec. 24, 2025), https://perma.cc/F2JH-4K29.

1

termination decisions. When combined with the numerous other incongruities of timing and reasoning identified in AAP's opening brief and unrebutted by Defendants, the evidence of First Amendment retaliation and viewpoint discrimination is overwhelming.

Defendants principally seek to evade review by arguing that any challenge to an award termination is a contract claim that must be asserted in the Court of Federal Claims. But that argument has been repeatedly and soundly rejected in the context of constitutional claims generally and First Amendment claims in particular. Defendants identify no contrary authority.

The remaining factors weigh decisively in favor of injunctive relief. AAP is in urgent need of relief as its life-saving programs, its mission, its staff, and its First Amendment freedoms all face imminent jeopardy as a result of Defendants' abrupt and callous decision to terminate awards that funded AAP's vital programs. The public interest also favors allowing AAP to continue supporting and educating pediatric providers so they can better protect, diagnose, and treat their patients. Injunctive relief should issue no later than January 9, 2026.

## ARGUMENT

### I.  AAP Is Likely to Succeed on the Merits

AAP has readily shown that it is likely to succeed on the merits of its First Amendment claims: HRSA and CDC terminated nearly $12 million in federal awards to AAP because HHS leadership decided to punish AAP for its speech that contradicted and criticized HHS's views on high-profile health policy issues.[2] As explained below, Defendants do not deny any of the core

---

[2] Contrary to Defendants' characterization, Opp. 7, ECF No. 16, AAP does not seek a mandatory injunction that would alter the status quo. "The status quo is the last uncontested status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (citation omitted). "Courts also have awarded preliminary injunctions when it is necessary to compel defendant to correct injury already inflicted by defining the status quo as 'the last peaceable uncontested status' existing between the parties before the dispute developed." *Id.* at 733–34. AAP simply seeks relief that would confirm the state of affairs before this dispute developed.

elements of AAP's claims, but instead, they protest that any individual piece of evidence alone is not sufficient to prove retaliation or viewpoint discrimination. Defendants' theory misses the mark—the cumulative evidence here, including Defendants' expression of hostility to the protected speech, the proximity in time between the protected speech and government's adverse actions, and the absence of a proffered plausible alternative explanation for Defendants' actions, compels the conclusion that AAP was targeted and punished by HHS leadership for its views. *See Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025).

*American Bar Association v. Department of Justice*, 783 F. Supp. 3d 236 (D.D.C. 2025) is directly on point. Defendants' perplexing assertion that the case is dissimilar because the *ABA* court relied on "direct evidence" of retaliation is badly mistaken. Opp. 17–18. In *ABA*, the court determined that ABA was likely to succeed on its First Amendment claims because of substantial circumstantial evidence that is strikingly similar to the evidence present here, including: contemporaneous statements that evince retaliatory motive; temporal proximity between ABA's speech and the termination of ABA's grants; lack of plausible proffered justification that the grants no longer aligned with the agency's priorities; lack of plausible explanation for why ABA's grants were suddenly deemed inconsistent with the goals of the administration; disparate treatment of other similarly situated grantees; and other grant recipients that continued to conduct similar training functions with the same grant money. 783 F. Supp. 3d at 246–47. The court in *ABA* therefore concluded that ABA handily demonstrated that the "government's proffered justification for terminating the grants is pretextual, and that the real reason was retaliation." *Id.* at 246. The same principles apply here to conclusively establish that the government's proffered justification for AAP's award terminations is pretextual, and that the real reason was retaliation.

## A. The award terminations are unconstitutional retaliation

AAP has made a strong showing that Defendants terminated AAP's federal awards to retaliate against it for engaging in protected speech. Defendants principally question whether AAP has proven that its First Amendment activity was the but-for cause of the award terminations.[3] But Defendants offer no credible reason to reject the overwhelming evidence that the award terminations here—which supported more than a dozen AAP programs that furnish resources to medical providers and facilitate early detection and interventions for various pediatric diseases and conditions—are only explicable as retaliation for AAP's advocacy. *See* AAP Br. 14–19, ECF No. 2-1. Instead, Defendants unconvincingly assert that the government is entitled to "the presumption of regularity." Opp. 16 (quotation marks omitted). "The presumption of regularity, however, is just that, a presumption." *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 89 (D.D.C. 2025). To the extent that the government has not already forfeited its right to the presumption of regularity, *see id.* at 92 ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity.") (collecting cases), AAP has easily rebutted any presumption with "clear evidence" demonstrative of HHS's unlawful retaliatory intent. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

Most critically, Defendants *do not deny* the core elements of AAP's retaliation claim. Defendants do not deny that Secretary Kennedy, his senior HHS advisor, and multiple of his CDC advisors have repeatedly attacked AAP's speech and advocacy on matters of public

