**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN ACADEMY OF PEDIATRICS, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-4505 (BAH) <br><br> Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

Facts matter in both law and science, and debates about the inferences to be drawn from the facts presented clarify the best path forward. When addressing the complexities of public health issues that affect the most vulnerable in our country, namely, our children, parents want recommendations based on evidence-based results and distilled after healthy debate among knowledgeable experts. Plaintiff, the American Academy of Pediatrics ("AAP"), as "the nation's premier professional organization for pediatric medicine," is considered "the best resource for information for pediatricians," providing information to pediatricians across the country and to the public that "is grounded in science and is subject to extensive vetting by subject matter experts, project advisory boards, federal project officers, and AAP staff." Pl.'s Mot. TRO or, Alternative, Prelim. Inj. ("Pl.'s Mot."), Decl. of AAP's Senior Vice President, Debra B. Waldron ("Waldron Decl.") ¶¶ 4, 6, ECF No. 2-2.

The dissemination of credible, expert-vetted information on public health issues is part of AAP's mission and has led the organization to support pediatric vaccination schedules to protect against various possibly chronic and life-threatening illnesses, including COVID-19, influenza, mumps, measles, rubella, and hepatitis B, even when the current leadership of the U.S. Department

of Health and Human Services ("HHS") has adopted a contrary position. *Id.* ¶ 7; Compl. ¶ 33, ECF No. 1. For the first time in thirty years, AAP's vaccination recommendations differ from those recently adopted by HHS and its Advisory Committee on Immunization Practices ("ACIP"). Pl.'s Mot., Decl. of AAP's Chief Exec. Off., Mark Del Monte ("Del Monte Decl.") ¶ 7, ECF No. 2-3. AAP has also continued to support access to gender-affirming care when such care is in the child's best interest, and this recommendation is, again, contrary to the current position of HHS. Compl. ¶ 38. In addition to offering independent expertise and views that differ from HHS on these critical public health issues for children, AAP has brought legal challenges to HHS administrative actions to remove all seventeen members of ACIP and the revised vaccination recommendations made by ACIP's replaced members, in a lawsuit filed, in July 2025, in federal court in Massachusetts. For its public dissemination of information on childhood vaccinations and gender-affirming care and legal advocacy, AAP has been targeted with public name calling and other pejorative statements reflecting clear animus by current HHS leadership and officials.

Then, on December 16, 2025, for the first time in AAP's history, seven of its grants—none of which involved programs directed at childhood vaccinations or gender-affirming care for children—were abruptly terminated by HHS on the basis that the "award no longer effectuates agency and [HHS] priorities." Compl. ¶¶ 24, 51. AAP promptly, on December 24, 2025, initiated this lawsuit against HHS and component agencies, the Centers for Disease Control and Prevention ("CDC") and the Health Resources and Service Administration ("HRSA") (collectively referred to as "HHS"), and the heads of these agencies, in their official capacities, claiming that the termination of these grants was made in retaliation for AAP's vigorous engagement in constitutionally protected free speech and amounts to a violation of the organization's free speech rights under the First Amendment of the U.S. Constitution.

This is not a case about whether AAP or HHS is right or even has the better position on vaccinations and gender-affirming care for children, or any other public health policy. This is a case about whether the federal government has exercised power in a manner designed to chill public health policy debate by retaliating against a leading and generally trusted pediatrician-member professional organization focused on improving the health of children. The First Amendment binds the United States to "a profound national commitment to the principle that debate on public interest should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). This constitutional right protects far more than just political speech and expression; the guarantee also secures the free flow of information for the promotion of "the advancement of truth, science, morality, and arts in general." *Roth v. United States*, 354 U.S. 476, 484 (1957).

AAP claims that HHS is using its power to terminate multi-year grants as part of a retaliatory campaign designed to chill AAP's speech on vaccines and other important public-health issues that differ from the views of the current HHS leadership. Such retaliatory government action is at odds with the First Amendment, which "eschew[s] silence coerced by law—the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 375-76 (1927) (Brandeis, J., concurring). When force and coercion replace reason in the marketplace of ideas, the public suffers by denial of access to high-quality information. In the realm of public health policy, where evidence-based research can make the difference between lives well-lived and chronic illness or even death, assuring such public access to information and debate is acutely important.

The termination of the seven HHS grants, representing almost two-thirds of AAP's federal funding, would result in the organization having to lay off about ten percent of its workforce by January 9, 2026. Compl. ¶¶ 25, 63. AAP seeks a preliminary injunction to "block the unlawful

termination of AAP's awards and require HRSA and CDC to immediately resume disbursing the funding awarded to AAP." Pl.'s Mem. Supp. Pl.'s Mot. TRO or, Alternative, Prelim. Inj. ("Pl.'s Mem.") at 3, ECF No. 2-1. Having marshaled substantial and undisputed evidence from statements and other actions by HHS leadership and officials that demonstrate the likelihood of retaliatory motive for the grant terminations at issue, AAP's motion for a preliminary injunction is granted, as explained more fully below. *See* ECF No. 2.

## I.    BACKGROUND

Set out below is the factual and procedural background relevant to resolving AAP's pending motion for preliminary injunctive relief. Notably, HHS "do[es] not dispute the material allegations in the Complaint." Defs.' Mem. Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n") at 4 n.1, ECF No. 16; *see* Mot. Hr'g (Jan. 6, 2026) Tr. at 43:15-18, ECF No. 19 (HHS counsel confirming this position).[1] Thus, for purposes of the instant motion, AAP's facts are assumed to be true.

### A.    Factual Background

AAP is a nearly 100-year-old "professional organization" of about "67,000 pediatricians, with members in every state in the country who provide direct care to infants, children, adolescents, and young adults in both hospital and outpatient settings." Waldron Decl. ¶ 4. To support its members across the country, AAP provides "training, technical assistance, education, quality improvement initiatives, and other support to pediatricians on critical public health topics," including "safe infant sleep, immunizations, youth and adolescent mental health, and birth defects and infant disorders." *Id*. ¶ 6. In addition, AAP "is the best resource for information for pediatricians," providing "public information [that] is grounded in science and is subject to extensive vetting by subject matter experts, project advisory boards, federal project officers, and

---

[1]    HHS is careful to "reserve the right to address those allegations at a later date." Defs.' Opp'n at 4 n.1.

AAP staff, depending on the topic," and guidance in the form of "AAP policy, which has been developed by national subject matter experts and reviewed by numerous peers and external organizations, including federal agencies, such as CDC and HRSA, and other professional societies." *Id.*

AAP's mission "is to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults." *Id.* ¶ 5; *see also* Del Monte Decl. ¶ 4. To advance this mission, AAP has an important role in "educating the public on issues of public health and advocating for the evidence-informed practices and expert consensus among its members on important public health matters." Waldron Decl. ¶ 7. AAP "identifies the expert consensus among its members on important child health matters and advocates for that position," including, for example, "speak[ing] out publicly about the importance of vaccinations, both for the vaccinated individuals and for immunity levels among the population generally, and to respond publicly to efforts by the administration to create confusion about vaccines that have been proven to be safe and effective." Del Monte Decl.¶ 5; *see also* Waldon Decl. ¶ 7.

### 1.    *CDC and HRSA Grant Awards to AAP*

AAP has been a long-standing recipient of federal grants. Compl. ¶ 24. HHS is authorized by Congress to award grants under various statutes. For example, the Public Health Service Act, 42 U.S.C. §§ 201 *et seq.*, authorizes HHS grant-making for public health initiatives such as preventative care; the Social Security Act, 42 U.S.C. § 701(a)(2), authorizes HHS grant-making for maternal and pediatric health, including by reducing infant mortality; and the Early Hearing Detection and Intervention Act, 42 U.S.C. § 280g-1, authorizes HHS grant-making for the development of statewide newborn and young child hearing screening, evaluation, and diagnosis. Compl. ¶ 20.

Obtaining a grant award from authorized federal funds is not easy and involves "a highly competitive application process."  Waldron Decl. ¶ 9.  An "agency will issue a notice of funding opportunity (NOFO) that lays out the requirements for applicants to meet the agency's goals and objectives for the award and specific criteria for scoring applications."  *Id.*  Applicants then take weeks or months to create an application package responsive to the NOFO.  *Id.* ¶ 10.  Information included in the package might include the applicant's "background and expertise in the area; the goals, objectives, and activities proposed to achieve the outcomes outlined by the federal agencies; . . . logistical details about how the project will be staffed and which partners will be part of the project"; and "budgetary information."  *Id.*  Successful applicants receive an award letter containing the terms and conditions of the award.  *Id.* ¶ 12.  Recipients of HHS grant awards are then assigned a liaison who serves as a point of contact between the awardee and agency "throughout the lifespan of the award."  *Id.* ¶ 14.

While grants typically have multiyear terms, notice of continued funding usually occurs annually.  *Id.* ¶ 15.  Grant recipients "must submit an annual noncompeting continuation application and progress report."  *Id.*  "While noncompeting continuation applications are not competitive insofar as other entities are not vying directly for the same award funds, the awardee must still persuade the agency to continue funding the award."  *Id.*  AAP has been the recipient of numerous grants with CDC and HRSA, and at the time of the termination of the seven grants at issue had active grants with both of these HHS components.  *Id.* ¶¶ 18-25.  Until December 16, 2025, the federal government had never terminated an award for federal funding for which AAP was the prime recipient.  *Id.* ¶ 29.

### 2.    *AAP's Public Statements and Advocacy*

Since at least the summer of 2025, AAP and HHS have taken divergent approaches on public health policy regarding childhood vaccines.  In June 2025, HHS Secretary Robert F.

Kennedy, Jr. fired the seventeen sitting members of ACIP, "an advisory committee that helps set vaccine policy and recommendations," and tapped his own picks as replacements.  Compl. ¶ 34. The next month, a lawsuit was initiated against HHS, CDC, and their respective heads, in the U.S. District Court for the District of Massachusetts, with AAP serving as the lead plaintiff, to challenge the firing of the seventeen sitting ACIP members and ACIP's replacement members' subsequent reclassifications of vaccines, as violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.  See* Third Am. Compl. ¶¶ 112, 123, 125, *Am. Acad. of Pediatrics v. Kennedy*, 1:25-cv-11916 (D. Mass. Nov. 5, 2025).  The reaction from HHS was swift: in August 2025, AAP was informed that the organization was no longer allowed to serve on ACIP's subcommittees.  Compl. ¶ 34.  That same month, AAP released its own vaccine recommendations.  *Id.* ¶ 36 n.11.  In September 2025, "ACIP voted to no longer routinely recommend COVID-19 vaccinations," and in December 2025, "ACIP voted to recommend ending universal vaccination at birth for hepatitis B."  *Id.* ¶ 35.

In contrast to ACIP's recent recommendations, AAP continues to recommend COVID-19, hepatitis B, and other vaccines, and "[f]or the first time in 30 years" has "published vaccine recommendations that significantly depart from the federal government's guidance."  *Id.* ¶ 36.  The head of AAP's infection-diseases committee, Dr. Sean O'Leary, said, in August 2025, in response to HHS's COVID-19 vaccination policy: "The majority of what we've seen from the secretary has been a pretty clearly orchestrated strategy to sow distrust in vaccines.  We make our recommendations based on what's in the best interest of the health of children."  *Id.* ¶ 36 (quoting Lena H. Sun, *RFK Jr., Pediatrician Association Clash over Covid Shots for Kids*, Wash. Post (Aug. 19, 2025), https://perma.cc/5PK4-8EY8).