---

[3] Defendants also make a cursory argument that AAP has not established that "the cancellation of $12 million in grants is sufficient to chill a person of ordinary firmness," Opp. 16, but AAP has conclusively met that threshold by explaining that the "sudden ripping away of funding—thereby functionally extinguishing significant portions of AAP's work—is unquestionably 'sufficiently adverse . . . to give rise to an actionable First Amendment claim.'" AAP Br. 13 (citation omitted). The harms to AAP are discussed further in Part II, *infra*, which addresses irreparable harm.

concern. Defendants do not deny that AAP has continually clashed with HHS over vaccine policy and other public health issues since Secretary Kennedy's confirmation. Defendants do not deny that HHS leadership directed HRSA and CDC to terminate AAP's awards. Nor do their declarants swear to any affirmative statement disclaiming that AAP's protected speech factored into the termination decisions. Defendants also do not deny that in many instances, AAP was just one of many awardees under a given program, yet it alone had its funding terminated. Likewise, it is uncontested that certain award terminations have no plausible link to Defendants' proffered justification. Defendants' concessions conclusively demonstrate that AAP's First Amendment activity was the cause of HHS's decision to terminate AAP's federal awards.

1. AAP has demonstrated that it was targeted by HHS leadership and, as a result, HRSA and CDC terminated nearly $12 million in AAP's federal awards. In fact, public statements by Mike Stuart, HHS's General Counsel, and Secretary Kennedy from *this past week* confirm as much. On December 27, 2025, Stuart retweeted a news article about the initiation of this lawsuit and wrote that "AAP's decision to hire radical, anti-Trump, anti-faith, and anti-mainstream counsel for its lawsuit against HHS sends a clear message about its true agenda" and that he is "going to" stop AAP's "wasteful spending" because "[t]he days of *unchecked funding for radical causes* are over." Mike Stuart (@HHSGCMikeStuart), X (Dec. 27, 2025, at 12:26pm ET) (emphasis added), https://perma.cc/SS4S-KSVT. Secretary Kennedy, in turn, credited Stuart with the decision to terminate AAP's federal awards, retweeting Stuart's post and stating: "Thank you, Mike Stuart, for stopping this wasteful spending and fiercely defending the interests of hardworking Americans." Robert F. Kennedy, Jr. (@SecKennedy), X (Dec. 27, 2025, at 12:45pm ET), https://perma.cc/PPU4-VUHR.

Tellingly, nowhere in Defendants' declarations from CDC and HRSA employees does either declarant disclaim that HHS leadership directed AAP's award terminations. Instead, both

CDC and HRSA declarants state in the passive voice that *some unknown* decisionmaker decided to terminate AAP's awards. *See* Legier Decl. ¶ 12 ("*[I]t was determined* that the application submissions and design elements of the awards no longer aligned with current CDC and HHS priorities.") (emphasis added); Baugh Decl. ¶ 14 ("*[I]t was determined* that it was necessary to make adjustments to the [terminated AAP awards].") (emphasis added). These events, combined with the facts that (i) AAP's awards with both HRSA and CDC were terminated on the same day, *see* AAP Br. 15–16; (ii) HRSA and CDC staff, who in the normal course would indicate concerns or preferences about certain projects to AAP staff, were unaware of the abrupt award terminations, *see* AAP Br. 16; and (iii) an HHS official purportedly emailed CDC officials on December 16 with the direction to terminate specific AAP awards, *see* AAP Br. 16 n.1, leave no doubt as to what Secretary Kennedy's and General Counsel Stuart's social media messages have since confirmed: AAP was targeted by HHS leadership. AAP's mountain of evidence that Secretary Kennedy, top HHS advisors, and HHS's General Counsel repeatedly and recently attacked AAP *because of* AAP's vaccine-related lawsuit and its speech on children's health policy issues,[4] when combined with clear evidence that AAP's award termination decisions were made outside of typical channels and at the direction of HHS leadership, demonstrates that the award terminations here are only explicable as retaliation for AAP's advocacy.

Defendants attempt to downplay the Secretary's repeated vitriolic attacks on AAP as "a few comments." Opp. 18. But there can be no denying the frequency and hostility of the Secretary's attacks on AAP. Defendants decline to address Secretary Kennedy's repeated (and false) accusations that AAP's positions on children's health policy are "a pay-to-play scheme to

---

[4] Just two days ago, Advisory Committee on Immunization Practices (ACIP) member Retsef Levi, who was selected to lead its COVID-19 immunization workgroup, criticized AAP's vaccine-related speech in apparent response to this lawsuit. *See* Retsef Levi (@RetsefL), X (Dec. 30, 2025, at 5:11pm ET), https://perma.cc/4LFK-49P4.

promote commercial ambitions of AAP's Big Pharma benefactors," "malpractice," and "betray[] [AAP's] oath to first do no harm," AAP Br. 7–8. *Cf. Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 255 (D.D.C. 2025) (Courts may consider a defendant's "contemporaneous statements" when assessing "retaliatory motive."); *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 162 (D.D.C. 2025) ("President Trump's repeated prior statements about plaintiff and lawyers formerly associated with the Firm provide probative context that informs assessment of the retaliatory purpose of the Order as a whole."); *Am. Bar Ass'n*, 783 F. Supp. 3d at 245–46.