AAP continues to make public statements recommending policies that differ from those expressed currently by HHS, and not only regarding childhood vaccination schedules. For example, on May 1, 2025, AAP released an article expressing concern about HHS's stance on transgender youth and stating that the organization "oppos[es] [HHS's] infringements on the patient-physician relationship." *Id.* ¶ 39 (quoting Melissa Jenco, *AAP Speaks Out Against HHS Report on Gender Dysphoria, Infringement on Physician-Patient Relationship*, Am. Acad. of Pediatrics (May 1, 2025), https://perma.cc/4W3E-2WN5).

### 3.    *HHS Officials' Pejorative Statements about AAP*

As AAP has spoken out about public health policy issues, the organization has repeatedly drawn attacks and negative critiques impugning its motivations from current high-level HHS officials, including, notably, statements from HHS Secretary Robert F. Kennedy, Jr. The Secretary "is widely known for his decades-long history of promoting anti-vaccine views that depart from the generally accepted scientific consensus," and "[h]e frequently questions the efficacy and safety of vaccines, in particular mRNA technology, which helped develop coronavirus vaccines during the pandemic." Compl. ¶ 34. On August 19, 2025, for instance, Secretary Kennedy posted to social media a screenshot of AAP thanking four corporate donors for its Friends of Children Fund. Declaration of Allyson R. Scher ("Scher Decl."), counsel for AAP, Ex. 16, Robert F. Kennedy, Jr. (@SecKennedy), X (Aug. 19, 2025, at 5:17pm ET), https://perma.cc/C7H4-AGGZ, ECF No. 21-17. The Secretary captioned this image with the advisement that "AAP should follow the lead of HHS and disclose conflicts of interest, including its corporate entanglements and those of its journal—Pediatrics—so that Americans may ask whether the AAP's recommendations reflect public health interest, or are, perhaps, just a pay-to-play scheme to promote commercial ambitions

of AAP's Big Pharma benefactors." *Id.*[2]  On September 4, 2025, the Secretary testified to the Senate Finance Committee reiterating his belief that AAP is "gravely conflicted" and further stated that he "wouldn't put a big stake in what they say that benefits pharmaceutical interests."  Compl. ¶ 41 (quoting *Hearing on 2026 Health Care Agenda*, at 30:11-30:45, C-SPAN (Sept. 4, 2025)). On November 19, 2025, following HHS's release of a report relating to gender-affirming medical care, the Secretary went even further than impugning the reliability of AAP's policy recommendations as conflicted, to accuse the organization of lying and "malpractice," stating that "[t]he American Medical Association and the American Academy of Pediatrics peddled the lie that chemical and surgical sex-rejecting procedures could be good for children.  They betrayed their oath to first do no harm, and their so-called 'gender-affirming care' has inflicted lasting physical and psychological damage on vulnerable young people.  That is not medicine—it's malpractice."  Scher Decl., Ex. 12, Press Release, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures*, Dep't of Health and Hum. Servs. (Nov. 19, 2025), ECF No. 21-13.

In response to AAP's filing of the instant lawsuit, the HHS General Counsel, Mike Stuart, on December 27, 2025, posted on social media statements claiming credit for stopping the grant funding to AAP, stating, "It's our money, and it's HHS's duty to protect taxpayers from wasteful spending.  And that's exactly what I'm going to do."  Scher Decl., Ex. 27, Mike Stuart (@HHSGCMikeStuart), X (Dec. 27, 2025, at 12:26pm ET), https://perma.cc/SS4S-KSVT, ECF No. 21-28.  Secretary Kennedy responded just seventeen minutes later: "Thank you, Mike Stuart, for stopping this wasteful spending and fiercely defending the interests of hardworking

---

[2]    In fact, "less than 4% of AAP's charitable fund revenue comes from industry sources."  Compl. ¶ 41 n.23.

Americans." Scher Decl., Ex. 28, Robert F. Kennedy, Jr. (@SecKennedy), X (Dec. 27, 2025, at 12:45pm ET), https://perma.cc/PPU4-VUHR, ECF No. 21-29.

A senior advisor to the HHS Secretary, Calley Means, has likewise attacked AAP, using extreme language to describe his negative views of AAP. For example, Means described AAP as part of "demonic forces" that "in many cases, are practicing evil," and are "committing war on kids." Scher Decl., Ex. 18, Joe Kinsey, *White House MAHA Official Destroys Youth Transgender Treatments as Nike Continues to Dodge Study Questions*, OutKick (Apr. 25, 2025) , ECF No. 21-19.[3] Means also accused AAP of being "completely captured" by the interests of pharmaceutical companies. *Id.* He warned that the Make America Healthy Again movement "is intended to be 'a very harsh examination of what the American Academy of Pediatrics has been advising patients.'" Compl. ¶ 43 (quoting Susanna Vogel, *Top RFK Aide Lashes out Against Healthcare Industry for Profiting off of Illness*, Healthcare Dive (Oct. 25, 2025), https://perma.cc/7NYB-KDN6).

The Secretary's hand-picked ACIP members have also voiced harsh criticisms of AAP both generally and as to AAP's public health policy recommendations about vaccinations for children. The Chairman of ACIP, Martin Kulldorff, wrote in a July 1, 2025 tweet about AAP that it is "[a]stonishing that pro-mercury in kids is their battle cry!!" Compl. ¶ 48 (quoting Martin Kulldorff (@MartinKulldorff), X (July 1, 2025, at 10:35am ET), https://perma.cc/AR85-VQDF). Another ACIP member, Retsef Levi, on August 4, 2025, took to Twitter to malign AAP's position on encouraging vaccinations as a requirement for school attendance, stating about AAP, "[t]hey are so vaccine-fanatics, or perhaps financially conflicted, they ignore their own research on the devastating harm of expelling children from school! Continuous moral & scientific failure of the AAP that didn't stand up against school closure & promoted children masking during COVID!"

---

[3]    In October 2025, Calley Means left his position as a special government employee but returned to HHS in November 2025 as a "senior advisor." Pl.'s Reply at 7 n.5.

Scher Decl., Ex. 20, Retsef Levi (@RetsefL), X (Aug. 4, 2025, at 10:59am ET), https://perma.cc/V38D-89JZ, ECF No. 21-21.  Later the same month, on August 19, 2025, Levi tweeted that AAP "recommends COV19 vaccines that vast majority of medical professionals elect not to take to young babies!  What brings them to recommend to babies that have zero risk vaccines that could harm their [emoji of a broken heart]?!  Financial interests?  Personal vendetta?  Fanaticism?"  Scher Decl., Ex. 21, Retsef Levi (@RetsefL), X (Aug. 19, 2025, at 4:28pm ET), https://perma.cc/4UVA-UYQX, ECF No. 21-22).  Shortly after the filing of the instant lawsuit, Levi, on December 30, 2025, posted a tweet posing the question "Why [AAP] leaders are mad at ACIP?," followed by summarizing a series of policy disagreements between ACIP and AAP, and then asking the question "Who are they representing??" followed by a photograph containing the logos of four major pharmaceutical companies.  Scher Decl., Ex. 29, Retsef Levi (@RetsefL), X (Dec. 30, 2025, at 5:11pm ET), https://perma.cc/4LFK-49P4, ECF No. 21-30.

Dr. Robert Malone, ACIP's vice chair, has made critical comments about the lawsuit pending in the District of Massachusetts brought by AAP and other plaintiffs, literally calling for "consequences for such behavior."  Specifically, on July 12, 2025, the same week that the Massachusetts lawsuit was filed, Malone posted on social media that AAP and "other woke organizations" brought a "bogus lawsuit."  Scher Decl., Ex. 22, Robert W Malone, MD (@RWMaloneMD), X (July 12, 2025, at 7:52am ET), https://perma.cc/DJ93-FJR9, ECF No. 21-23.  He furthered stated that "[t]his lawsuit is completely frivolous—they are suing because they claim they aren't sure of the government's policy.  Yep—that is the reason.  The lawfare against the Trump administration has to stop.  There have to be consequences for such behavior, which is meant to tie up the executive branch of the federal government so that it can't do the real work of running the country and make impactful change on our healthcare system."  *Id.*

11

The next month, Malone circulated several articles online critical of AAP, including, on August 4, 2025, an article he authored titled "'Woke' Bioethics Tyranny," which concluded that AAP's "positions are morally wrong, must be rejected, and organizations promoting this logic should be shamed and shunned." Scher Decl., Ex. 19, Robert W. Malone, MD, *"Woke" Bioethics Tyranny*, SUBSTACK (Aug. 4, 2025), https://perma.cc/W95R-AQYW, ECF No. 21-20. That same day, he reposted on social media another article critical of AAP, titled "The American Academy of Pediatrics: Mining Children for Profit." Compl. ¶ 44 (citing Robert W Malone, MD (@RWMaloneMD), X (Aug. 4, 2025, at 8:43am ET), https://perma.cc/T89E-P7QQ). The article accused AAP of believing that "bodily autonomy is subservient to State-imposed requirements and that the post-World War II human rights of non-coercion and informed consent are subservient to the opinion of someone receiving money to perform an injection. Its approach coincides with the pre-War technocracy movement or medical fascism (in which a declared 'expert' decides on imposing healthcare measures rather than the patient themselves choosing it)." David Bell, *The American Academy of Pediatrics: Mining Children for Profit*, BROWNSTONE INST. (Aug. 2, 2025), https://perma.cc/PA5U-D9J8. Three weeks later, on August 25, 2025, Malone reposted an article seemingly critical of the amount of federal grant funding awarded to AAP, stating that AAP "received tens of millions in federal funding to push vaccines and combat 'misinformation.'" Scher Decl., Ex. 23, Robert W Malone, MD (@RWMaloneMD), X (Aug. 25, 2025, at 3:06pm ET), https://perma.cc/9UE9-7LLQ, ECF No. 21-24 (capitalization standardized).

### 4.    *Termination of AAP Grants*

On December 16, 2025, HRSA sent letters to AAP informing the organization that the awards of four multi-year grants were terminated, effective immediately. Compl. ¶ 53; *see, e.g.*, Waldron Decl., Ex. 4, Letter from Thomas J. Engels, Adm'r, Health Resources & Servs. Admin., to Am. Acad. Pediatrics (Dec. 16, 2025), ECF No. 2-2 at 47 ("This letter constitutes a notice of

termination, effective December 16, 2025.  Pursuant to the terms of the award and 2 C.F.R. § 200.340(a)(4), the Health Resources and Services Administration (HRSA) may terminate a federal award 'to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'").  The same day, CDC sent letters to AAP that the awards of three multi-year grants were terminated, effective December 22, 2025.  Compl. ¶ 51; *see, e.g.*, Waldron Decl., Ex.1, CDC Award Amendment Notice (Dec. 16, 2025) ("The purpose of this amendment is to terminate this award effective December 22, 2025. . . . CDC has determined that this award no longer effectuates agency and Department of Health and Human Services (HHS) priorities.").  These seven terminated grants totaled almost $12 million in undisbursed funding for the year, representing nearly two-thirds of AAP's federal funding.  Waldron Decl. ¶ 18.  Since the termination, AAP is spending "approximately $116,500 per week on employee salaries and benefits and indirect costs that were previously covered by the awards."  Del Monte Decl. ¶ 15.