Instead, Defendants attempt to minimize the roles of Secretary Kennedy's senior advisors, who have called AAP "demonic" and accused it of "committing war on kids," called for AAP to be "shamed and shunned," said there have to be "consequences" for AAP's "frivolous" lawsuit challenging recent changes to CDC's vaccine schedules and vaccine advisory body, and repeatedly called attention to the fact that AAP is the recipient of millions of dollars in federal awards. AAP Br. 8, 13–15 (citation omitted). But Defendants merely assert that these HHS advisors have "no apparent role with respect to the grants—let alone the ability to terminate them."[5] Opp. 18. That statement means nothing where, as here, there is overwhelming evidence that HHS leadership circumvented the typical award review process and directed HRSA and CDC to terminate AAP's awards, and Defendants do not disclaim that HHS leadership directed HRSA and CDC to terminate the federal awards. The present circumstances therefore do not remotely resemble the Title VII cases cited by Defendants, in which the individuals who had

---

[5] Defendants also incorrectly assert that Calley Means—who called AAP "demonic"—"left his role as an advisor to Secretary Kennedy before the grant terminations." Opp. 20. Means left his role as a special government employee in October, as was required, but returned in November as a "senior advisor" at HHS. Dani Blum, *Calley Means Returns to Kennedy's Side as Senior Adviser*, N.Y. Times (Nov. 18, 2025), https://perma.cc/2KCY-B9TN.

expressed discontent with an employee were not the same individuals who initiated an adverse employment action against the employee. *See* Opp. 19–20.

In *Media Matters*, the D.C. Circuit made plain that public criticism from individuals known to be involved with the decisionmaker—even individuals with no formal role in the government—was persuasive "circumstantial evidence" that "can support a finding that protected speech caused the agency's response." *Media Matters*, 2025 WL 2988966, at *8; *see* AAP Br. 14–15. Accordingly, the numerous statements by Children's Health Defense—an organization Secretary Kennedy founded and long chaired—and by several of Secretary Kennedy's handpicked vaccine advisors, that attack AAP for its speech and lawsuit against HHS, and explicitly link that speech to the award terminations, are persuasive circumstantial evidence that AAP's protected speech caused the award terminations. *See, e.g.*, Robert W. Malone, MD (@RWMaloneMD), X (Dec. 17, 2025, at 9:10pm ET), https://perma.cc/UQ3R-ZNVB ("HHS has terminated multiple federal awards to the American Academy of Pediatrics (AAP)" for the purportedly "good reason" that AAP has recommended pediatricians practice gender-affirming care when it is in the best interest of the child, "issued its own COVID-19 vaccination guidance that diverged from [recently changed] federal policy," and "continues to use 'identity-based language.'"); Children's Health Defense (@ChildrensHD), X (Dec. 17, 2025, at 8:53pm ET), https://perma.cc/2CEY-XEAT ("applaud[ing] the "defunding" of AAP). Defendants' observation that *Media Matters* came to the court in a different posture, in which the government had the burden to prove likelihood of success on the merits, does not undermine the logic of this conclusion.

Defendants' accusation that AAP is "rel[ying] almost exclusively on statements by non-decisionmakers," Opp. 19, is especially perplexing given that Defendants have refused to clearly identify who the decisionmakers even were. Defendants seem to concede that the program staff

normally responsible for administering the grants were cut out of the process. Opp. 22. But beyond that, there is no clarity. For example, the CDC termination letters were signed by Jamie Legier, but as noted, Legier's declaration is written in the passive voice and Legier takes no responsibility for the termination decisions. On the contrary, even Legier seems uncertain as to which individuals contributed to the termination process. *See* Legier Decl. ¶ 14 (stating that certain individuals were uninvolved in the decisions "[a]s far as I am aware"). Secretary Kennedy's recent social media post seems to credit the HHS General Counsel with effectuating the terminations. Given Defendants' opacity and the clear departure from regular order, Defendants have given the Court no credible basis for assurance that any of the high-profile critics of AAP in Secretary Kennedy's orbit were uninvolved in the terminations.

2. The proximity in time between AAP's protected speech and the award terminations is probative of Defendants' retaliatory intent. Defendants retort that "[p]roximity alone is insufficient to obtain injunctive relief," Opp. 21, but AAP does not dispute this point, and, to the contrary, has readily shown temporal proximity in addition to a wealth of other evidence. Defendants also confusingly assert that "Plaintiff's failure to differentiate a specific act of protected speech from among this ongoing criticism negates its proximity argument." Opp. 22. But the implication that a plaintiff that is *too* outspoken would be unable to prove retaliation for their "ongoing criticism" makes no sense. *Id.* Defendants cite no authority for this illogical proposition, and it is clearly rejected in *ABA*, which found probative temporal proximity between ABA's recent protected speech and the adverse governmental action when ABA had recently filed suit against the government, yet the government's retaliation was also based on ABA's "history of taking positions on contentious legal, policy, and social issues that frequently have not aligned with the positions advanced by DOJ and its litigation in support of activist causes." *Am. Bar Ass'n*, 783 F. Supp. 3d at 246 (cleaned up).