The following chart summarizes information about each terminated grant, including the multi-year period for each award, the most recent month when the award had been approved to continue by relevant staff at either the CDC or HRSA, the date that the December 16, 2025 terminations became effective, and the amount of funds remaining to be awarded to AAP under each grant.[4]

| Award | Award Name | Award Period | Award Approved to Continue | Termination Effective | Funds Outstanding |
|-------|-----------|-------------|---------------------------|----------------------|-------------------|
| CDC-1 | Enhancing Partnerships to Address Birth Defects, Infant Disorders, and Related Conditions, and the Health of Pregnant and Postpartum People | 9/30/23-9/29/26 | September 2025 | 12/22/25 | $7,876,408 |
| CDC-2 | Category C: Pediatric Healthcare Clinicians | 8/1/24-7/31/29 | July 2025 | 12/22/25 | $1,042,610 |

---

[4]    This chart relies upon information found in the Complaint and Declaration of Debra B. Waldron.  *See* Complaint ¶ 32 (providing the most recent month when a continuation application was accepted); Waldron Decl. ¶¶ 19-25 (providing all other information).

| CDC-3 | National Partnerships to Address Prenatal Alcohol and Other Substance Use and Fetal Alcohol Spectrum Disorders | 4/1/23-9/29/26 | August 2025 | 12/22/25 | $409,153 |
| HRSA-1 | Telehealth Technology-Enabled Learning Program | 9/30/21-9/29/26 | July 2025 | 12/16/25 | $408,498 |
| HRSA-2 | Comprehensive Systems Integration for Adolescent and Young Adult Health. | 9/1/23-8/31/28 | July 2025 | 12/16/25 | $1,698,360 |
| HRSA-3 | Universal Newborn Hearing Screening | 4/1/24-3/31/29 | July 2025 | 12/16/25 | $146,354 |
| HRSA-4 | Safe Infant Sleep Systems Integration Program | 7/1/22-6/30/25; extended to 6/30/26 | August 2025 | 12/16/25 | $348,714 |

When terminated, four of the terminated grants were scheduled to end in mid- to late-2026 (CDC-1, 3; HRSA-1, 4), one of the terminated grants was intended to end in mid-2028 (HRSA-2, 3) and two of the terminated grants was intended to end in early- to mid-2029 (CDC-2; HRSA-3). All seven terminated grants support programs designed to improve health outcomes for infants and children. For instance, the first CDC award "Enhancing Partnerships to Address Birth Defects, Infant Disorders, and Related Conditions, and the Health of Pregnant and Postpartum People" funds programs to, among other things, "enhance the capacity of pediatric healthcare clinicians to support infants with perinatal substance exposure and their birth mothers"; "to improve clinical and public health outcomes for infants and children with birth defects [and] infant disorders"; "to improve early identification and intervention for developmental delays and disabilities among young children"; to educate pediatricians to better "support[] children with Tourette Syndrome and ADHD"; and "to positively impact the health of individuals affected by congenital heart defects." Waldron Decl. ¶ 19. The second CDC award supports, among other projects, "information sharing on sepsis, among pediatric clinicians and summer camp healthcare

providers," *id.* ¶ 20, and the third CDC award provides funding for a program to support pediatricians "work[ing] with public health organizations that make up the systems of services for families living with substance use and children with fetal alcohol spectrum disorders," *id.* ¶ 21.

The first HRSA award for the "Telehealth Technology-Enabled Learning Program" supports a "national learning collaborative designed to help pediatricians recognize and support the unique needs of autistic children and their families in rural areas." *Id.* ¶ 22. The second HSRA award "supports a program that increases the capacity of states, territories, and tribal organizations to promote adolescent health and young adult health and well-being." *Id.* ¶ 23. The third HRSA award aids projects for the "development of educational resources to improve services for deaf and hard of hearing children and their families." *Id.* ¶ 24. Notably, this grant award "addresses universal newborn hearing screening, as one of *three* national technical assistance centers that make up the Early Hearing Detection and Intervention National Network," and, while AAP's award was terminated "for purportedly no longer effectuating program goals or agency priorities, . . . neither of the other two centers that received awards under the same grant for purposes of operating the same program as AAP were terminated." Compl. ¶ 57 (emphasis in original). The fourth HRSA award supports the "Safe Infant Sleep Systems Integration Program" which "aims to reduce rates of sudden unexpected infant death (SUID)." Waldron Decl. ¶ 25.

The termination of AAP's grant awards was a surprise, not only to AAP but apparently to the CDC and HRSA staff most closely supervising the projects funded by the grants. Following the change in administrations, "AAP worked closely with agency program staff to ensure its projects and continuation of funding applications conformed to the priorities and preferred terminologies of the new administration." Waldon Decl. ¶ 16. This effort was successful since, before receiving the termination notices, AAP had been "fully performing with respect to the CDC

and HRSA awards," Compl. ¶ 49, and "[c]ontinuation of funding applications for each of the seven terminated awards were approved during the Trump administration." Waldron Decl. ¶ 17. After these recent approvals, AAP's "liaisons at CDC and HRSA maintained lines of communication suggesting that it was business as usual for the awards in question. Agency staff appeared to be unaware that the awards were about to be or had been terminated." Compl. ¶ 50. Indeed, AAP's "staffers exchanged emails with CDC team members on December 16 and 17, discussing ongoing and future anticipated work for one of the relevant programs." *Id.* "AAP staff were told by agency staff that they were unaware of these terminations, which AAP staff understood to mean that the terminations came at the direction of HHS leadership, rather than through normal channels." Waldron Decl. ¶ 34; Compl. ¶ 55. Tellingly, "none of the other entities that received awards under the same awards as AAP have had their own awards terminated." Waldron Decl. ¶ 34; Compl. ¶ 57.

On December 17, 2025, ACIP's vice chair, Dr. Malone, posted on social media "Breaking NEWS: HHS has terminated multiple federal grants to the American Academy of Pediatrics (AAP), totaling around $18-20 million and for good reason." Scher Decl., Ex. 3, Robert W Malone, MD (@RWMaloneMD), X (Dec. 17, 2025, at 9:10pm ET), https://perma.cc/R3GX-YDWC. The social media page dedicated to the Make America Healthy Again movement also celebrated the grant terminations and posted "Huge MAHA Win Big Pharma's puppet, the American Academy of Pediatrics, just lost federal funding thanks to HHS. Under RFK Jr., taxpayer dollars will no longer bankroll propaganda, only organizations committed to gold-standard, evidence-based science will receive support." Compl. ¶ 61 (citing MAHA Action (@MAHA_Action), X (Dec. 17, 2025, at 9:17pm ET), https://perma.cc/DVM3-SXKE).

16

Timing-wise, AAP points out that the decision to terminate these seven grants was made the day before a scheduled hearing on the government's motion to dismiss the lawsuit against HHS and CDC in the District of Massachusetts. Compl. ¶ 37; *see* Clerk's Notes, *Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass. posted Dec. 17, 2025), ECF No. 164.

After the termination of the seven grant awards, AAP still "has six other active HHS awards." Compl. ¶ 25. Three remaining awards are with HRSA, one is with CDC, and the other two awards are with neither of these HHS components. The three remaining HRSA awards are: "Bright Futures Pediatric Implementation," "Pediatric Mental Health Care Access," and "Building Systems of Services for Children and Youth with Special Health Care Needs." Defs.' Opp'n, Decl. of HRSA Assoc. Adm'r in Off. of Fed. Assistance & Acquisition Mgmt., Cynthia R. Baugh ("Baugh Decl.") ¶ 17, ECF No. 16-2. The only remaining CDC award is "National Initiative to Advance Health Equity in K-12 Education by Preventing Chronic Disease and Promoting Healthy Behaviors." Defs.' Opp'n, Decl. of CDC Dir. of Off. of Grants Servs., Jamie W. Legier ("Legier Decl.") ¶ 17, ECF No. 16-1. The terminated awards, however, "make up nearly two-thirds of AAP's total federal award funding." Compl. ¶ 25.

## B.    Procedural Background

AAP filed the instant suit on December 24, 2025. *See* Compl. Based on allegations that the award terminations "are only explicable as retaliation for AAP's advocacy," AAP claims that "HHS's actions are unconstitutional" because "[t]he First Amendment does not permit HHS to retaliate against AAP for its viewpoints or for having filed a lawsuit against the federal government," "[they] constitute *de facto* unconstitutional conditions on federal funding, in violation of the First Amendment and the Spending Clause of the U.S. Constitution," and "they violate the Fifth Amendment's equal protection guarantee and the Administrative Procedure Act." *Id.* ¶¶ 7-8.

The complaint asserts five claims, alleging that HHS violated the First Amendment's prohibition on retaliation for engaging in protected First Amendment activity, by terminating AAP's grant awards for engaging in speech that the government disfavors and for petitioning for judicial relief adverse to the government, Compl. ¶¶ 71-76 (Count I), and the First Amendment's prohibition on viewpoint discrimination by targeting AAP with the grant terminations in an effort to stop or chill AAP from advancing views with which the government disagrees, *id.* ¶¶ 77-83 (Count II). AAP further claims that HHS violated the First Amendment by setting unconstitutional new conditions for government grants, namely, "that the grantee may not engage in speech or petitioning activity that the government disfavors," *id.* ¶¶ 84-87 (Count III), and the Fifth Amendment's Equal Protection clause by terminating AAP's grants with "a bare intent to punish AAP," when other similarly situated organizations have not been subject to the same, or even similar, sanctions, *id.* ¶¶ 88-94 (Count IV). Finally, AAP claims that HHS violated the Administrative Procedure Act by terminating the organization's grants in violation of AAP's First Amendment rights, *id.* ¶¶ 95-100 (Count V).

Contemporaneously with filing its complaint, AAP moved for either a temporary restraining order or a preliminary injunction, on the two First Amendment claims asserted in Counts I and II, for retaliation and viewpoint discrimination, respectively. Pl.'s Mot. at 1; Pl.'s Mem. at 3; Mot. Hr'g Tr. at 8:1-7.[5] As relief, AAP seeks an order "barring Defendants from

---

[5]    In a footnote to its memorandum in support of a preliminary injunction, AAP also mentions the APA claim in Count V as a basis for relief, *see* Pl.'s Mem. at 21 n.3, and, at the hearing, clarified that the APA claim provides "another pathway to the same outcome" and "the analysis is basically just going to collapse into Counts 1 and 2." Mot. Hr'g Tr. at 8:16-18. To the extent that AAP can show a likelihood of success on either Count I or Count II, the organization would also show success on Count V for at least two reasons. First, a regulation incorporated into the terms of each of AAP's grants, 2 C.F.R. § 200.340(a)(4), requires that grant terminations made because "an award no longer effectuates the program goal or agency priorities" must be made "to the extent authorized by law," and a grant termination violative of the First Amendment fails to meet this regulatory requirement. Second, a grant termination violative of the First Amendment also runs afoul of APA, which permits reviewing courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B); *see, e.g., Trudeau v.*

enforcing or otherwise giving effect to the termination of any award to AAP, including through the enforcement of closeout obligations; barring Defendants from re-obligating funds used to support AAP's awards; and requiring Defendants to take all steps necessary to ensure that the Centers for Disease Control and Prevention and Health Resources and Service Administration disburse funds on AAP's awards in the customary manner and in customary timeframes."  Pl.'s Mot. at 1.  The same day, HHS moved for an extension of time to respond, Defs.' Mot. for an Extension of Time at 2, ECF No. 11, which AAP opposed, Pl.'s Opp'n to Defs.' Mot. for Extension of Time, ECF No. 12.  With HHS's motion for extension of time fully briefed, the case was randomly assigned to the undersigned Judge, on December 29, 2025, and a scheduling order was promptly entered, denying the motion for extension of time due to the urgency of the situation, created by the abrupt terminations of the seven grants to AAP.  *See* Minute Order (Dec. 29, 2025) ("Though the Court appreciates defendants' request for additional time to respond to the 'voluminous filing' at issue, plaintiff correctly point outs that the 'urgent situation [is] of Defendants' own creation." (citations omitted)).