3. AAP was singled out for adverse treatment, demonstrating that AAP was targeted for reasons unrelated to Defendants' purported justification that the terminations were part of a broad initiative to identify awards that do not further current agency priorities. As AAP previously explained, in many instances, AAP was just one of many awardees under a given program, yet it alone had its funding terminated. *See* AAP Br. 16–17. Defendants offer no explanation at all (let alone a plausible explanation) as to why HRSA terminated AAP's award related to an Early Hearing and Detection Intervention network that operates as a partnership with two other organizations, but did not terminate the awards of AAP's two partner organizations. The same is true for AAP's terminated award that is just one of several dozen awardees under a program denominated—by CDC—"Enhancing Partnerships to Address Birth Defects, Infant Disorders and Related Conditions, and the Health of Pregnant and Postpartum People," but no other awardees receiving awards under the same program to support "pregnant and postpartum people" have been terminated. Defendants do not contest these facts, and they have no response for how the termination of AAP's awards, but not the awards of other organizations that are part of the very same program, is anything other than retaliation directed at AAP. *See Am. Bar Ass'n*, 783 F. Supp. 3d at 246–47 ("[T]he government's different treatment of other grantees suggests this justification is pretextual. DOJ did not terminate any other [of the same grant office's] grants, and, at oral argument, the government conceded that other grant recipients continue to conduct similar training functions with [the grant office's] money.").

Defendants' contention that "Plaintiff's conclusion is undermined by the facts that CDC has terminated six other discretionary awards for non-alignment with agency priorities," Opp. 23, is insufficient to overcome the plain evidence that AAP was singled out for adverse treatment compared to other organizations that received awards as part of the *very same programs*. Moreover, given that CDC administers thousands of grants, the fact that six other grants were

terminated hardly exonerates Defendants from a claim that AAP was selectively targeted. *See supra* n.1. And Defendants concede that HRSA has terminated only AAP's awards. Baugh Decl. ¶ 15.

4. Defendants' proffered justifications for the terminations are implausible on their face. Indeed, Defendants make no attempt to explain how any one of AAP's awards was inconsistent with agency priorities beyond the vague articulations in the HRSA and CDC letters—there is not a scintilla of additional information from the agencies' grant experts in their declarations. *See* AAP Br. 17–18. As AAP has explained, two of the awards that HRSA terminated out of a purported desire to "focus[] agency resources toward activities that more directly support improved health outcomes for adolescents and young adults, including the addition of a focused emphasis on nutrition and the prevention and management of chronic disease" were directed to the very purposes that HRSA claimed to be prioritizing. AAP Br. 18–19. Defendants offer no rebuttal or disavowal on this point, effectively conceding that the agency's stated justifications for these particular terminations are pretextual.

Nor can Defendants reasonably explain "why [the awards] were suddenly deemed inconsistent with the goals of the affected grants," *Am. Bar Ass'n*, 783 F. Supp. 3d at 246, when funding for all seven awards was approved this year, and four of the seven terminated awards were approved as recently as September 2025. AAP Br. 18. While Defendants advance that HRSA and CDC did not publish their priorities until September and October, that explanation does not account for why AAP received no advanced warning from HRSA or CDC technical staff about concerns with the focus of any of the terminated awards, the agencies' unwillingness to afford AAP an opportunity to make modifications to better align its programs with the agencies' new claimed priorities, and, of course, the proffered justifications for the terminations that are inconsistent with the terms of the award. AAP Br. 17–19.

Defendants' submission leaves no room for doubt that the but-for cause of the termination of AAP's awards was Defendants' desire to harm AAP for its advocacy in flagrant violation of the First Amendment.

**B.  The award terminations are also unconstitutional viewpoint discrimination**

For much the same reasons, the award terminations constitute impermissible viewpoint discrimination. AAP has demonstrated that it was targeted for adverse governmental action based on the "opinion or perspective of the speaker," *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015) (citation omitted), and therefore that AAP is likely to succeed in its First Amendment challenge.

**C.  This Court has jurisdiction to provide relief**

Defendants also insist that the Court lacks jurisdiction because the case is really a disguised contract action that the Tucker Act assigns to the exclusive jurisdiction of the Court of Federal Claims and/or a suit for money damages that falls outside of any waiver of sovereign immunity. But this Court is the proper forum (indeed, the only forum) for review of AAP's constitutional claims and has authority to enjoin government action violative of the First Amendment (here, the award terminations). Defendants' contrary argument conflicts with squarely controlling Supreme Court and D.C. Circuit precedent and numerous recent decisions from this District and others. Defendants barely engage with the specific claims asserted here, and do not identify even a single case adopting their arguments in the context of a First Amendment challenge.