In accordance with the Scheduling Order, briefing for AAP's pending motion was completed on January 2, 2026, and a motions hearing was held on January 6, 2026.  At the hearing, the parties agreed to proceed on the motion as seeking preliminary injunctive relief.  *See* Mot. Hr'g Tr. 9:17-18 (AAP's counsel responding to the question of whether AAP agrees to address the motion as a preliminary injunction: "Yes.  I think we would be fine with that, Your Honor."); *id.* at 42:20-22 (HHS counsel responding to the question of whether they agree that this is in a preliminary injunction posture: "That is correct, Your Honor.  We don't think that there will be

---

*FTC*, 456 F.3d 178, 189 (D.C. Cir. 2006) ("[T]he APA's 'scope of review' provision permits us to grant [appellant]'s request to hold the press release unlawful if we find it 'contrary to constitutional right' because of the asserted First Amendment violation . . . .").

any more benefit from additional briefing on preliminary injunction.").  The following day, AAP was granted leave, without objection, to supplement the record.  Pl.'s Mot. Leave to File Decl. of Allyson R. Scher, ECF No. 20; Minute Order (Jan. 7, 2026).  AAP's pending motion for preliminary injunctive relief is ripe for resolution.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction "must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "The balance of the equities weighs the harm to [plaintiff] if there is no injunction against the harm to [defendants] if there is," and, when the government opposes the preliminary injunction, "the [government]'s harm and the public interest are one and the same, because the government's interest *is* the public interest," so the third and fourth factors merge.  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).[6]

---

[6]    AAP cites the "'sliding scale' approach" to evaluating the four injunction factors.  Pl.'s Mem. at 11-12.  The D.C. Circuit has "[i]n the past . . . applied a 'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another,'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)), but now regularly acknowledges that "[t]his approach is arguably in tension with intervening Supreme Court decisions stating without qualification that 'a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits,'" *id.* (quoting *Munaf v. Geren*, 553 U.S. 674, 690 (2008)); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-1236 (D.C. Cir 2025) ("It is questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter v. Natural Resources Defense Council, Inc*[,] [which] can be read to require movants to establish *each* preliminary injunction factor independently.  But we have (somehow) gone seventeen years without

Additionally, "[t]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).   The party seeking a preliminary injunction "carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed.1995)).

## III.    DISCUSSION

To obtain the preliminary injunctive relief sought, AAP must show a likelihood of success on the merits of the organization's First Amendment claims that the termination decision was made as retaliation for AAP's advocacy; that, absent the requested preliminary relief, AAP is likely to suffer irreparable harm; and, finally, that consideration of the equities and the public interest favors the requested relief.  *See supra* Part II.  These factors are considered seriatim.

### A.    Likelihood Of Success On The Merits

In order to demonstrate a likelihood of success on the merits AAP must first satisfy the "threshold" issue of establishing that this Court has subject-matter jurisdiction over AAP's claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998); *see also Elec. Priv. Info. Ctr.*, 928 F.3d at 104.  Only after that jurisdictional showing is made does analysis turn to the underlying merits of AAP's claims themselves.

---

needing to say if *Winter* really meant what it can be read to have said." (emphasis in original; internal citations omitted)); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]his court has not yet decided whether *Winter v. National Resources Defense Council* is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned . . . ." (internal citation omitted)).  In accordance with *Winter*, AAP's satisfaction of each factor is considered here.  *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (without referencing "sliding scale" approach, holding "that the District Court did not err in granting the preliminary injunction because Appellees have met each element of the test enunciated in *Winter* . . . .").

1.      *Jurisdiction*

HHS contends that the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491, bars this Court's exercise of subject matter jurisdiction to consider AAP's claims.  According to HHS, the federal government has waived the otherwise applicable sovereign immunity bar for federal grant termination claims only when such claims are heard in the United States Court of Federal Claims because the relief sought amounts to money payments that originate from a contract with the federal government.  Defs.' Opp'n at 9 (stating that "the Tucker Act channels suits like this for money damages from grant terminations to the Court of Federal Claims").

The Tucker Act gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  That jurisdiction is "exclusive" for "breach of contract claims against the United States seeking more than $10,000 in damages."  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021)).  The "longstanding test for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" is set out by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).  *Crowley*, 38 F.4th at 1106.  In *Megapulse*, the D.C. Circuit rejected the position "that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act."  672 F.2d at 967-68.  Instead, "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which plaintiff bases its claims, and upon the type of relief sought."  *Id.* at 968.  Both prongs of the *Megapulse* test are required to be met, such that the Court of Federal Claims has exclusive jurisdiction of an action pursuant to the Tucker Act only if a plaintiff's "asserted right is based on contract and seeks 'in essence' more than $10,000 in monetary relief from the federal

government." *Crowley*, 38 F.4th at 1113.  Application of each prong to AAP's First Amendment claims is considered next.

### (a) First Prong of Megapulse Test: Source of Rights Asserted

Determining the source of the rights asserted is necessary because the D.C. Circuit has rejected the position "that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Megapulse*, 672 F.2d at 967-68.  By extension, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Crowley*, 38 F.4th at 1107 (ellipsis in original) (quoting *Megapulse*, 672 F.2d at 968).  The first prong of the test therefore asks "whether the plaintiff's rights 'exist[] prior to and apart from rights created under the contract.'" *Id.* (alteration in original) (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2 891, 894 (D.C. Cir. 1985)); *see also Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.) (holding that, where "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," the claims "are not contract claims for Tucker Act purposes").  Here, the source of AAP's claims is not contractual in nature since these claims arise out of rights protected not by contracts but rather by statutes and the Constitution— and those rights exist completely separately from any terms created under the grant award agreements.  *See A.B.A. v. U.S. Dep't of Justice*, 783 F. Supp. 3d 236, 244 (D.D.C. 2025) (CRC) (concluding that first prong of *Megapulse* test not met by claim that plaintiff's cooperative agreements with federal agency were terminated "in retaliation for protected speech, an act that would violate the First Amendment regardless of the agreements' terms," and "[t]his theory of pretextual termination does not turn on contractual language.").  The fact that this case rests on

First Amendment retaliation and viewpoint discrimination claims constitutes "truly independent legal grounds" supporting the exercise of jurisdiction by this Court. *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.3d at 970).

Having determined that AAP's First Amendment claims do not meet the first condition of the *Megapulse* test for exclusive jurisdiction in the Court of Federal Claims, the analysis may end here. As *Crowley* determined, the *Megapulse* test is conjunctive, requiring satisfaction of both elements to provide exclusive jurisdiction to the Court of Federal Claims. Nevertheless, for completeness, the second condition in this test is considered and found also not to be met here.

### *(b) Second Prong of Megapulse Test: Money Damages*

The second prong of the *Megapulse* test is to determine the type of relief sought by asking "whether the plaintiff effectively seeks to attain monetary damages in a suit." *Crowley*, 38 F.4th at 1107. Put another way, "a claim is subject to the Tucker Act and its jurisdictional consequences if, in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Id.* (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)).

The parties dispute whether AAP "effectively seeks to attain monetary damages." AAP points to the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which makes clear the distinction between money damages and equitable relief, even when that equitable relief involves the payment of money. In *Bowen*, the Court explained that money damages "refers to a sum of money used as compensatory relief." *Id.* at 895 (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446). Specific remedies in the form of equitable relief "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* (quoting *Md. Dep't of Human Res.*, 763 F.2d at 1446). AAP here seeks an injunction barring enforcement of the seven grant termination orders and restoration of those grants, not to compensate for the harm caused by the

unlawful termination of their grants but rather to return to the *status quo ante*, *i.e.*, AAP's position before the unlawful actions, and to clarify future obligations as to its rights, protecting the organization from future harm. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020). Such relief cannot be characterized as monetary damages. Moreover, the certainty provided by the requested equitable relief provides value independent of any funds paid—the ability for AAP to conduct the grant-funded programs without fear of arbitrary and abrupt termination. *See Crowley*, 38 F.4th at 1111 (describing the benefits of equitable relief requested there including "the certainty of knowing whether [certain procedures] apply" and "an answer to the question whether the [government] has authority" to take certain challenged actions). Thus, the fact that "[t]hat the specific relief sought here— preventing the government from terminating the contract[s] for retaliatory reasons—may result in a monetary payout does not convert it into a claim for money damages." *A.B.A.*, 783 F. Supp. 3d at 244. In short, as AAP states, the organization "seeks classic equitable remedies, including injunctive and declaratory relief," which "is the type of injunctive relief that is routinely awarded by district courts in First Amendment cases," Pl.'s Reply at 15-16, and not money damages.

HHS errs in arguing that in "*Bowen* no longer is controlling in light of *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), which expressly adopted Justice Scalia's dissent in *Bowen*." Defs.' Opp'n at 12. In his *Bowen* dissent, Justice Scalia argued that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Bowen*, 487 U.S. at 918-19 (Scalia, J., dissenting). Noting two references in *Knudson* to Justice Scalia's *Bowen* dissent, HHS posits that "*Knudson* therefore limited *Bowen* to cases that are 'not merely for past due sums, but for an injunction to correct the method of calculating payments going forward,'" Defs.' Opp'n at 13 (quoting *Knudson*, 534 U.S.

at 212), such that, "[a]fter *Knudson*, the test no longer is whether a plaintiff seeks specific or substitute monetary relief[, but] all that matters is whether a suit 'seek[s] . . . to compel the defendant to pay a sum of money to the plaintiff,'" *id.* (last alteration and ellipsis in original) (quoting *Knudson*, 534 U.S. at 210).

HHS's reading of *Knudson* as substantially overruling *Bowen sub silentio* does not hold up under closer examination.  At the outset, *Knudson* involved neither a Tucker Act jurisdictional issue nor any government funds or government contracts at all.  Instead, petitioners in *Knudson* were insurance companies seeking restitution from a car accident settlement made between the victim and various tortfeasors for medical costs previously paid by petitioners.  534 U.S. at 207.  To do so, petitioners filed a federal action, pursuant to an ERISA provision creating a cause of action for civil actions for "appropriate equitable relief," to enforce a reimbursement provision of its insurance plan with the accident victim that "provid[ed] that the Plan shall have 'the right to recover from the [beneficiary] any payment for benefits' paid by the Plan that the beneficiary is entitled to recover from a third party."  *Id.* (second alteration in original).  By the time the case reached the Supreme Court the question presented was whether the requested relief, *i.e.*, reimbursement of funds paid to the victim, constituted "equitable relief" under ERISA.  *Id.* at 209-10.  The Supreme Court determined that "petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity," *id.* at 210, and further emphasized that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity," *id.* at 210-11  Pointing out the obvious, the Court distinguished *Bowen*, which "'did not turn on distinctions between 'equitable' actions and other actions . . . but rather [on] what Congress meant by 'other than money damages'' in the Administrative Procedure

Act." *Id.* at 212 (alterations in original) (quoting *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)).  Further distinguishing *Bowen*, the Supreme Court found that "*Bowen*, unlike petitioners' claim, did not deal with specific performance of a *contractual* obligation to pay *past* due sums" and that "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due." *Id.*

Eighteen years after *Knudson*, the Supreme Court in *Maine Community Health Options v. United States*, 590 U.S. at 327, further delineated the relationship between the rules announced in *Bowen* and *Knudson*, emphasizing that "the suit in *Bowen* 'was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward," and that "because the Court of Federal Claims 'does not have the general equitable powers of a district court to grant prospective relief,' . . . *Bowen* belonged in district court." *Id.* at 326-27 (quoting *Knudson*, 534 U.S. at 212, then *Bowen*, 487 U.S. at 905).  The Supreme Court concluded that where petitioners "seek specific sums already calculated, past due, and designed to compensate for completed labors," suit in the Court of Federal Claims is proper, but where "prospective, nonmonetary relief to clarify future obligations" is sought, the rule from *Bowen* applies and the claims may be brought in a federal district court. *Id.* at 327.