1. This Court recently surveyed the law concerning the applicability of the Tucker Act to suits challenging agency decisions terminating grant awards. *See Urb. Sustainability Directors Network v. U.S. Dep't of Agric.*, 2025 WL 2374528, at *11–21 (D.D.C. Aug. 14, 2025). As this Court noted, many courts (including ultimately this one) have rejected the same arguments that

Defendants press here even in the context of claims that the award terminations were arbitrary and capricious or otherwise violative of the Administrative Procedure Act (APA). *See id.* at *20 (collecting cases). But while some courts have accepted the government's argument in the context of APA claims, courts have consistently rejected Tucker Act defenses in the context of constitutional claims. For courts in this Circuit, that result is compelled by binding precedent that Defendants fail to acknowledge. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609–10 (D.C. Cir. 1992) (holding "that Tucker Act jurisdiction is not exclusive for claims founded upon the Constitution" and litigants "may bring statutory and constitutional claims for specific relief in federal district court"), *abrogated on other grounds as recognized in Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Tellingly, two of the cases affirmatively cited by Defendants adopted their arguments as to APA claims, while nonetheless concluding that the Tucker Act did not bar constitutional claims. *See Vera Inst. of Just. v. DOJ*, 2025 WL 1865160, at *7 (D.D.C. July 7, 2025) ("The source of these claimed rights is thus the Constitution, not any grant award. The court therefore can hear those claims."); *Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*, 2025 WL 2615054, at *13 (D.D.C. Sep. 10, 2025) ("Plaintiffs' constitutional claims are thus properly before this Court.").[6]

First Amendment challenges, in particular, are properly asserted in district court, rather than the Court of Federal Claims. Defendants appear to recognize that Judge Cooper's recent

---

[6] The D.C. Circuit's recent opinion in *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), which involved APA and constitutional challenges to a grant termination, confirms that point. That sharply divided decision was recently vacated by the D.C. Circuit, which has decided to hear the case en banc. *Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025). But notably, one of the few points of commonality between the panel majority and the dissent is that the district court had jurisdiction to hear the plaintiff's constitutional challenge. *See* 154 F.4th at 817 ("And while the district court had jurisdiction over the grantees' constitutional claim, that claim is meritless."); *id.* at 831 (Pillard, J., dissenting) (noting the majority's acknowledgment that the constitutional claim was not jurisdictionally barred and arguing that plaintiff was entitled to relief on that claim).

decision in *ABA* squarely rejected their argument in the context of a First Amendment claim. Opp. 11–12. They suggest that Judge Cooper mistakenly relied on Supreme Court precedent that, according to Defendants, has been overruled *sub silentio.* Opp. 11–12. But the government did not even appeal Judge Cooper's ruling. *See* Joint Status Report, *Am. Bar Ass'n v. DOJ*, 25-cv-01263 (Dkt. 34) (D.D.C. July 14, 2025) (stating that government is not appealing the injunction in *ABA*). This stands in stark contrast to the ways in which the government has aggressively sought review of its Tucker Act arguments when applied to claims that grant terminations were arbitrary-and-capricious in violation of the APA. *See Dep't of Educ. v. California*, 604 U.S. 650 (2025) (seeking emergency Supreme Court review); *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (same).

And *ABA* is hardly an outlier—several other courts have rejected the argument that the Tucker Act applied to a First Amendment challenge. *See Am. Ass'n of Univ. Professors v. Trump*, No. 25-cv-07864, 2025 WL 3187762, at *21 (N.D. Cal. Nov. 14, 2025) ("Nothing requires Plaintiffs' First Amendment challenge to the Funding Cancellation to be routed to the Court of Federal Claims ('CFC'), which lacks the power to issue injunctive relief to halt a First Amendment violation or to stop its chilling effects."); *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 107 (D. Mass. 2025) ("[T]his Court cannot conclude that core First Amendment claims or pure statutory violations fall within the exclusive jurisdiction of the Court of Federal Claims."); *Thakur v. Trump*, 787 F. Supp. 3d 955, 991–92 (N.D. Cal. 2025) ("Here, as noted above, Plaintiffs have demonstrated that they are likely to succeed on a First Amendment claim alleging viewpoint discrimination that has nothing to do with the terms of the contracts. Plaintiffs cannot obtain injunctive relief to protect that constitutional right in the Court of Federal Claims."); *Ervin & Assocs., Inc. v. Dunlap*, 33 F.

Supp. 2d 1, 11–12 (D.D.C. 1997) (rejecting Tucker Act argument where plaintiff alleged that the government was "retaliating against [plaintiff] in violation of the First Amendment").