At the hearing, HHS argued that *Maine Community*—which neither side cited in briefing— does not alter *Knudson*'s ringing of the death knell for *Bowen* because "the Supreme Court has looked in grant termination cases subsequent to *Maine Communities* [sic].  It's looked at it this past summer, and has said that those claims belong in the Court of Federal Claims, under *California* [referring to *Department of Education v. California* ("*DOE*"), 604 U.S. 650 (2025)] and under *APHA [referring to National Institutes of Health v. American Public Health Association ("APHA"),* 145 S. Ct. 2658 (2025) (mem.)]." Mot. Hr'g Tr. at 56:13-18.  The argument that the

Supreme Court *sub silentio* overruled *Bowen*'s long-standing reasoning since 1988, in its 2002 decision in *Knudson*, then forgot to recognize this overruling in its 2020 merits decision in *Maine Community*, and only remembered that *Bowen* was overturned, without saying so, in the spring and summer of 2025 during consideration of two emergency docket stay applications in *DOE* and *APHA*, at worst, strains credulity and, at best, is a weak basis for rejecting the reasoning in *Bowen* as no longer good law.  In any event, the Supreme Court has admonished that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).  *Bowen*, a case concerning the interplay between the APA and the Tucker Act's grant of exclusive jurisdiction to the Court of Federal Claims, has direct application in the instant case and accordingly is followed here.  Under this binding precedent and that of the D.C. Circuit, AAP has made the required showing that jurisdiction to consider its First Amendment claims properly rests in this Court and not the Court of Federal Claims.

### (c) Megapulse Test Survives Recent Supreme Court Emergency Stay Orders

As a last refuge, HHS doubles down in relying on the two recent *per curiam* orders in *DOE* and *APHA* from the Supreme Court's emergency docket, though those orders were issued without oral argument and do not constitute merits decisions.  In April 2025, in *DOE*, the Supreme Court stayed a District of Massachusetts order enjoining a federal agency from terminating education-related grants.  604 U.S. at 650.  In so doing, the Court relied on *Knudson* to find that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here. . . . Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with

the United States.'" *Id.* at 651 (quoting *Knudson*, 534 U.S. at 212, then 28 U.S.C. § 1491(a)(1)). Several months later, in August 2025, in *APHA*, the Supreme Court granted a stay of a different District of Massachusetts order, which had enjoined the termination of "research-related grants" by the National Institutes of Health. 145 S. Ct. at 2659. Again, the Supreme Court reminded that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* at 2658 (second alteration in original) (quoting *DOE*, 604 U.S. at 651). In the controlling concurrence, Justice Barrett explained that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)" and that "the Government is not entitled to a stay of the judgments insofar as they vacate the guidance documents." *Id.* at 2661 (Barrett, J., concurring in the partial grant of the application for stay).[7]

Both *DOE* and *APHA* concerned challenges raised under the APA. Federal district courts and the Court of Federal Claims have concurrent jurisdiction over some disputes arising under the APA because the Supreme Court has long held that a "District Court's jurisdiction to award

---

[7]    Neither of the emergency-docket stay orders in *DOE* and *APHA* considered whether the grants at issue amounted to "contracts" within the meaning of the Tucker Act, with no attention given to jurisprudence from the Court of Federal Claims and the Federal Circuit that the kinds of contracts subject to Court of Claims' exclusive jurisdiction are those that allow the government to "obtain a service" or property, in contrast to those only indirectly benefitting the government by "advanc[ing] the agency's overall mission" and do not provide sufficient consideration to qualify as a contract triggering Tucker Act jurisdiction. *See, e.g.*, *Hymas v. United States*, 810 F.3d 1312, 1328-29 (Fed. Cir. 2016); *see also Penn. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 791 (2001) ("By funding and regulating programs designed for the public good, the U.S. is acting in its role as sovereign and the moneys promised are gifts or gratuities which do not establish any contractual obligation, express or implied, on the part of the United States." (quoting *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 864 (1982))). In *DOE*, the parties "did not raise the issue challenging whether the grants were contracts," so "the lower courts did not consider it." *Urb. Sustainability Dirs.' Network v. U.S. Dep't of Agric.*, No. 25-cv-1775 (BAH), 2025 WL 2374528, *17 (D.D.C. Aug. 14, 2025). Consequently, "the Supreme Court's jurisdictional determination seemingly assumed that the grants in that case were subject to Tucker Act jurisdiction, without considering whether different grant agreements may not be contracts falling within the Court of Federal Claims' exclusive jurisdiction." *Id.* Likewise, neither of the lower court opinions leading up to *APHA* addressed the issue of whether these grants were contracts within the meaning of the Tucker Act. *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39 (1st Cir. 2025); *Massachusetts v. Kennedy*, 783 F. Supp. 3d 487 (D. Mass. 2025). Whether the terminated grant awards at issue here constitute "contracts" subject to Tucker Act jurisdiction is not an issue raised by the parties and is therefore not considered.

complete relief in [certain APA] cases is not barred by the possibility that a purely monetary judgment may be entered in the Claims Court." *Bowen*, 487 U.S. at 911.  The Supreme Court has noted that "[i]t is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for more than $10,000. . . . Rather, that court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court." *Id.* at 910 n.48.  The Supreme Court reasoned that where an APA claim permits a district court to grant monetary relief, "the fact that the purely monetary aspects of the case could have been decided in the Claims Court is not a sufficient reason to bar that aspect of the relief available in a district court. *Id.*

AAP seeks injunctive relief in the pending motion solely on its First Amendment claims that the grant terminations executed by HHS were retaliatory and targeted viewpoint discrimination, and therefore violative AAP's constitutionally protected free speech rights. *See* Compl., Counts I and II.  Such claims fall squarely in this Court's jurisdictional grant.  28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution . . . of the United States.").  Nowhere in *DOE* or *APHA* does the Supreme Court hint, let alone express the view, that parties, such as AAP here, have no forum in district court to hear First Amendment claims merely because the cases involve federal grants.  Such a ruling would have the perverse result that parties challenging government action involving government funding on First Amendment grounds would have no forum at all, since the Court of Federal Claims and the Federal Circuit have both determined that "the Court of Federal Claims lacks jurisdiction over claims arising under the First Amendment . . . as they are not money-mandating." *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2023) (citing *Cooper v. United States*, 771 F. App'x 997, 1000-01 (Fed. Cir. 2019)).  Nevertheless, HHS at oral argument maintained that "the guidance that

the Supreme Court has provided," which "is the best guidance that we have at the moment," suggests that "every case touching on a federal grant or a federal contract must be heard in the Court of Federal Claims, regardless of the seriousness of any constitutional claims argued or claimed." Mot. Hr'g Tr. at 49:16-50:3. Such an outcome would run counter to the commonsense principle articulated by the D.C. Circuit that "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006).

HHS is not alone in trying to tease out of the Supreme Court's emergency docket orders in *DOE* and *APHA* the implications on jurisdictional issues raised by the Tucker Act. Immediately after the Supreme Court issued the *DOE* order "[m]uch confusion ensued as countless courts—in this district and others—attempted to interpret that cursory explanation when applying the *Megapulse* inquiry in challenges to grant terminations." *Urb. Sustainability*, 2025 WL 2374528, at *14. "The D.C. Circuit . . . provided some guidance in interpreting the Court's stay ruling in" *DOE* when the en banc court expressly adopted Judge Pillard's view "indicating that the 'stay order' did not 'change the landscape' established by *Megapulse*." *Id.* (quoting *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *13 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting)); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, *1 (D.C. Cir. May 28, 2025) (en banc) (adopting Judge Pillard's view). As the D.C. Circuit has determined that the *Megapulse* landscape was unaltered by *DOE*, and *APHA* merely purported to apply *DOE*, *Megapulse* still stands as binding precedent to be followed by this Court.

***

In sum, HHS's urging that the Supreme Court's *per curiam*, non-merits stay orders on the emergency docket in *DOE* and *APHA* must be read to require that AAP's First Amendment claims

may only be heard in the Court of Federal Claims, and that the Supreme Court's decision in *Knudson* must be read to overrule *sub silentio Bowen*, is rejected. The D.C. Circuit's *Megapulse* test for identifying claims within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act, remains good law. As applied to AAP's First Amendment claims, neither prong of the *Megapulse* test is met since the rule announced in *Bowen* continues to control and AAP does not seek specific performance to cover past due sums, but rather a prospective remedy to correct a constitutional violation. Accordingly, subject-matter jurisdiction may be properly exercised to consider AAP's First Amendment claims.

### 2. *First Amendment Retaliation Claim (Count 1)*

"The First Amendment generally 'prohibits government officials from subjecting individuals to retaliatory actions after the fact of having engaged in protected speech.'" *Media Matters for Am. v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (quoting *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)). AAP has demonstrated a likelihood of success on the merits of its First Amendment retaliation claim. To prevail on a retaliation claim, plaintiff must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) [defendants] took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) there is 'a causal link' between the protected First Amendment activity and 'the adverse action taken against [plaintiff].'" *Id.* at 584 (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)); *see also Wilson*, 595 U.S. at 477 ("Under this Court's precedents, a plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'" (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019))). As to the first element, HHS does not dispute that AAP engaged in First Amendment protected speech. Defs.' Opp'n at 16 ("Defendant does not dispute that Plaintiff's officers and employees have spoken out

about public issues on which they disagree with the current administration.").  The parties disagree, however, as to whether plaintiff has made a sufficient showing of a likelihood of success on the remaining two elements to prevail on the organization's First Amendment retaliation claim.  Each of the remaining two elements is discussed *seriatim*.

### (a) Retaliation Claim's Second Element: Retaliatory Action Sufficient to Deter

The second element of a First Amendment retaliation claim requires showing a likelihood that HHS' retaliatory action was sufficient to deter a person of ordinary firmness in AAP's position from speaking again.  AAP points out that HHS's retaliatory action of abruptly terminating seven multi-year grants has directly harmed the organization in concrete ways.  AAP faces the loss of $12 million per year in government grants constituting almost two-thirds of the organization's total annual federal award funding.  Waldron Decl. ¶ 18.  As a result, AAP is spending "approximately $116,500 per week on employee salaries and benefits and indirect costs that were previously covered by the awards."  Del Monte Decl. ¶ 15.  Additionally, "AAP lacks the resources to continue making these payments past January 9, 2026."  *Id.*  As a result, "[i]f the awards at issue are not reinstated by January 9, 2026, AAP will be forced to send termination notices to several dozen employees who are directly or indirectly compensated by these awards," which "constitutes approximately 10% of [AAP's] workforce."  *Id.* ¶ 12.  Moreover, "[t]he retaliatory award terminations will force AAP to shutter projects, lay off staff, and break commitments to partner organizations and sub-awardees."  Pl.'s Mem. at 13.  Such harms are more than enough to show an "adverse action" that would likely deter a person of ordinary firmness from speaking again about the topics disfavored by HHS.