2. The two-part test for Tucker Act preclusion announced in *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), which Defendants agree governs, confirms that this suit was properly brought in district court. Defendants assert without explanation or analysis that "'the source of the rights' asserted by Plaintiff is the grant agreements themselves, including the contractual termination clause in each agreement." Opp. 10. But as AAP explained in its opening brief (AAP Br. 20–21), the source of AAP's rights here is the First Amendment, not the provisions of any funding agreement. AAP has not invoked any provision of its agreements or the regulations generally governing award terminations, 2 C.F.R. § 200.340(a). In fact, AAP's claim would be the same even if the Court were to assume that the agreements imposed no enforceable obligations on the government at all. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (holding that a plaintiff can state a cognizable First Amendment retaliation claim even in the absence of enforceable contractual rights because "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech"); *see also Orange v. District of Columbia*, 59 F.3d 1267, 1271–72 (D.C. Cir. 1995) (finding plaintiffs could "prevail on [a First Amendment] claim if they can show that the University dismissed them for exercising their First Amendment rights, whether or not they had an enforceable employment contract"). Defendants do not even acknowledge, let alone rebut, this analysis, which is determinative.

Defendants also miss the mark in insisting for purposes of the second prong of the *Megapulse* inquiry that the type of relief sought here is contractual. AAP seeks classic equitable

remedies, including injunctive and declaratory relief. *See* Compl. at 34, ECF No. 1. AAP's

primary objective in this case is to secure an injunction that prevents Defendants from "giving

effect to the terminations of AAP's grants," which were issued in violation of the First

Amendment. *Id.* This is the type of injunctive relief that is routinely awarded by district courts in

First Amendment cases. *See, e.g.*, *Perkins Coie LLP*, 783 F. Supp. 3d at 181 (permanently

enjoining defendants from enforcing or implementing an order that was issued in violation of the

First Amendment).

Defendants insist that the relief sought here is no different from a request for money

damages because if the award terminations are set aside, Defendants will have to continue

performing under the grant agreements and will be obligated to make payments to AAP. Opp.

11. But as this Court recently explained, precedent establishes that "an order for 'specific relief'

(undoing a wrongful action), even if resulting in the payment of money, is not the same as

'money damages.'" *Urb. Sustainability Directors Network*, 2025 WL 2374528, at *12 (analyzing

*Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988), and *Crowley Gov't Servs., Inc. v. Gen.*

*Servs. Admin.*, 38 F.4th 1099, 1107–08 (D.C. Cir. 2022)).

Defendants acknowledge that their argument conflicts with *Bowen*, but argue that the

relevant portion of that decision was implicitly overruled in *Great-West Life & Annuity*

*Insurance Co. v. Knudson*, 534 U.S. 204 (2002). But the latter case hardly can be said to have

overruled *Bowen* simply by including a citation to the *Bowen* dissent. *Knudson* is also readily

distinguishable. That decision held that a suit seeking a specific past due sum under a plan

agreement (there, $411,157.11) could not be brought under an ERISA provision that authorized

only suits for equitable relief. *See id.* at 207–09, 221. Here, AAP is not seeking "an injunction to

enforce a contractual obligation to pay money past due." *Id.* at 212. Rather, it seeks prospective

relief that will prevent future application of an unlawful termination. In any case, it is the

Supreme Court's exclusive prerogative to overrule its own decisions and this Court must continue to follow binding precedent even if subsequent decisions raise doubts about the continued vitality of that precedent. *See, e.g.*, *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016).

3. If more were needed, sovereign immunity is also inapplicable under the so-called "Larson–Dugan exception," which provides that sovereign immunity does not bar suits alleging that government officials "acted unconstitutionally" and which "request[] only injunctive and declaratory relief." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012); *see Urb. Sustainability Directors Network*, 2025 WL 2374528, at *20 n.9 (recognizing that "constitutional and other nonstatutory claims need not rely on any waiver of sovereign immunity because where an officer is not doing the business which the sovereign has empowered him to do such immunity did not attach in the first place") (cleaned up). As explained, this suit seeks declaratory and injunctive relief, not money damages. Accordingly, sovereign immunity imposes no bar to relief.

## II. AAP Will Suffer Irreparable Harm Absent Immediate Relief

As explained in its motion, AAP also faces immediate and irreparable harm absent emergency relief. The award terminations have impaired AAP's core First Amendment freedoms and have inflicted devastating harm to AAP's mission. Defendants do not meaningfully rebut either of these asserted harms.

For one, "[b]y establishing a likelihood of success on the merits of its First Amendment claims," AAP "has established it will suffer irreparable harm in the absence of preliminary relief." *Am. Bar Ass'n*, 783 F. Supp. 3d at 247. As the record demonstrates, AAP regularly engages in protected expressive activity, including by promoting public health positions at odds with those of the current administration and by participating in litigation against the government. Compl. ¶¶ 33–39; Del Monte Decl. ¶¶ 5–9, ECF No. 2-3. To punish AAP for that protected

activity, Defendants abruptly and unlawfully terminated several AAP awards. Compl. ¶¶ 40–61; *see* AAP Br. 12–20.