HHS responds that AAP "has not alleged that the terminated grants have had any effect on its speech, or that it is advocating any less zealously for the positions it advances."  Defs.' Opp'n

at 17.  In other words, HHS holds up AAP itself and this organization's continued commitment to advancing evidence-based, expert-vetted public health policies, and educating the public about the same, as proof that this second element is not and cannot be met here.

The flaw in HHS's proffered reasoning is that using AAP as the exemplar converts a legally objective test into a subjective one based on the actions of the most principled of actors, *i.e.*, a plaintiff seeking to vindicate First Amendment free speech rights—and that is simply not the correct test.  The D.C. Circuit recently made this distinction clear, explaining that "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.  The objective 'ordinary firmness' test requires plaintiffs to allege that the retaliatory acts of the defendants adversely affected them."  *Paxton*, 138 F.4th at 581 (citation omitted) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005)).  As AAP explained succinctly during the hearing, the test is objective "for good reason; because, otherwise, it would basically strip constitutional rights away from the most principled speakers."  Mot. Hr'g Tr. 31:6-9.

### (b) Retaliation Claim's Third Element: Causal Link

As to the third element for the First Amendment retaliation claim, AAP must show a likely causal link between the organization's protected speech activity and the adverse action taken by HHS.  For this element, AAP relies on circumstantial evidence, Mot. Hr'g Tr. 33:15-22, which "is equally as probative as direct evidence in proving illegitimate intent.  Also, direct evidence of an improper motive is usually difficult, if not impossible, to obtain."  *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *23 (D.C. Cir. Oct. 23, 2025) (per curiam) (quoting *Bailey v. Ramos*, 125 F.4th 667, 685 (5th Cir. 2025)).  The D.C. Circuit has provided guidance on evaluating circumstantial evidence of such a causal link.  "Courts have recognized that such circumstantial evidence, including proximity in time between the protected speech and government's adverse

actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response." *Id.* at *8.

Consideration of the circumstantial evidence marshaled by AAP in each of the three, non-exhaustive categories for such evidence, even at this early stage of litigation, amply supports a likelihood of demonstrating the requisite causal link.

### (i) Timing Proximity Between Protected Speech and Adverse Action

The timing of HHS's retaliatory act of terminating the seven grants has almost perfectly coincided with significant events in one area of AAP's First Amendment protected speech, namely, the lawsuit that AAP brought challenging agency actions in the U.S. District Court for the District of Massachusetts. The Constitution protects the right "to petition the Government for a redress of grievances," U.S. Const. amend I, and the Supreme Court has "confirm[ed] that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Conduct to vindicate rights in court is also protected under the First Amendment. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government . . . ."); *see also Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) ("[T]he Supreme Court has treated lawsuits as petitions.").

Five days after the Massachusetts lawsuit in which AAP serves as the lead plaintiff was filed, Dr. Robert Malone, a top CDC advisor and vice chair of ACIP, publicly warned that "[t]he lawfare against the Trump administration has to stop" and threatened that "[t]here have to be consequences for such behavior." Scher Decl., Ex. 22; *see Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass. filed July 7, 2025). This public rebuke of AAP by a person hand-

picked by the HHS Secretary for a leadership role on an important HHS advisory committee, was followed by AAP being dismissed from and disallowed from serving on ACIP's subcommittees. Compl. ¶ 34.  On December 16, 2025, the day before a hearing in that case concerning HHS's motion to dismiss, seven of AAP's grants were terminated.  *Id.* ¶ 37.  On December 17, 2025, the day of the hearing, Dr. Malone again posted on social media cheering the grant termination, stating, "Breaking NEWS: HHS has terminated multiple federal grants to the American Academy of Pediatrics (AAP), totaling around $18-20 million and for good reason."  Scher Decl., Ex. 3.  The temporal proximity between HHS's actions of disallowing AAP from serving on ACIP subcommittees and of terminating AAP's grant awards, and the initiation of and hearing in the lawsuit in the District of Massachusetts is probative of a retaliatory motive and a causal link between this motive and the grant termination actions taken.

At the same time as pursuing litigation, over the last year, "AAP been consistently vocal about its evidence-based support for pediatric immunizations" for certain illnesses and "publicly opposed HHS's contradictory positions," Compl. ¶ 33, leading to AAP, on August 19, 2025, "publish[ing] vaccine recommendations that significantly depart from the federal government's guidance, *id.* ¶ 36.  Similarly, in May 2025, AAP "publicly criticized HHS's positions on gender-affirming medical care," *id.* ¶ 39, for "interfer[ing] with the ability of an adolescent, their parents and their physician to determine the best medical care for them, *id.* ¶ 38.  Given the ongoing participation of AAP in public health debates, with repeated public statements expressing AAP's recommendations and views that differ from those of current HHS leadership, tying a proximate timing between those statements and the grant terminations is illusive and, ultimately, unnecessary, given the totality of the circumstantial evidence supporting a likely causal link.  Ironically, HHS's

excuses for the timing of AAP's grant terminations actually help show the causal link to AAP's disfavored speech.

Specifically, HHS argues that any causal link "is undermined by the facts that [1] CDC has terminated six other discretionary awards for non-alignment with agency priorities; [2] CDC and HRSA are both in the process of reviewing existing grants; and [3] both organizations still have grants awarded to Plaintiff and its affiliate." Defs.' Opp'n at 23 (citing Legier Decl. ¶¶ 10, 15, 17, and Baugh Decl. ¶¶ 15, 17). Taking each of these asserted reasons in turn: first, just because HHS has terminated a few other grant awards does not defeat the other circumstantial evidence showing a likelihood of retaliatory animus for the termination of AAP's grants. Moreover, that a *third* of the total grants CDC cancelled, and *all* of the grants HRSA cancelled, under this review belonged to AAP is quite significant. *See* Baugh Decl. ¶ 15. Pointing to the termination of six other grants is incapable of distracting from the fact that more than half of the total terminations under this review were for grants belonging to AAP and occurred on the same day.

As to the second reason, CDC and HRSA issued policy guidance for discretionary grants, on September 30 and October 1, 2025, and, as a result, "CDC and HRSA have been undertaking large-scale reviews of their discretionary award portfolios." Defs.' Opp'n at 4. In the two months of this undertaking, the fact that AAP has been among the first to have its grants terminated, despite never having any federal grant terminated before, *see* Compl. ¶ 24, reflects a selective targeting consistent with the animus expressed publicly by HHS officials, as discussed above, *see supra* Part I.A.3. Rather than "undermin[ing]" a retaliation claim, the fact that AAP has been catapulted to the top of HHS's list for review and termination of the organization's grant awards is telling.

Finally, despite terminating most of AAP's grants, representing two-thirds of AAP's federal grant funding, the third fact cited by HHS that AAP still has several ongoing HHS grants

does not "undermine" the claim of retaliatory action.  Retaliatory actions serve both to punish past disfavored speech and as a warning shot to chill such speech in the future.  The continuing HHS grant awards to AAP simply leaves AAP, and other HHS grant recipients, to ponder the level of critical public debate HHS would tolerate before issuing further grant terminations, including of AAP's four remaining HHS grants, Legier Decl ¶ 17; Baugh Decl ¶ 17, which may serve as an additional deterrent against future protected speech.  As AAP's counsel articulated this point at the hearing, the existence of AAP's remaining grants "keeps the sword of Damocles hanging . . . . [I]f you are trying to silence a critic, you don't drop the atom bomb initially.  First you do something that leaves the . . . affected agency with the ability to still have something to lose."  Mot. Hr'g Tr. 15:17-23.

### (ii)  HHS Officials' Expression of Hostility to AAP's Protected Speech

"AAP has been treated as a bête noir by Secretary Kennedy, other senior HHS officials, and their ideological compatriots, including Children's Health Defense, an organization Secretary Kennedy founded and long chaired."  Pl.'s Mem. at 14.  As described below, without addressing the evidence backing AAP's health policy recommendations, the HHS Secretary has instead impugned AAP's motivations, repeatedly accusing this organization of having conflicts of interest and, worse, attempting to harm children.  This "tone-from-the top" of HHS is echoed by others within HHS leadership positions and the HHS Secretary's close associates.

Several examples of the HHS Secretary's actions regarding and statements about AAP have been presented.  In August 2025, the month after AAP filed, with other plaintiffs, the Massachusetts lawsuit against HHS, AAP was removed from ACIP's subcommittees and the HHS Secretary posted online an image of four corporate donors, with a caption asking whether "AAP's recommendations reflect public health interest, or are, perhaps, just a pay-to-play scheme to

promote commercial ambitions of AAP's Big Pharma benefactors." Scher Decl., Ex. 16.[8]  A few weeks later, on September 4, 2025, the HHS Secretary repeated to the Senate Finance Committee the same accusation that AAP is "gravely conflicted" and that he "wouldn't put a big stake in what they say that benefits pharmaceutical interests."  Compl. ¶ 41.  On November 19, 2025, the HHS Secretary moved beyond accusing AAP of having conflicts of interest to state that the organization had "betrayed [its] oath to first do no harm" and committed "malpractice."  Scher Decl., Ex. 12. Notably, these accusations do not appear to critique the evidence collected by AAP or the analytical methodologies used by AAP to support its public health policy positions but rather amount to dismissal and disparagement of the organization itself as conflicted and unethical.

The statements from the top leadership of HHS that were made after the instant lawsuit was filed are particularly probative of the causal link between that leadership's animus towards AAP and the grant terminations at issue.  On December 27, 2025, HHS General Counsel Mike Stuart posted about the suit: "It's our money, and it's HHS's duty to protect taxpayers from wasteful spending.  And that's exactly what I'm going to do."  Scher Decl., Ex. 27.  The Secretary responded almost immediately: "Thank you, Mike Stuart, for stopping this wasteful spending and fiercely defending the interests of hardworking Americans."  Scher Decl., Ex. 28.

AAP has presented similarly pejorative statements about AAP over a matter of months from the top and down the line of HHS leadership.  For instance, in April 2025, a senior advisor to the HHS Secretary, Calley Means, accused AAP of being part of "demonic forces" that "in many cases, are practicing evil," and are "committing war on kids," Scher Decl., Ex. 18,

---

[8]     At the hearing, AAP indicated that "it might be" enough, to establish a First Amendment violation "if the only full-time HHS employee who [had] made negative, pejorative, or hostile comments about AAP [were] Secretary Kennedy," but noted there is "so much other evidence that goes hand in hand with" the Secretary's statements.  Mot. Hr'g Tr. 26:12-21; *see also id.* at 24:14-16 ("[W]e have got the secretary, . . . the head of the agency . . which . . . by itself is probably sufficient.").

39

accompanied by the warning that the Make America Healthy Again movement "is intended to [be] a very harsh examination of what the American Academy of Pediatrics has been advising patients." Compl. ¶ 43 (internal quotation marks and footnote omitted).[9]

The new ACIP members hand-picked by the HHS Secretary have also been vocal in their dislike of AAP and AAP's policy recommendations on vaccines. Martin Kulldorff, the Chairman of ACIP, on July 1, 2025, wrote about AAP that it is "[a]stonishing that pro-mercury in kids is their battle cry!!" Compl. ¶ 48. Another ACIP member, Retsef Levi, on August 4, 2025, claimed that AAP's members "are so vaccine-fanatics, or perhaps financially conflicted, they ignore their own research on the devastating harm of expelling children from school! Continuous moral & scientific failure of the AAP[.]" Scher Decl., Ex. 20. On August 19, 2025, Levi rhetorically asked for explanation behind AAP's pro-vaccination policies and proffered as potential answers "financial interests," "personal vendetta," and "fanaticism." Scher Decl., Ex. 21. On December 30, 2025, Levi rhetorically asked who AAP represents followed by a photograph displaying the logos of four major pharmaceutical companies. Scher Decl., Ex. 29.