The termination of nearly $12 million in federal funding—not to mention the threat of future award terminations if AAP does not submit to Defendants' coercion—plainly impairs AAP's First Amendment rights to speak openly on matters of public concern and to petition the courts. This satisfies the irreparable harm requirement. *See, e.g.*, *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam))); *Am. Bar Ass'n*, 783 F. Supp. 3d at 247 (finding irreparable harm where "the ABA regularly engages in protected expressive activity, and DOJ's termination of its grants directly punishes that activity"); *see also Perkins Coie LLP*, 783 F. Supp. 3d at 178 (explaining that constitutional violations "would continue were the injunction lifted, meaning they are sufficient, by themselves, to establish irreparable harm").

The D.C. Circuit has held elsewhere that plaintiffs established irreparable harm where they were "suffering from a campaign of retaliation against them in response to their exercise of their First Amendment rights." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). That is the case here. Defendants have retaliated against AAP—by terminating nearly $12 million in federal awards—in direct response to AAP's protected First Amendment activity. This therefore constitutes irreparable harm under binding Circuit precedent. *Id.*; *accord, e.g.*, *Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-cv-1959, 2025 WL 2378009, at *22 (D.D.C. Aug. 15, 2025), *stay pending appeal denied*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025).

Defendants maintain that, to show irreparable harm based on free expression, a plaintiff must "demonstrate a likelihood that they are engaging or would engage in the protected activity

the governmental action is purportedly infringing." Opp. 26–27 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006)). But AAP has done just that. The protected activity here is speaking about public health issues and petitioning the courts. The record makes clear that AAP is engaged in that protected activity. Compl. ¶¶ 33–39; Del Monte Decl. ¶¶ 5–9. And the government action at issue in this case—retaliatory termination of AAP's funding—infringes on that protected activity.

While the First Amendment harm alone is sufficient, AAP has also demonstrated that it will suffer irreparable injury to its mission absent preliminary relief. As this Court has explained, "'obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission' may 'provide injury for purposes . . . of . . . irreparable harm.'" *Urb. Sustainability Directors Network*, 2025 WL 2374528, at *36 (alterations and omissions in original) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

AAP's mission is to advance children's health and the profession of pediatrics. Waldron Decl. ¶ 5, ECF No. 2-2. As Dr. Waldron's declaration explains, the award terminations make it substantially more difficult for AAP to accomplish that mission. AAP has been forced to discontinue critical projects funded by the now-terminated awards. *Id.* ¶ 41. As a result, doctors and families will lose access to critical resources, and AAP's subawardee partners will have to stop their work. *Id.* ¶¶ 43–44. And in one week, AAP will have to begin laying off dozens of staff—approximately 10% of its workforce. Del Monte Decl. ¶ 12. These harms to AAP's mission also satisfy the irreparable injury requirement. *See, e.g.*, *Urb. Sustainability Directors Network*, 2025 WL 2374528, at *36–37 (finding irreparable harm due to grant terminations where plaintiffs had to shut down programs, delay publication of educational resources, and lay off staff members); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 56–57 (D.D.C. 2025) (finding irreparable harm where some of plaintiff's members were forced

to shutter programs, and "patients or customers that rely on their services may be denied care when it is most needed").

Defendants insist that AAP has not shown the kind of loss that "threatens the very existence of the movant's business." Opp. 29 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). But it is nevertheless the case that vital resources and services will become permanently discontinued if AAP does not obtain relief. Waldron Decl. ¶ 41; *see also* Del Monte Decl. ¶ 18 ("AAP does not have another source of grant funds available to save the projects funded by the terminated awards."). In some cases, AAP was the only organization providing these life-saving resources, so they will no longer be available to those who rely on them. Waldron Decl. ¶ 41. This constitutes irreparable harm to AAP's mission, even though the organization's continued existence is not in question.

Defendants also seem confused about the nature of the programs at issue here. They contend that the asserted harms to public health depend on "assuming the best-case results for [AAP's] studies." Opp. 31. But the terminated programs were not research studies, and the benefits of these programs are not tied to "best-case results" or "speculation about scientific progress." *Id.* These programs support dissemination of existing scientific knowledge, best practices, and resources to help pediatric providers better care for their patients. As Dr. Waldron explains, the termination of funding will, among other things, jeopardize the release of national standards of care for certain newborn nurseries, hinder early identification of developmental delays, and halt a national communications campaign to promote mental health. Waldron Decl. ¶ 43. And while Defendants claim the terminated awards may not support "significant measurable health improvements for children," Opp. 30, Dr. Waldron details at length the numerous benefits these programs provide—and the massive harms that will result from their suspension, Waldron Decl. ¶¶ 19–25, 43. At bottom, Dr. Waldron attests that the award

terminations "will have a catastrophic effect on public health" and that "lives will be lost as a result of the terminations." *Id.* ¶ 46. Defendants offer nothing to suggest otherwise. AAP has thus satisfied its burden to show irreparable harm.[7]

## III. Equitable Relief Is in the Public Interest

The public interest also weighs strongly in favor of allowing AAP's literally life-saving programs to remain active during the pendency of the litigation. Defendants do not deny that absent injunctive relief, life-threatening illnesses such as sepsis will go without early identification and medical intervention. Conditions such as developmental delays and fetal alcohol syndrome will be detected later thereby depriving infants of the benefits of timely interventions, and critical information regarding sudden unexpected infant death syndrome will not be adequately publicized and disseminated to prevent devastating outcomes. AAP Br. 23–24.