HHS discounts this evidence as "a few negative statements made by the Secretary about [AAP] and . . . from three others who have no apparent role whatsoever with respect to these grants." Defs.' Opp'n at 5. Yet, the D.C. Circuit has relied upon public criticism by advisors to the decisionmakers to support a showing of animus. *FTC*, 2025 WL 2988966, at *8 ("[T]hree

---

[9]     Indeed, the day after HHS terminated AAP's seven grants, "[t]he account dedicated to Secretary Kennedy's 'Make America Healthy Again' movement posted: 'Huge MAHA Win Big Pharma's puppet, the American Academy of Pediatrics, just lost federal funding thanks to HHS. Under RFK Jr., taxpayer dollars will no longer bankroll propaganda, only organizations committed to gold-standard, evidence-based science will receive support.'" Compl. ¶ 61 (quoting MAHA Action (@MAHA_Action), X (Dec. 17, 2025, at 9:17pm ET), https://perma.cc/DVM3-SXKE). That same day, the Children's Health Defense Fund, an organization the Secretary had long chaired, posted "CHD applauds the HHS decision to end seven multimillion dollar grants to the American Academy of Pediatrics. While this trade organization poses as a professional association promoting children's health, in fact it is a front organization for the pharmaceutical industry. It markets anything and everything that that industry sells. . . . It's time for change, and Secretary Kennedy is bringing that." Scher Decl., Ex 2, Children's Health Defense (@ChildrensHD), X (Dec. 17, 2025, at 8:53pm ET), https://perma.cc/2CEY-XEAT, ECF No. 21-3.

individuals who had publicly criticized [plaintiff's] reporting by name were involved with [the] Chairman . . . or the Commission at the time the Demand issued."). Even if some of the quoted HHS officials from ACIP have "no apparent role" regarding the terminated grants, their expressed views are relevant since they are influential with the HHS Secretary and within HHS.

HHS attempts to blunt the force of these negative—and even some downright extreme—public statements against AAP by HHS officials, by arguing that "[e]ven if Plaintiff provided sufficient evidence to show that some individuals at the Department of Health & Human Services strenuously disagreed with certain of Plaintiff's positions, that is not enough." Defs.' Opp'n at 18. This is a good point. As this Court emphasized at the hearing, "agency heads have to be able to speak out critically about positions with which they disagree without forfeiting the agency's ability to terminate grants to organizations expressing contrary positions so long as, of course, the termination is based on appropriate reasons." Mot. Hr'g Tr. 28:2-7. Here, AAP provides much additional evidence, beyond the statements by the HHS Secretary and other HHS officials, to establish the elements of the First Amendment retaliation claim, a fact that HHS acknowledges by describing this circumstantial evidence as being "sort[able] into five buckets," Defs.' Opp'n at 18, and the public statements fall into only one of those "buckets."

### (iii) Absence of a Proffered Legitimate Alternative Explanation for Adverse HHS Action

Critical to the causal link to show a First Amendment retaliation claim here is that HHS offers only a pretextual explanation for its adverse actions, namely, that "[t]he grants were terminated because they were not aligned with agency priorities pursuant to 2 C.F.R. § 200.340." Def.'s Opp'n at 17. Recall that, due to the fact that grants are awarded over multiyear terms, they sometimes extend across presidential administrations and after a change in administrations, "awardees may be expected in their continuation applications to propose programmatic shifts in

response to changed agency priorities." Waldron Decl. ¶ 15. Following the change of administrations in January 2025, that is exactly what AAP did, "work[ing] closely with agency program staff to ensure its projects and continuation of funding applications conformed to the priorities and preferred terminologies of the new administration." *Id.* ¶ 16. Consistent with this respectful approach to a new administration's priorities, starting in early 2025, "after the issuance of multiple executive orders related to diversity, equity, and inclusion, AAP modified [its] work plans and continuation applications, whenever needed, to align with new agency priorities." *Id.* ¶ 27. Specifically, AAP communicated "with subawardee partners, including through individual calls, to let them know they needed to be complaint with the executive orders" and "regularly communicated with [HHS] agency liaisons on the steps [AAP] w[as] taking and to seek their guidance on how [AAP] should proceed." *Id.* Additionally, until AAP "could ensure compliance with the executive orders," the organization "paused some webinars and other programming." *Id.* Due to AAP's compliance efforts, "[a]gency staff never suggested that the modifications submitted by AAP were inadequate or ever asked AAP to make changes to conform to changed agency priorities that AAP failed to implement." *Id.* ¶ 28. Each of the terminated grants had received approval for a continuation of funding application by the current administration with the earliest issued in April 2025 and most recently in September 2025. *Id.* ¶ 17.

In the wake of these efforts by AAP to accommodate the new administration's policies in implementing the grant awards, and the approval by CDC and HRSA staff that such accommodations had been successful, as demonstrated by the approvals of continued funding for each of the seven terminated grants, the abrupt grant terminations are suspicious—particularly so given the animosity toward AAP expressed in public statements by HHS and ACIP leadership.

The explanations for the terminations provided in the HHS termination letters only confirm suspicions that the terminations are retaliatory because the explanations are implausible on their face. For instance, the termination letters sent by HRSA includes the sentences: "HRSA's current priorities include focusing agency resources toward activities that more directly support improved health outcomes for adolescents and young adults, including the addition of a focused emphasis on nutrition and the prevention and management of chronic disease. These enhancements will help ensure the program remains responsive and evidence based." Waldron Decl., Exs. 4-7. Yet, AAP points out that both HRSA-1 and -2 are designed for the precise purpose cited as "HRSA's current priorities": to improve health outcomes for adolescents. Waldron Decl. ¶¶ 38-39. HHS has no response to this fact.

Additional circumstances render the justification provided in the termination letters suspect. AAP was targeted for termination of grant funding on projects with multiple awardees, making clear that the projects were not the issue but only AAP. AAP was one of three national partners awarded grant funds under HRSA-3, "which addresses universal newborn hearing screenings," but "[n]either of the other two [partners] received termination notices, and they are now missing a key partner." Waldron Decl. ¶ 37. AAP's grant for CDC-1 was terminated purportedly because the program—"to improve clinical and public health outcomes for infants and children with birth defects [and] infant disorders," Waldron Decl. ¶ 19—was deemed, inexplicably, as no longer aligned with agency priorities, while "none of the three dozen other organizations funded under this award have received termination notices," *id.* ¶ 35.[10]

---

[10]     The termination of AAP's four HRSA grants are particularly suspect due to how rarely such termination decisions apparently occur. According to a publicly accessible HHS database, called "Tracking Accountability in Government Grants System" ("TAGGS"), in 2025, HRSA awarded $10.7 billion in grant funds, Compl. ¶ 21, and terminated for the entire year, only five grants, four of which had been awarded to AAP. The fifth award was terminated "for cause." *See Grants Terminated*, TAGGS, https://perma.cc/XTK6-3T3V (archived Jan. 11, 2026).

While HHS is correct that, generally, a starting presumption is that "public officers have 'properly discharged their official duties,'" Defs.' Opp'n at 16, this is merely a presumption that may be overcome.  In this case, the "constellation of undisputed facts and circumstances compiled in this still-preliminary record" are enough to conclude that this presumption is rebutted.  *FTC*, 2025 WL 2988966, at *6.  This "constellation" of evidence encompasses statements made by senior ranking HHS officials and advisors since this lawsuit was initiated, which statements reflect a highly politicized prism in viewing AAP and its efforts to vindicate its First Amendment rights.  Specifically, three days after the instant lawsuit was filed, HHS's general counsel, Michael Stuart, posted on social media comments attacking the perceived political leanings of AAP's counsel of record in this case and disparaged AAP, a national pediatricians' professional organization, as engaging in "wasteful spending" for "radical causes."  Scher Decl., Ex. 27.[11]  This is an eyebrow-raising stretch to characterize as "wasteful" or "radical" grant awards to AAP for, *inter alia*, programs to improve newborn care for infants and children with perinatal substance exposure, birth defects and other infant disorders; to strengthen doctor skills in supporting children with Tourette Syndrome and ADHD, and the unique needs of autistic children and their families in rural areas; to help children with congenital heart defects; to reduce rates of sudden unexpected infant death; and to strengthen food allergy resources in schools and information sharing about treating sepsis in children.  Waldron Decl. ¶¶ 19-25.  The HHS General Counsel went on to claim credit for stopping the grant funding to AAP, stating, "It's our money, and it's HHS's duty to protect taxpayers from wasteful spending.  And that's exactly what I'm going to do."  Scher Decl., Ex. 27.

---

[11]    The HHS General Counsel stated: "AAP's decision to hire radical, anti-Trump, anti-faith, and anti-mainstream counsel for its lawsuit against HHS sends a clear message about its true agenda.  Democracy Forward's client list reads like a who's-who of radical special interests. . . . The arrogance behind this lawsuit is staggering—AAP seems to believe its their money to spend as they please.  Wrong!  It's our money, and it's HHS's duty to protect taxpayers from wasteful spending.  And that's exactly what I'm going to do.  The days of unchecked funding for radical causes are over."  Scher Decl., Ex. 27.

Seventeen minutes later, the HHS Secretary responded: "Thank you, Mike Stuart, for stopping this wasteful spending and fiercely defending the interests of hardworking Americans."  Scher Decl., Ex. 28.  This interchange between the HHS Secretary and HHS General Counsel suggests that the grant termination decisions were made at this senior level of HHS rather than by CDC and HRSA staff supervising the grants—which explains why this staff was unaware of AAP's grant terminations on December 16, 2025, or even the next day.  Waldron Decl. ¶ 31 (noting that the day after termination notices were sent out, "CDC program staff requested information about the Sepsis Awareness project and ECHO sessions, inquiring about how the CDC could promote January 2026 ECHO sessions via social media, . . . suggest[ing] that the CDC staff fully anticipated continuation of the project as planned."); *see* Compl. ¶ 55 ("AAP staff were told by agency staff that they were unaware of these terminations, which AAP staff understood to mean that the terminations came at the direction of HHS leadership.").

In sum, a combination of the overlapping timeline between the retaliatory acts taken by HHS and AAP's participation in the Massachusetts lawsuit, the number and negativity of statements made by HHS leadership over the course of months, and the complete absence of a plausible legitimate alternative explanation for adverse HHS action is sufficient to find that AAP has demonstrated a likelihood of a causal link between its protected speech and the adverse action.

***

Accordingly, AAP has demonstrated a likelihood of prevailing on its First Amendment retaliation claim.[12]

---

[12]    AAP's Claims II and V need not be discussed.  *See A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 210 (D.D.C. 2020) ("Plaintiffs need only establish a likelihood of success on the merits of one claim to obtain the injunctive relief that they seek."); *see also* Mot. Hr'g Tr. at 8:16 (AAP's counsel stating that Count V provides "another pathway to the same outcome" as Counts I and II.).