Defendants instead suggest that these considerations are somehow outweighed by the danger that "[g]ranting a preliminary injunction would disrupt the Department's review of existing grants, which Plaintiff here does not challenge." Opp. 31. It is not entirely clear why Defendants believe that an injunction would have this effect. AAP has sought relief only on its own behalf and its legal theory is specific to the ways in which AAP has been singled out for

---

[7] This Court has observed that "[r]eputational injury may also be considered irreparable." *Urb. Sustainability Directors Network*, 2025 WL 2374528, at *36; *see also, e.g.*, *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) ("Reputational injury can also suffice to establish irreparable harm."). Here, Dr. Waldron explains that many AAP projects funded by the now-terminated awards have subawardees who have been forced to stop their work. Waldron Decl. ¶ 44. And she attests that "[t]his damage to AAP's partnerships will further harm AAP's reputation as a leader in the field and as a trusted partner on these issues. If AAP's funding is not reinstated, its partners will be forced to discontinue longstanding, effective working relationships." *Id.* ¶ 45; *see Urb. Sustainability Directors Network*, 2025 WL 2374528, at *38 (concluding that reputational harm was irreparable where it was "a direct result of the termination of federal funding that plaintiffs had been using to partner with community groups and provide resources to sub-awardees"). This reputational harm is not diminished by the fact that some partners expressed hopes that these (unlawful) terminations would be undone. *Contra* Opp. 30.

retaliation. In any case, this consideration pales in comparison to the public health implications of the terminations.

Defendants also note that they will be unable to recover any funds paid out as a result of an injunction. But these claimed harms should ring particularly hollow when funding for these same programs was approved mere months ago, while HHS, HRSA, and CDC were under their current respective leaderships. Waldron Decl. ¶ 17. These programs were sufficiently consistent with the current administration's priorities that it was willing to approve their continued funding.

## IV. No Stay Should Be Issued

Defendants ask that if the Court grants relief, it stay its order "pending the disposition of any appeal that is authorized by the Solicitor General" or, in the alternative, issue an administrative stay for seven days. Opp. 32. This request ignores the fact that AAP is in urgent need of relief, while it was Defendants who needlessly and vindictively terminated the awards without prior notice and gave those terminations immediate effect (in the case of HRSA) or nearly immediate effect (in the case of CDC). As this Court has recognized, if Defendants wish to facilitate judicial review, they have the option to agree to the "suspension or delay in the effective date of the termination decision during the pendency" of litigation. Minute Order (Dec. 29, 2025). AAP should not be forced to lay off critical staff because of Defendants' unwillingness to voluntarily take the steps necessary to preserve the status quo ante during the pendency of judicial review.

Any suggestion that Defendants have an urgent need to give these particular terminations immediate effect is incompatible with their merits argument. If the terminations of AAP's grants were merely part of a broad, ongoing effort to review CDC's and HRSA's grants for consistency with agency priorities, there should be no greater urgency to terminate the AAP awards than the many other awards that are apparently still being funded as the agencies complete their reviews.

22

## V.  Any Bond Should Be *De Minimis*

Defendants also ask this Court to impose an injunction bond of unspecified magnitude. The authority of the Court to require a bond under Federal Rule of Civil Procedure 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). As noted in AAP's opening brief, it is appropriate to set a bond at no higher than a *de minimis* level when imposing a more onerous bond would have the effect of denying the plaintiff its right to judicial review. AAP Br. 24 n.4 (citing *Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 130). That principle counsels in favor of, at most, a *de minimis* bond here. Beyond the bare request that a bond of some amount be required, Defendants offer no contrary argument.

## CONCLUSION

For all these reasons, the Court should grant AAP's motion and enter a temporary restraining order or preliminary injunction.

January 2, 2026

Respectfully submitted,

*/s/ Joshua M. Salzman*
Joshua M. Salzam (D.C. Bar. No. 982239)
Allyson R. Scher (D.C. Bar No. 1616379
Michael J. Torcello (D.C. Bar 90014490)
Joel McElvain (D.C. Bar. No. 448431)
Robin F. Thurston (D.C. Bar. No. 1531399)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jsalzman@democracyforward.org
ascher@democracyforward.org
mtorcello@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org