**B.      AAP Has Demonstrated a Likelihood of Irreparable Harm in the Absence of Injunctive Relief**

AAP has demonstrated a likelihood of suffering irreparable harm in the absence of the requested relief.  To make this showing, a movant must establish that the alleged injury is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Such a showing requires "proof indicating that the harm is certain to occur in the near future."  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  This is a "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

AAP proceeds on three theories to establish irreparable harm: (1) the impairment of its First Amendment rights and the resulting chilling effect created therefrom, (2) the reputational harm done to the organization, and (3) "the threat to the very existence of several AAP programs." Pl.'s Mem. at 21-22.  AAP's first two theories are sufficient to make this showing.

At the outset, HHS disputes, as "not the law," AAP's position that a showing of "a loss of First Amendment freedoms" is sufficient to show irreparable harm.  Defs.' Opp'n at 26.  As support, HHS cites *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024), for the proposition that "[a]n alleged deprivation of a constitutional right does not 'constitute irreparable harm,'" and "[e]ven in the sensitive areas of freedom of speech and religion, where the risk of chilling protected conduct is especially high, we do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights."  *Id.* (quoting *Hanson*, 120 F.4th at 244).  To be sure, while the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Paxton*, 138 F.4th at 585 (quoting

*Pursuing Am.'s Greatness*, 831 F.3d at 511), slightly more is required to obtain a preliminary injunction.  For preliminary injunctive relief on a showing of a First Amendment violation, as already noted, "a party must show that their 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'"  *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991)).

AAP easily demonstrates that its First Amendment interests are threatened at the time relief is sought.  Not only has AAP established a likelihood of success on its First Amendment retaliation claim and the irreparable injury that flows from that violation, but also that its First Amendment interests continue to be threatened and impaired by HHS.  AAP routinely employs its members' expertise by speaking openly about matters of public interest, including views on two particular public health policy topics—gender affirming care for children and the utility of vaccinations—that are disfavored by the current leadership of HHS.  As in *American Bar Association v. U.S. Department of Justice*, 783 F. Supp. 3d at 247, "the First Amendment injury is concrete and ongoing" because AAP "regularly engages in protected expressive activity, and [defendants'] termination of its grants directly punishes that activity."  Especially stark are the circumstances immediately preceding the termination of these grants.  Several critical comments made by HHS officials coincided with and contemplated events in AAP's ongoing litigation in the District of Massachusetts.  That the termination of two-thirds of AAP's federal grant funding occurred the day before a hearing in that lawsuit was an obvious distraction for AAP and, on this early record in the case, suggests an effort to do more than distract but also to coerce a change of conduct.

Moreover, HHS continues to hold a third of AAP's federal funding in ongoing grants.  This continued leverage over AAP functions to "keep[] the sword of Damocles hanging" as a deterrent against future speech, Mot. Hr'g Tr. 15:17-18, and litigation conduct.  Worse yet, though

47

AAP has shown no inclination to be cowed or coerced, the performative power of abruptly terminating millions of dollars of federal grant funding to a prominent organization cannot be ignored by other individuals and organizations involved in public health policy issues, with the concomitant reluctance of such participants to risk the loss of federal funding and the resultant chilling of debate.

AAP has also demonstrated irreparable harm to its reputation.  *See* Pl.'s Mem. at 22; Pl.'s Reply at 21 n.7.  "Reputational injury can also suffice to establish irreparable harm."  *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) (PLF) (citing *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (HHG) (finding plaintiffs' business "reputation will be damaged by [agency]'s characterization of them . .  as 'enticing' senior citizens into meetings, and 'pressuring' them to obtain reverse mortgages 'under the guise of sound estate planning'")).  AAP's loss of funding will force the organization to "break off relationships with partner organizations, damaging AAP's reputation as a leader in the field and as a trusted partner."  Pls.' Mem. at 22.  "In the wake of the award terminations, AAP received outreach from many partners and beneficiaries of [its] work noting their disappointment in the terminations, emphasizing the importance of the discontinued projects, and expressing hopes that the awards would be reinstated."  Waldron Decl. ¶ 42.  "[T]he harm to [AAP's] reputation is a direct result of the termination of federal funding that plaintiffs had been using to partner with [partner organizations] and provide resources to sub-awardees.  Such reputational harm is considered to result from the challenged action and is indeed irreparable, considering such harm is impossible to quantify."  *Urb. Sustainability*, 2025 WL 2374528, at *38.

HHS errs to rely on *Storch v. Hegseth*, No. 25-cv-415 (ACR), 2025 WL 2758238, at *8 (D.D.C. Sept. 24, 2025), to argue that AAP's reputational harm does not amount to irreparable

injury.  *See* Defs.' Opp'n at 30.  At issue in that case was the firing of eight inspectors general without the statutorily-required 30-day notice and substantive rationale.  *Storch*, 2025 WL 2758238, at *2.  Reasoning that "[i]f the Court reinstated Plaintiffs, the President could refire each of them by providing the required notice and rationale," the court found "that 'rationale' could well cause the very reputational harm they seek to avoid."  *Id.* at *8.  In other words, the reputations of the *Storch* plaintiffs were better served, in the court's view, without the requested reason for the firings being spelled out by the President.  That is a far cry from the instant situation, where the reputational harm to AAP is a direct consequence of the grant terminations since not only does this adverse retaliatory action make AAP a risky, rather than a trusted, partner for any other organization seeking federal funding, those in partnership with AAP are already suffering the consequences.  For example, some subawardees, for whom "the funds constitute a significant portion of their payroll," will face "immediate disruptive impact on their personnel."  Waldron Decl. ¶ 44.  Others partner organizations must continue to endeavor to carry out critical projects facing "increased difficulty without the key partnership of AAP."  *Id.* ¶ 41.  These harms to AAP's partners would almost certainly harm AAP's reputation in the field.

AAP has established irreparable injury here.

## C.    The Balance of Equities and Public Interest Favor AAP

The remaining factors, the balance of the equities and the public interest, merge where, as here, the government is the opposing party.  *Pursuing Am.'s Greatness*, 831 F.3d at 511.  These merged factors likewise favor AAP.

"In First Amendment cases, the likelihood of success will often be the determinative factor."  *Paxton*, 138 F.4th at 584 (quoting *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022)).  The finding that AAP has established a likelihood that HHS's termination decision was retaliatory reduces most of the complexity of the inquiry of the remaining factors.  Quite

simply, "[g]overnment actions in contravention of the Constitution are 'always contrary to the public interest.'" *A.B.A.*, 783 F. Supp. 3d at 248 (quoting *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (BAH)).  As the D.C. Circuit observed in *Media Matters for America v. Paxton*, 138 F.4th at 585, when granting a preliminary injunction against a defendant government entity, "'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." (*Pursuing Am.'s Greatness*, 831 F.3d at 511).  In other words, an injunction against the perpetuation of unconstitutional government action axiomatically favors the public interest.

Additionally, AAP is correct that the public interest supports "allowing AAP's literally life-saving programs to remain active during the pendency of the litigation."  Pl.'s Reply at 21. For instance, without restoration of the terminated grant funding, "there is no nationally coordinated approach to support new parents in understanding and practicing safe sleep" even though "[s]udden unexpected infant death is the leading cause of death for infants under one year of age" and loss of the program could "result in an increase in sleep-related deaths in healthy infants."  Compl. ¶ 67.  Without funding for the Universal Newborn Hearing Screening Program, there will be "delays in identifying infants who are deaf and hard of hearing, and corresponding delays in access to critical therapies and services to improve language acquisition and communication . . . "which can impact neuro cognitive development, learning, and communication."  *Id.*  The public interest favors maintaining such grant programs in accordance with their grant award terms.[13]

---

[13]    HHS asks that any injunction be limited so that HHS is not required "to renew the grants at the end of their terms," and HHS is not prevented from terminating the "grants for permissible and *truly* nonretaliatory reasons." *A.B.A.*, 783 F. Supp. 3d at 248; *see* Mot. Hr'g Tr. 63:16-64:5 ("We point out that in *ABA*, Judge Cooper granted the PI because it was very limited in scope in several ways.").  Such explicit limitations in the order are unnecessary since nothing about enjoining HHS from violating the law as to the terminated grants bars HHS from complying with the law with respect to the same and any other grants.

HHS raises two unavailing arguments.  First, HHS contends that "[g]ranting a preliminary injunction would disrupt the Department's review of existing grants."  Defs.' Opp'n at 31.  Under an injunction, however, HHS remains free to review grants, but in compliance with the law.  HHS was never free to retaliate with terminations of grant awards to recipients engaging in protected First Amendment speech disfavored by current HHS leadership, and the public suffers no harm when HHS is restrained from doing so.  Second, HHS avers that "the government will likely be unable to recover the grant funds once they are disbursed."  Defs.' Opp'n at 31-32.  This argument is undercut by the facts that the terminated grants were recently approved to continue by HHS and HHS continues to fund some of these same programs through grants to other awardees.  Further, the harm to the public whose health programs may become collateral damage to HHS's likely retaliatory acts against AAP, outweighs the harm suffered by HHS of having to disburse funds to a disfavored speaker.  In short, neither of HHS's contentions are sufficient to upset the finding that the merged factors favor imposition of injunctive relief.[14]

---

[14]    HHS requests that any injunction should be "stayed pending the disposition of any appeal . . . or, at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals."  Defs.' Opp'n at 32.  This request is denied.  "A stay is not a matter of right."  *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).  "It is instead 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'  *Id.* (brackets in original).  Stays pending appeal "are granted only in extraordinary circumstances."  *Graves v. Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in Chambers).  In deciding whether to grant a stay pending appeal, a court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  The foregoing analysis has already demonstrated that AAP has established a likelihood of success on the merits, *see supra* Part III.A, and that the balance of equities and public interest favor AAP, *see supra* Part III.C.  As to the remaining factor, HHS cannot establish irreparable injury.  APP has shown a strong likelihood of success on the claim that HHS has acted unconstitutionally to retaliate against AAP for exercise of its First Amendment rights.  HHS does not enjoy a right to violate the constitutional protections of another and so is not irreparably injured by any injunction preventing the perpetuation of its retaliation.

As AAP points out, the same result would follow even if, for purposes of the stay analysis, HHS's pretextual explanation were credited: If HHS's claim is correct that "the terminations of AAP's grants were merely part of a broad, ongoing effort to review CDC's and HRSA's grants for consistency with agency priorities, there should be no greater urgency to terminate the AAP awards than the many other awards that are apparently still being funded as the agencies complete their reviews."  Pl.'s Reply at 22.  Thus, under either set of facts, HHS cannot demonstrate a

### D.    Bond

HHS requests that "any injunction relief be accompanied by a bond," citing Federal Rule of Civil Procedure 65(c) which states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Defs.' Opp'n at 32. This Rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

AAP asks for nothing more than "a minimal bond" because "AAP does not have the resources to function without the award money that Defendants unlawfully withdrew—and so does not have the resources for a bond either." Pl.'s Mem. at 24 n.4. AAP also "cannot reallocate funds for its research projects without further reducing resources for other programs and, in turn, putting those programs at risk." Compl. ¶ 66. "Requiring a significant bond here would impair [AAP's] ability to seek recourse in court to vindicate alleged violations of their rights, especially considering [AAP's] already difficult financial straits." *Urb. Sustainability*, 2025 WL 2374528, at *39. At the hearing, AAP stated that a bond of "a two-figure amount . . . maybe $100 would be appropriate." Mot. Hr'g Tr. 41:2-4. Accordingly, a bond of $100 is imposed.

## IV.    CONCLUSION

For the foregoing reasons, AAP's motion for a preliminary injunction is granted. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  January 11, 2026

_____
**BERYL A. HOWELL**
United States District Judge

---

likelihood of irreparable harm. Having proven none of the four factors necessary for a stay, HHS's request for a stay is denied.